1   BENJAMIN B. WAGNER
    United States Attorney
2   MATTHEW D. SEGAL
    Assistant United States Attorney
3   501 I Street, Suite 10-100
    Sacramento, CA 95814
4   Telephone:  (916) 554-2700
    Facsimile:   (916) 554-2900
5

6   MYTHILI RAMAN
    Acting Assistant Attorney General
7   Criminal Division, United States Department of Justice
    JAMES SILVER
8   Trial Attorney
    Computer Crime and Intellectual Property Section
9   1301 New York Avenue, Suite 600
    Washington, DC 20530
10  Telephone:  (202) 514-1026

11

12

13                  IN THE UNITED STATES DISTRICT COURT

14                  EASTERN DISTRICT OF CALIFORNIA

15
    UNITED STATES OF AMERICA,            CASE NO.  13-CR-0082 KJM
16
                         Plaintiff,
17                                       DATE: JANUARY 29, 2014
                    v.                   TIME: 9:00 A.M.
18                                       COURT: Hon. Kimberly J. Mueller
    MATTHEW KEYS,
19
                         Defendants.
20

21

22

23                  **OPPOSITION TO MOTION TO SUPPRESS**

24

25

26

27

28
                                1

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................3

I.      INTRODUCTION ...................................................................................................7

II.     STATEMENT OF RELEVANT FACTS ..............................................................8

       A.      The FBI Investigates Five Different Pseudonymous E-Mail Accounts     Used in December 2010 to Harass Fox 40. ....................................................8

       B.      The L.A. Times Is Hacked. ...........................................................................9

       C.      Its Investigation Ongoing, the FBI Notes the Possible Inconsistency Between the   E-Mail Addresses Leading to Keys, Versus Those That Had Been Anonymized. .................................................................................................10

       D.      The Sacramento Field Office Transfers the Investigation to the Los Angeles Field Office. ................................................................................................11

       E.      The FBI Subsequently Obtains New Evidence Tying Keys to the Hacking of the L.A. Times and the Pseudonymous E-mails to Fox 40. ..........................11

       F.      The FBI Obtained A Search Warrant For Keys' New Jersey Residence. .........14

       G.     While the Search Warrant is Executed, Keys Consents to An Interview With the   FBI, and Admits to Sending the Pseudonymous E-Mails to Fox 40, Attacking the   L.A. Times, and Using the Pseudonym AESCracked. ...........................15

III.    LEGAL ANALYSIS .............................................................................................16

       A.      The Search Warrant Satisfied the Fourth Amendment. ....................................16

       B.      The Search Warrant Contained No Material Omissions and A Franks Hearing Is   Not Required. ...........................................................................................22

       C.      Keys' Statements to the Government Were Obtained From an Independent Source   and Should Be Admitted Into Evidence Even if the Court Finds the Warrant     Defective. ...............................................................................26

       D.      Keys Validly Waived His *Miranda* Rights. ....................................................26

IV.    CONCLUSION .....................................................................................................29

2

1

## TABLE OF AUTHORITIES

2  **Federal Cases**

3  Brown v. Illinois,
4      422 U.S. 590 (1975) …………………………………………………………………..15

5  Colorado v. Connelly,
6      479 U.S. 157 (1986) ……………………………………………………………… 21

7  Cottrell v. Trimble,
8      2012 WL 3042437 (E.D.Cal. 2012) ………………………………………………… 1

9  Franks v. Delaware,
10      438 U.S. 154 (1978)………………………………………………………16, 17, 19, 20

11  Illinois v. Gates,
12      462 U.S. 213 (U.S. 1983)………………………….........................................13

13  Kyllo v. United States,
14      533 U.S. 27 (2001)…………………………………………………………………11

15  Miranda v. Arizona,
16      384 U.S. 436 (1966)……………………………………………………………….. 21

17  Murray v. United States,
18      487 U.S. 533 (1988)………………………………………………………………. 20

19  United States v. Adjani,
20      452 F.3d 1140 (9th Cir. 2006) …………………………….…………………………..10

21  United States v. Bernard S.,
22      795 F.2d 749 (9th Cir. 1986)……………………………………………………….21

23  United States v. Bertrand,
24      926 F.2d 838 (9th Cir. 1991)…………………………………………………………..13

25  United States v. Binder,
26      769 F.2d 595 (9th Cir. 1985)……………………………………………………….21

27  United States v. Blake, No. 1:08-cr-0284 OWW,
28      2010 WL 702958 (E.D. Cal. Feb. 25, 2010)……………………………...............................12

United States v.
    Brobst, 558 F.3d 982 (9th Cir. 2009) ……………………….……...……....…...10, 11

United States v. Chavez-Miranda,
    306 F.3d 973 (9th Cir. 2002)…………………….……………….…………………...17

United States v. Cotterman,
    709 F.3d 952 (9th Cir. 2013) ……………………….…….........................................11

United States v. Comprehensive Drug Testing, Inc. ("CDT III"),
    621 F.3d 1162 (9th Cir. 2010)……………………….……………………………...12

United States v. Craighead,
    539 F.3d 1073 (9th Cir. 2008)……………………….……………..........16, 17, 19, 20

United States v. Crews,
    502 F.3d 1130 (9th Cir. 2007) ……………………….……………………………...16

United States v. Garibay,
    143 F.3d 534 (9th Cir. 1998)……………………….……………………………….21

United States v. Garza,
    980 F.2d 546 (9th Cir. 1992) ……………………….……………………………...17

United States v. Giberson,
    527 F.3d 882 (9th Cir. 2008)……………………….………………………….10, 11

United States v. Greathouse,
    297 F.Supp.2d 1264 (D. Or. 2003)…………………….…………………………14

United States v. Hay,
    231 F.3d 630 (9th Cir. 2000)……………………….…………………………11, 17

United States v. Hernandez-Escarsega,
    886 F.2d 1560 (9th Cir. 1989)……………………….…………………………14

United States v. Kelley,
    482 F.3d 1047 (9th Cir. 2007)……………………….…….……………………17

United States v. Kelley,
    953 F.2d 562 (9th Cir. 1992)……………………….……………………21, 22

United States v. Kim,
    105 F.3d 1579 (9th Cir. 1997)……………………………………..…………………………22

United States v. Lacy,
    119 F.3d 742 (9th Cir. 1997)……………………………………………………………11, 14

United States v. Leon,
    468 U.S. 897 (1984)……………………………………………….……………………………15

United States v. Lewis,
    833 F.2d 1380 (9th Cir. 1987)………………………………………………...21, 22

United States v. Mann,
    389 F.3d 869 (9th Cir. 2004)……………………………………………………………10

United States v. Martin,
    781 F.2d 671 (9th Cir.1993)…………………………………………………………21, 22

United States v. McQuisten,
    795 F.2d 858 (9th Cir. 1986)……………………………………………………14

United States v. Prideaux-Wentz,
    543 F.3d 954 (7th Cir. 2008)…………………….....……………………………15

United States v. Reeves,
    210 F.3d 1041 (9th Cir. 2000) …………………………………………………………16

United States v. Rude,
    88 F.3d 1538 (9th Cir. 1996)…………….…..……………………………………10

United States v. Schesso,
    730 F.3d 1040 (9th Cir. 2013)…………………….....……………………11, 12, 13, 14

United States v. Seiver,
    692 F.3d 774 (7th Cir. 2012)…………………………………………………….....14

United States v. Shetler,
    665 F.3d 1150 (9th Cir. 2011)…………….……………………………………………21

United States v. Shi,
    525 F.3d 709 (9th Cir. 2008 )………………….…………………………….......15

United States v. Silva,
 470 F. Supp. 2d 1202 (D. Haw. 2006)……………………………………………………17, 19

United States v. Stanert,
 762 F.2d 775 (9th Cir. 1985)…………………………………….....................................16, 17

United States v. Tamura,
 694 F.2d 591 (9th Cir. 1982)………………………………………………………………12

United States v. Vosburgh,
 602 F.3d 512 (3d Cir. 2010)………………………………………………………………14

United States v. Wulferdinger,

 782 F.2d 1473 (9th Cir. 1986) ……………………………………………………...17, 19

**Statutes**

18 U.S.C. § 371…………………………………………………………………………….8

18 U.S.C. § 1030(a)(5)…………………………………………………………………….8

18 U.S.C. § 1030(a)(6)…………………………………………………………………….8

**Constitutional Provisions**

U.S. Const. Amend. IV ............................................................................................10

1  BENJAMIN B. WAGNER
   United States Attorney
2  MATTHEW D. SEGAL
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone:  (916) 554-2700
   Facsimile:  (916) 554-2900
5
   MYTHILI RAMAN
6  Acting Assistant Attorney General
   Criminal Division, United States Department of Justice
7  JAMES SILVER
   Trial Attorney
8  Computer Crime and Intellectual Property Section
   1301 New York Avenue, Suite 600
9  Washington, DC 20530
   Telephone:  (202) 514-1026
10
   Attorneys for Plaintiff
11 United States of America

12

13                    IN THE UNITED STATES DISTRICT COURT

14                    EASTERN DISTRICT OF CALIFORNIA

15  UNITED STATES OF AMERICA,              CASE NO.  2:13-CR-000820 KJM

16                         Plaintiff,       OPPOSITION TO MOTION TO SUPPRESS

17             v.                           DATE: January 29, 2014
                                            TIME: 9:00 a.m.
18  MATTHEW KEYS,                           COURT: Hon. Kimberly J. Mueller

19                         Defendant.

20

21              I.      **INTRODUCTION**

22        After a nearly two-year-long investigation into multiple pseudonyms responsible for online

23  attacks against Sacramento television station KTXL FOX40 ("Fox 40"), and the website of the *Los

24  Angeles Times* newspaper (*L.A. Times*), the Federal Bureau of Investigation ("FBI") ultimately obtained

25  a search warrant for Defendant Matthew Keys' ("Keys'") Secaucus, New Jersey residence.  Agents did

26  not arrest Keys, but they gave him *Miranda* warnings nonetheless.  (Keys Interview Tr. 1-2, ECF No.

27  23-5.)  Keys understood and responded to questions, and provided a written statement.  There is little

28  doubt as to what happened in the interview, because the FBI audio-recorded the entire encounter.  After

7

1  waiving his Miranda rights, Keys admitted to his involvement in the hacking of the L.A. Times, and to

2  sending a series of disparaging, sometimes threatening e-mails to Fox 40 "as an angry former

3  employee."  (Keys Interview Tr. 49, ECF No. 23-5.)

4      Keys was indicted on March 14, 2013.  (ECF No. 1.)  Keys now asks the Court to suppress his

5  oral and written statements to the FBI, along with the FBI's records of Keys' oral statement, information

6  obtained from the search warrant, and other evidence.  The motion should be denied.

## II.    STATEMENT OF RELEVANT FACTS

### A.    The FBI Investigates Five Different Pseudonymous E-Mail Accounts

### Used in December 2010 to Harass Fox 40.

10     On or about December 1, 2010, Brandon Mercer ("Mercer"), then employed as a news producer

11  at Fox 40, received the first of what would become a series of unsolicited, sometimes threatening e-

12  mails sharing a theme of disparaging Fox 40's business practices.  (Search Warrant ¶ 7, ECF No. 23-1.)

13  Mercer reported the e-mails to the Sacramento field office of the FBI.  (*Id.* ¶ 8.)

### 1.    Some of the Pseudonymous E-Mail Accounts Are Linked to Keys;

### Others Are Not.

16     The first such e-mail came from the address foxmulder4099@yahoo.co.uk, and suggested that its

17  author had obtained Fox 40's e-mail contact list, which Fox 40 used to communicate with its viewers.

18  (*Id.* ¶ 9.)  The e-mail offered some sample viewer e-mail addresses as apparent evidence that he had in

19  fact obtained the list.  (*Id.*)  Mercer received several more similarly-themed e-mails from

20  foxmulder4099@yahoo.co.uk.  (*Id.*)

21     The next day, Mercer received an e-mail from the address cybertroll69x@hotmail.com

22  (hereinafter "cybertroll69x"), which appeared to forward a message from a then-current Fox 40

23  employee, "J.H.," claiming that foxmulder4099@yahoo.co.uk was Keys.  (*Id.* ¶ 10.)  The then-current

24  Fox 40 employee denied sending the message.  (*Id.*)  The FBI obtained records showing that the

25  cybertroll69x e-mail address was registered by someone providing the name Matt Keys and a

26  Sacramento zip code, and from an IP address in Sacramento.  (*Id.* ¶ 11.)

27     On or about December 3, 2010, Mercer received an e-mail from a third pseudonym, "Cancer

28  Man."  (*Id.* ¶ 12.)  This e-mail contained the phrase "watch yourselves Fox 40" and appeared to contain

an e-mail that had been sent from the American Cancer Society to Cancer Man.  (*Id.*)  The e-mail from the American Cancer Society to Cancer Man contained information suggesting that Cancer Man had contacted the American Cancer Society using the e-mail address CancerMan4099@yahoo.co.uk, and provided the contact name "MATTHEW KEYS."  (*Id.*)

Also on or about December 3, 2010, a Fox 40 customer complained about receiving unsolicited e-mail from the address fox40truthers@gmail.com.  (*Id.* ¶ 13.)

Ultimately, the FBI learned that five different e-mail accounts had been used to harass Fox 40 and its customers.  (*Id.* ¶ 15.)  Although the FBI linked two of the accounts to Keys for the reasons described above, the remaining three accounts were not yet tied to Keys, and IP address analysis suggested that the messages were sent using proxy servers.  (*Id.*)

### 2. Keys Contacts Mercer and Predicts that the *L.A. Times* Will Be Hacked.

On or about December 12, 2010, a person claiming to be Matthew Keys, using an e-mail address of Matthew@sactownmedia.com, sent Mercer an e-mail claiming to have infiltrated the group Anonymous.  (*Id.* ¶ 16.)  Keys further stated that he had access to future operations of Anonymous, including those against PayPal, Amazon, Fox News, and the L.A. Times.  (*Id.*)  Later that day, Keys spoke by telephone with Mercer, and discussed Anonymous' hacking attack against the website Gawker.  (*Id.*)  Keys told Mercer that he had entered an Internet chat room with over 2,000 members, and met someone who invited him into a private room containing 15 highly skilled hackers.  (*Id.*)

Keys further told Mercer that he maintained computer records of his interactions with Anonymous, and had told the hackers about his past journalism experience.  (*Id.*)  However, Keys denied any involvement with the suspicious e-mails to Mercer described above.  (*Id.*)

### B. The L.A. Times Is Hacked.

Two days later, on or about December 14, 2010, the FBI's Sacramento field office learned that a server belonging to Tribune Media ("Tribune"), the parent company of both the *L.A. Times* and Fox 40, had been hacked.  (*Id.* ¶ 18.)  As a result, the headline and byline of a story about Congress were altered without authorization.  (*Id.*)

Tribune employees spent at least 333 hours investigating and responding to the hack, at an

estimated labor cost of $17,650.40.  (*Id*. ¶ 31.)  This figure does not include the cost of hardware and software upgrades undertaken by Tribune after the hack, or costs incurred by Fox 40 relating to the theft of its e-mail list, or advertising losses resulting from either event.  (*Id*.)

**C.     Its Investigation Ongoing, the FBI Notes the Possible Inconsistency Between the E-Mail Addresses Leading to Keys, Versus Those That Had Been Anonymized.**

In a memorandum begun on February 14, 2011 and completed December 11, 2011, FBI Special Agent John Cauthen ("Agent Cauthen"), of the FBI's Sacramento field office, summarized the investigation to date, and laid out the evidence that the FBI had obtained in its efforts to identify the author of the pseudonymous e-mails described above.  (FBI December 2011 Memo, ECF No. 23-2.) Agent Cauthen wrestled with the fact that while some of the e-mails readily led to Keys, others had been routed through proxy servers and registered with pseudonyms in an apparent bid to prevent identification.  (*Id*. 2.)  Agent Cauthen summarized his analysis in a parenthetical note:

> (FBI Note:  Given the effort to hide the identity of the sender via the use of fake e-mails and proxy servers, it seems incongruous for the subject, if it is indeed Matthew Keys, to send out an e-mail identifying himself by name.)

(*Id*.)

Agent Cauthen went on to summarize Keys' communications with Mercer, concluding the substance of his electronic communication with the following qualified observations:

> Based on the above, it appears Matthew Keys may not have been the subject behind the compromise at FOX40.  *It appears that Keys is involved with the group 'Anonymous' and members of this group hacked the P2P server on two occasions.*  The intrusion was accomplished by socially engineering someone to providing a user password.  Keys did have access to P2P.  His Twitter account may have been compromised.

(*Id*. 5; emphasis added.)

**D.** **The Sacramento Field Office Transfers the Investigation to the Los Angeles Field Office.**

In a memorandum dated June 6, 2011, Agent Cauthen summarized the FBI's plan to transfer the case against Keys to its Los Angeles office because of his above-cited analysis of the evidence against Keys as it currently stood, the Los Angeles location of the P2P server, and their effect on venue.  (FBI June 2011 Memo, ECF No. 23-3.)

Agent Cauthen suggested that a "logical step" for the investigation would be to obtain evidence from Keys regarding Anonymous, either by subpoena or search warrant.  (*Id.* 4.)  However, Agent Cauthen noted that because Keys considered himself a journalist, such an investigative step would require the Attorney General's concurrence.[1]  (*Id.*)  Agent Cauthen opined that the Los Angeles office had a solid basis to seek such evidence from Keys.  (*Id.*)

**E.** **The FBI Subsequently Obtains New Evidence Tying Keys to the Hacking of the L.A. Times and the Pseudonymous E-mails to Fox 40.**

**1.** **Internet Chat Logs Show That Keys Provided Anonymous With Passwords for the *L.A. Times*.**

Six months later, the FBI obtained evidence that login credentials for the *L.A. Times* had been given to Anonymous by a former *L.A. Times* employee using the moniker "AESCracked," and that Keys had used that moniker in his chat sessions with Anonymous.  In December 2011, the FBI began reviewing evidence pertaining to the hacking of a local company called HBGary.  (Search Warrant ¶ 22, ECF No. 23-1.)  While examining evidence obtained via search warrant, investigators noticed an Internet chat record, apparently from March 2011, in which "Kayla," a now-convicted hacker and member of Anonymous, discussed Keys.[2]  (*Id.*)  Kayla wrote "this 'keys' faggot we think is

---

[1] See 28 C.F.R. § 50.10; USAM 9-13.400 (describing authorization requirements in investigations and prosecutions involving members of the news media).

[2] "Kayla," whose real name is Ryan Ackroyd, was sentenced to thirty months' imprisonment by a court in the United Kingdom in May 2013. *LulzSec 'hactivists' handed long jail sentences for hacking*, The Guardian (May 16, 2013), http://www.theguardian.com/technology/2013/may/16/lulzsec-hacktivists-longest-jail-sentences-hacking.  Ackroyd also faces hacking-related charges in the Southern District of New York.

AESCracked who was an ex journalist…"  (*Id*.)  Kayla further wrote "but in that gawker article it says his name is 'Matt Keys' lol he's not so innocent and we have logs of him too, he was the one who gave us passwords for LA time, fox40 and some others, he had superuser on a lot of media[.]"  (*Id*.)

Also in December 2011, the FBI obtained additional Internet chat records from a computer in Ohio belonging to a suspected member of Anonymous who used the moniker "Owen," among others. (*Id*. ¶ 23.)  The chat records showed AESCracked sending a user name and password for the *L.A. Times* to members of Anonymous.  (*Id*.)  These chats are excerpted below:

> Dec 08 20:55:12   Sabu[3]          that would be nice to get access to fox.  let me know if I
> can get access.  I want to see if I can get further in
>
> …
>
> Dec 08 20:59:20   AESCracked   I'm not a hacker
>
> Dec 08 20:59:23   AESCracked   I'm an ex-employee
>
> …
>
> Dec 08 21:00:47   AESCracked   user: anon1234
>
> Dec 08 21:00:50   AESCracked   pass:  common2
>
> Dec 08 21:01:23   AESCracked   go fuck some shit up!
>
> Dec 08 21:01:29   sharpie      thanks very much
>
> Dec 08 21:01:32   Sabu         AESCracked: thank you.

(*Id*.)

### 2.     Analysis of IP Addresses Contained in the Internet Chat Records Leads Back to Keys.

The FBI compared the IP address used by AESCracked with the IP addresses used in the pseudonymous e-mails to Fox 40, and found a match:  on January 5, 2011, AESCracked had used the

---

[3] "Sabu," whose real name is Hector Xavier Monsegur, pleaded guilty on August 15, 2011 in the Southern District of New York to a 12-count information charging him with computer hacking conspiracies and other crimes, including a substantive hacking charge initially filed in the Eastern District of California related to the hack of HBGary, Inc.  *Six Hackers in the United States and Abroad Charged for Crimes Affecting Over One Million Victims*, United States Attorney's Office, Southern District of New York (March 6, 2012), http://www.justice.gov/usao/nys/pressreleases/March12/ackroydetalindictmentpr.pdf.  The Eastern District of California case is *United States v. Monsegur*, 2:11-cr-332-MCE.

1  same IP address as the user of the foxmulder4099@yahoo.co.uk account described above.  (*Id.* ¶ 25.)

2  Furthermore, after AESCracked was banned from the AnonOps chat server over accusations that he had

3  leaked information to the media, AnonOps users including Kayla identified AESCracked as logging

4  back in under the slightly-modified username "A2SCracked," using an IP address that the FBI learned

5  had been assigned to Keys in Sacramento by AT&T.  (*Id.* ¶ 26.)

6        **3.**      **The FBI's Sacramento Field Office Opens a New Case Against Keys.**

7        Based on this new evidence, in January 2012, the FBI's Sacramento field office opened a new

8  investigation of Keys, and agreed to work it jointly with the Los Angeles field office.  (See Gov.'s Ex. A

9  at 7 ("FBI January 2012 Memo").  Any charges against Keys would be brought in the Eastern District of

10  California.  (*Id.*)  Agent Cauthen wrote that "Recent information has arisen implicating Keys in the

11  original intrusions, and it is anticipated that he will be indicted in the next few weeks."  (*Id.* 2.)  Agent

12  Cauthen further wrote "In light of the above exchange wherein Matthew Keys also known as

13  AESCracked admitted to being a former FOX40 employee, and turned over the usernames and password

14  to Sharpie and others, Sacramento to open captioned matter."  (*Id.* 7.)

15        **4.**      **Keys Publicizes That He Interacted with Anonymous Using the Moniker**

16        **AESCracked.**

17        On March 6, 2012, Keys posted on his website, producermatthew.com, an image or screenshot of

18  an Internet chat, and wrote the following beneath the image:  "During my observance of

19  Anonymous/LulzSec hackers in a chat room called 'InternetFeds,' . . . Log recorded December 22,

20  2010."  (Search Warrant ¶ 20, ECF No. 23-1.)  The image obscured the username of the chat participant

21  whose screen had been captured, but another participant in the chat room addressed him as "AES."  (*Id.*

22  ¶ 21.)

23        Then, on June 5, 2012, the book *We Are Anonymous*, by Parmy Olson, was published.  (*Id.* ¶ 27.)

24  In the book, Olson wrote:  "Owen's quote . . . comes from screenshots of the #InternetFeds chat room

25  made by freelance journalist Matthew Keys, which were e-mailed to me by Keys in early 2011.  Keys

26  was invited to observe the goings-on in InternetFeds from December of 2010 to January of 2011.  *He*

27  *used the nickname AESCracked.*"  (*Id.*; emphasis added.)

28        Earlier, on May 25, 2012, Keys had used the social networking service Twitter to post about his

involvement in the book *We Are Anonymous*, posting "This is the book I'm in. You should think about buying it." (*Id.* ¶ 28.) In his post, Keys linked to the book. (*Id.*)

### F. The FBI Obtained A Search Warrant For Keys' New Jersey Residence.

On October 3, 2012, Magistrate Judge Michael A. Hammer, of the United States District Court for the District of New Jersey, issued a search warrant authorizing the FBI to search Keys' Secaucus, New Jersey apartment. (ECF No. 23-1.) The warrant application included, but was not limited to, the facts described above, and described Keys' use of multiple Internet pseudonyms, along with proxy servers, in order to conceal his identity. (*Id.* ¶¶ 5-32.) The government filed the warrant without seal.

### 1. The Warrant Application Described Evidence As Recent as March and May 2012.

The warrant application's probable cause statement included Keys' acts of March and May 2012, described above. (*Id.* ¶¶ 5-32.)

### 2. The Warrant Limited What the FBI Could Seize.

In its Attachment B ("ITEMS TO BE SEIZED"), the warrant set out limitations on what could be seized. (*Id.* pp. 5-8.) These limitations were tied to specified offenses (18 U.S.C. §§ 371 (conspiracy), 1030(a)(5) (transmitting malicious code), and 1030(a)(6) (trafficking in passwords)); the attacks on the Tribune server between December 1, 2010, and the present; records relating to trafficking in passwords; and records relating to 21 specific pseudonyms, including those described above, that were discussed in the warrant application. (*Id.*)

In order to search for the items contained within these limitations, the warrant authorized agents to "search, copy, image and seize the following items for offsite review[.]" (*Id.* p. 6.) These "following items" were defined in ten categories, which could be summarized as covering computers, digital equipment, or electronic storage media belonging to Keys that were capable of committing or storing evidence of the aforementioned offenses; related documentation and software; access-control devices necessary to access Keys' computers and data; records showing who was using Keys' device to commit the aforementioned offenses; evidence of software designed to eliminate data; and contextual information necessary to understand items falling within Attachment B. (*Id.* pp. 6-8.)

Pursuant to this warrant, the FBI seized from Keys a laptop computer and two external hard

14

drives.

### 3. Subsequent Examination of Keys' Computer Revealed Evidence of the *L.A. Times* Attacks.

Forensic examination of Keys' laptop revealed saved screenshots showing Keys' use of the pseudonym AESCracked in Internet chat, and his conversations with Anonymous hackers, including a hacker using the pseudonym Sharpie.  (See Gov.'s Ex. B at 4-7 ("Initial Keys Computer Review").) Sharpie bragged about editing an *L.A. Times* story and stated that he had attempted to alter the front page layout of the *L.A. Times*, but had been locked out by *L.A. Times* computer personnel.  (*Id*. 6-7.)  Keys offered to help Sharpie regain access to the *L.A. Times* but then discovered that he too had been locked out of the *L.A. Times* computer system.  (*Id*.)

### G. While the Search Warrant is Executed, Keys Consents to An Interview With the FBI, and Admits to Sending the Pseudonymous E-Mails to Fox 40, Attacking the L.A. Times, and Using the Pseudonym AESCracked.

Keys was not arrested during the warrant's execution.  Nonetheless, two FBI agents read Keys his *Miranda* warnings and interviewed him in his apartment while the warrant was being executed. (Keys Interview Tr., 1-2, ECF No. 23-5.)  The agents asked Keys whether he preferred to be interviewed in a different room within the apartment but, at Keys' request, they remained in the same room.  (*Id*. 2-3.)  The agents brought Keys water.  (*Id*. 12.)  The interview lasted about two hours and was audio-recorded by the FBI.  Keys admitted to selecting the pseudonym AESCracked in order to appear authentic or knowledgeable to members of Anonymous.  (*Id*. 16-17.)  Keys explained his selection:  he knew that WikiLeaks had previously released a data file encrypted using the AES encryption algorithm, and although Keys did not know what AES was, he knew that Anonymous would.  (*Id*.)

Keys further admitted taking screenshots of Internet chats he wished to retain, and acknowledged participating in the chat referenced in the search warrant application.  (*Id*. 19-28.)  He analogized his situation to that of a former "night manager at a retail store" who still had the keys to the store.  (*Id*. 36.) Keys also explained why he wanted to talk to the FBI:  "This is one of the reasons why I'm talking to you as opposed to saying, you know, I want a lawyer, or I want to talk to, you know, counsel at Tribune, or, again I'm sorry, Reuters or anything like that is because, you know, I did it."  (*Id*. 53.)

15

1    Keys also expressed worry over what would happen if the FBI's investigation of him became

2    public:  "My concern is this eventually getting out there under my name, um, and I know that there are

3    ways that, you know, like calling me a cooperating witness or, or something like that.  There's, whatever

4    in your ability to minimize [sic] … the impact."  (*Id*. 65-66.)  He added "Well, part of the issue is that

5    this offense was c-c-committed against a news organization."  (*Id*. 66.)

6                              **III.      LEGAL ANALYSIS**

7        **A.      The Search Warrant Satisfied the Fourth Amendment.**

8        Keys argues that the search warrant was "unconstitutionally overbroad and the modern

9    equivalent of a general warrant."  (Def.'s Mot. Suppress 10, ECF No. 23.)  The crux of his argument is

10   that a computer search warrant is overbroad unless the magistrate follows the guidelines set out in the

11   concurring opinion in *United States v. Comprehensive Drug Testing, Inc. ("CDT III")*, 621 F.3d 1162

12   (9th Cir. 2010).  However, even Keys admits these guidelines are "not law."  (Def.'s Mot. Suppress 14,

13   ECF No. 23.)  Keys' argument fails under Ninth Circuit precedent.

14           **1.      The Warrant Was Sufficiently Particular and Not Overbroad.**

15       Computers lie at the center of this case:  the victim *L.A. Times* computer was attacked by other

16   computers at the direction of their users, one of whom was Keys.  In the warrant described above, the

17   government established probable cause to search Keys' computers and digital media for evidence of

18   specific computer crimes.  Given the warrant's limitations to enumerated crimes and a date range, it was

19   reasonable for the FBI to seize Key's computer, and two of his external hard drives.

20       The Fourth Amendment requires that a warrant describe with particularity the "things to be

21   seized."  U.S. Const. amend. IV.  Search warrants must be specific in both particularity and breadth.

22   *United States v. Brobst*, 558 F.3d 982, 993 (9th Cir. 2009).  The description of the things to be seized

23   must be specific enough to enable the officers conducting the search reasonably to identify the things

24   authorized to be seized.  *Id*.  However, the search warrant "need only be reasonably specific, rather than

25   elaborately detailed."  *Id*. (quoting *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996)).  "The

26   specificity required varies depending on the circumstances of the case and the type of items involved."

27   *Id*.  This particularity "also ensures that the magistrate issuing the warrant is fully apprised of the scope

28   of the search and can thus accurately determine whether the entire search is supported by probable

                              16

cause. *Id*. (quoting *United States v. Mann*, 389 F.3d 869 at 877 (9th Cir. 2004)).

The Ninth Circuit applied this flexible standard to the search and seizure of electronic media in *United States v. Giberson*, 527 F.3d 882 (9th Cir. 2008). In *Giberson*, the Ninth Circuit upheld a district court's denial of defendant Giberson's motion to suppress evidence found on Giberson's computer. The court held that the warrant at issue "described the items to be searched and seized as particularly as could be reasonably expected given the nature of the crime and the evidence [the government] then possessed." *Id*. at 886 (quoting *United States v. Adjani*, 452 F.3d 1140, 1149 (9th Cir. 2006)). The court then concluded that the warrant was not a general warrant, and noted that the Ninth Circuit has "long held that a search warrant authorizing the seizure of materials also authorizes the search of objects that could contain those materials." *Id*.

Under Ninth Circuit law, it is appropriate to seize computers and electronic media where, as here, the affidavit supports the conclusion that a computer was used to commit the offense. *See Brobst*, 558 F.3d 982 (holding that the seizure of computers, compact disks, floppy disks, hard drives, and other storage media was permissible based on the discovery of one apparent child pornography photograph bearing Internet-type markings); *United States v. Hay*, 231 F.3d 630, 637 (9th Cir. 2000) (holding a "generic classification" authorizing the seizure of an "entire computer system and virtually every document in [the defendant's] possession without referencing child pornography or any other particular offense conduct" was permissible); *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (holding "when a more precise description is not possible" a blanket seizure is allowed).

In light of this authority, Keys' argument that the warrant was unconstitutionally overbroad must fail. As shown above, the Ninth Circuit has authorized broader seizures based on lesser showings of probable cause than what was offered here. Here, the warrant contained objective limits to help the agents determine what they could seize. Furthermore, the investigation pertained to crimes committed by and against computers, and while agents knew Keys possessed records related to the hack of the *L.A. Times*, they did not know exactly where or how he stored them. Under these circumstances, the warrant was neither overbroad, nor a general warrant.

///

///

2.    **The Government Was Not Required to Follow *Tamura/CDT III* Procedures.**

Defendant's argument is foreclosed by *United States v. Schesso*, 730 F.3d 1040 (9th Cir. 2013). In *Schesso*, the Ninth Circuit reversed a district court's order granting a motion to suppress based on the government's failure to follow the search protocols suggested by the concurring opinion in *United States v. Comprehensive Drug Testing, Inc. ("CDT III")*, 621 F.3d 1162, 1177 (9th Cir. 2010).  In *Schesso*, police obtained a warrant authorizing a search of Schesso's residence for "[a]ny computer or electronic equipment or digital data storage devices that are capable of being used" for child-pornography possession and trafficking.  730 F.3d at 1043.  The warrant permitted off-site examination, analysis, and recovery of data, and contained neither protocols for sifting through the data, nor any provision for the return of non-evidentiary property.  *Id*.

Upon reviewing the warrant, the Ninth Circuit concluded that its lack of electronic data search protocols neither violated the Fourth Amendment, nor was inconsistent with *CDT III* or its predecessor case, *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982).  *Id*. at 1047.  The court explained that "Schesso's scenario did not implicate the real concern animating the court in *CDT III* and *Tamura*: preventing the government from overseizing data and then using the process of identifying and segregating seizable electronic data 'to bring constitutionally protected data into … plain view." *Id*. at 1048, quoting *CDT III*, 621 F.3d at 1171 (per curiam opinion).

The Ninth Circuit further contrasted Schesso's situation with *CDT III* and *Tamura*, noting that the government properly executed the warrant for Schesso's residence, seizing only the devices covered by the warrant and for which it had shown probable cause.  *Id*. at 1049.  Based on evidence that Schesso possessed and distributed a child pornography video on a peer-to-peer file-sharing network, police had probable cause to believe that Schesso was a child pornography collector and thus to search Schesso's computer system for any evidence of possession of or dealing in child pornography.  *Id*.  "In other words, Schesso's entire computer system and all his digital storage devices were suspect."  *Id*.

*See also United States v. Blake*, No. 1:08-cr-0284 OWW, 2010 WL 702958, at *4 (E.D. Cal. Feb. 25, 2010) ("There is no legal requirement that a search warrant include a specification of the precise manner in which the search is to be executed.  (Citations omitted.)  As the Tenth Circuit has explained, while a search warrant must describe with particularity the object of the search, 'the

18

methodology used to find those objects need not be described:  this court has never required warrants to contain a particularized computer search strategy.'  (Citations omitted.)  After a computer search, "[i]t is unrealistic to expect a warrant to prospectively restrict the scope of a search by directory, file name or extension or to attempt to structure search methods—that process must remain dynamic."

Here, as in *Schesso*, the government properly executed the warrant for Keys' residence, seizing only the devices covered by the warrant and for which it had shown probable cause.  Based on evidence that Keys had participated in and still possessed digital evidence of a hacking attack against the *L.A. Times*, police had probable cause to search Keys's computers and digital media for evidence of conspiracy, computer hacking, and password-trafficking.  As in *Schesso*, Keys' entire computer system and all his digital storage devices were suspect.

Thus, under the recent and binding precedent of *Schesso*, the government was not required to follow *Tamura/CDT III* procedures.  Even if this Court were to conclude that the government should have incorporated such procedures, "it bears noting that neither *Tamura* nor *CDT III* resulted in the suppression of evidence despite the absence of precautionary procedures."  *Schesso*, 730 F.3d at 1051 n.9.[4]

### 3.     The Warrant Application Established Probable Cause and Was Not Stale.

The October 3, 2012 search warrant was based on an affidavit that described events that had occurred in March and May 2012.  (Search Warrant ¶¶ 20, 27-28, ECF No. 23-1.)  Since the date of the *L.A. Times* hack, Keys had saved and shared screen shots of his chats with Anonymous.  (*Id.* ¶¶ 21, 27.)  He used Twitter to promote a book in which his screen shots appeared.  Indeed, the affidavit stated that Keys' "web blog, www.producermatthew.com, is still active and contains stories going back to May 2010, including stories about Anonymous from approximately December 2010."  (*Id.* ¶ 36).  Thus, substantial evidence supported the affiant's opinion that Keys was proud of his achievement and likely to have kept records of it.  The warrant was not based on "crude stereotypes of computer users and

---

[4] Sitting in New Jersey, Magistrate Hammer would have been bound by the Third Circuit's rejection of one of the *CDT III* guidelines.  *United States v. Stabile*, 633 F.3d 219, 241 n.16 (3d Cir. 2011) (declining to forswear plain view in favor of allowing "the contours of the plain view doctrine to develop incrementally through the normal course of fact-based adjudication" (quoting *United States v. Mann*, 592 F.3d 779 at 785 (7th Cir. 2010)).

1    journalists," Def.'s Mot. to Suppress 18, but instead on observation of Keys' self-promotion based on

2    his access to a high-level Anonymous chat room.

3         A magistrate's determination of probable cause is afforded "great deference" by reviewing

4    courts.  *Illinois v. Gates*, 462 U.S. 213, 236 (U.S. 1983).  A trial court's determination that an affidavit

5    provided probable cause to issue a search warrant will be upheld unless clearly erroneous.  *United States*

6    *v. Bertrand*, 926 F.2d 838, 841 (9th Cir. 1991).  If the court finds "'that under the totality of the

7    circumstances the magistrate had a substantial basis for concluding that probable cause existed,'" the

8    warrant will be upheld.  *United States v. Hernandez-Escarsega*, 886 F.2d 1560 at 1563 (quoting *United*

9    *States v. McQuisten*, 795 F.2d 858, 861 (9th Cir. 1986)).

10        Information underlying a warrant is not stale "'if there is sufficient basis to believe, based on a

11   continuing pattern or other good reasons, that the items to be seized are still on the premises.'"  *Schesso*,

12   730 F.3d at 1047 (quoting *United States v. Lacy*, 119 F.3d 742, 745-46 (9th Cir. 1997) (internal quotation

13   marks and citation omitted)).  In *Lacy*, which Keys also cites, the Ninth Circuit concluded that ten-

14   month-old information was not stale.  *Id.* at 745.  The *Lacy* court's analysis also turned on the search

15   warrant affidavit's discussion of how child-pornography collectors highly value their sexually explicit

16   materials.  *Id.* at 746.  One circuit court has held that given the persistent nature of digital evidence,

17   staleness is rarely even a useful concept.  *United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012)

18   ("'Staleness' is highly relevant to the legality of a search for a perishable or consumable object, like

19   cocaine, but rarely relevant when it is a computer file.  Computers and computer equipment are 'not the

20   type of evidence that rapidly dissipates or degrades.'") (quoting *United States v. Vosburgh*, 602 F.3d

21   512, 529 (3d Cir. 2010)).

22        Here, the government included five-month-old and seven-month-old evidence in its search

23   warrant application.  This evidence was at least three months fresher than that approved by the *Lacy*

24   court.  Furthermore, case-specific facts favored the inference that Keys was still maintaining evidence.

25   After all, on his publicly available blog, Keys still kept posts about Anonymous from two years earlier.

26   (Search Warrant ¶ 36, ECF No. 23-1.)  As in *Lacy*, the search warrant affidavit in this case explained

27   that Keys highly valued this evidence because he was proud of his interactions with Anonymous, and

28   based on evidence, regarded the episode "as an accomplishment that he wants to publish and receive

1    credit for in the future." (*Id.*)  Although the *Lacy* court relied on general observations about child-

2    pornography collectors, here the Court can point to Keys' publication of this evidence to his own

3    website, and his Twitter posts as specific evidence of how highly Keys valued it.

4         Keys' staleness arguments all fail.  He cites an Oregon district court opinion, *United States v.*

5    *Greathouse*, 297 F.Supp.2d 1264 (D. Or. 2003), which is distinguishable because it addressed thirteen-

6    month-old evidence.  Morever, *Greathouse* has been criticized by the Seventh Circuit as containing

7    overly-restrictive analysis of probable cause.  *See U.S. v. Prideaux-Wentz*, 543 F.3d 954, 962 (7th Cir.

8    2008) ("[T]he government is not required to prove that [defendant] owned the same computer between

9    residences in order to establish probable cause.")  Thus, it was reasonable for the government to assume

10   that Keys brought his computers and digital media with him when he moved from California to New

11   Jersey.

12        It is immaterial whether Keys posted to his website a screenshot of chat logs, or chat logs

13   themselves:  in either case, they comprised recent evidence of Keys' involvement in the crimes under

14   investigation.  The magistrate was informed exactly of the difference, for whatever it was worth.  In the

15   warrant application, the FBI accurately described the posting as an "image," and a "contextual

16   screenshot," and attached the image so that the magistrate could review it himself.  Finally, as explained

17   above, the search warrant affidavit did not rely on stereotypes, but instead analyzed Keys' behavior

18   specifically and reasonably concluded that Keys was likely preserving the chat log screenshots as valued

19   mementos of his interactions with Anonymous.

20              **4.      The Good Faith Exception to the Exclusionary Rule Applies Here.**

21        Even if this Court determines that the warrant is deficient, it should still deny Keys' motion to

22   suppress under the "good faith" exception to the exclusionary rule.  "[T]he marginal or nonexistent

23   benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently

24   invalidated search warrant cannot justify the substantial costs of exclusion."  *United States v. Leon*, 468

25   U.S. 897, 922 (1984).  When officers obtain a search warrant that is later deemed invalid, the

26   exclusionary rule will not apply unless the officers "were dishonest or reckless in preparing their

27   affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."

28   *Id*. at 926.

1   Here, Magistrate Judge Hammer was not misled by information in the affidavit, he did not

2   wholly abandon his judicial role, and the affidavit was not "so lacking in indicia of probable cause as to

3   render official belief in its existence entirely unreasonable." *Id*. at 923 (quoting *Brown v. Illinois*, 422

4   U.S. 590, 611 (1975) (Powell, J., concurring in part)). *See also United States v. Shi*, 525 F.3d 709, 731

5   (9th Cir. 2008) (concluding that even if the warrant was deficient, executing government agents were

6   "entitled to the good faith exception"); *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007)

7   (finding that the "amount of work that went into the police investigation, surveillance, and execution of

8   search warrant" helped establish the government's good-faith reliance).

9   **B.     The Search Warrant Contained No Material Omissions and A Franks Hearing Is**

10          **Not Required.**

11   Keys seeks a *Franks* hearing based on two allegedly material omissions in the search warrant

12   affidavit.  One claimed "omission" did not concern a fact at all.  Rather, it involved an agent's

13   preliminary opinion before he learned of:

14   • A seized statement by "Kayla" that Keys as "AESCracked" had been the source for the

15      *L.A. Times* login credentials (FBI January 2012 Memo 3);

16   • Chat logs from a computer seized via warrant in Ohio in which AESCracked provided

17      *L.A. Times* login credentials and told participants to use them for malevolent purposes

18      (*Id*. 6-7);

19   • An image of an Internet chat posted by Keys to his website in which  another participant

20      appears to call him "AES" (Search Warrant ¶ 21); and

21   • Keys' promotion of the book *We Are Anonymous*, whose author said that Keys

22      communicated using the moniker AESCracked (*Id*. ¶ 27.).

23   The other "omission" to which Keys objects is immaterial.

24   In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court set out how a defendant may

25   challenge the truthfulness of a warrant.  To obtain a so-called *Franks* hearing based on allegations of

26   material false statements or omissions in a search warrant affidavit, a defendant must make a

27   "substantial preliminary showing" that false or misleading statements were (1) deliberately or recklessly

28   included in an affidavit submitted in support of a search warrant; and (2) "necessary to the finding of

22

probable cause." *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008).  After the hearing, suppression should result if, after excising the false statements from the warrant, probable cause is lacking.  *See Franks*, 438 U.S. at 171-72.  But when the offending material would not affect probable cause, the court does not even need to grant a *Franks* hearing in the first instance.  *See, e.g., United States v. Reeves*, 210 F.3d 1041 (9th Cir. 2000).

The Ninth Circuit has extended the *Franks* rule to deliberate or reckless omissions of *facts*. *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985).  However, the omission rule does not require an affiant to provide general information about "every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed for the search." *Craighead*, 539 F.3d at 1081.  *See also United States v. Kelley*, 482 F.3d 1047, 1053 (9th Cir. 2007) (holding that an affidavit's failure to raise the possibility that emails containing child pornography could have been unsolicited spam was not a misleading omission); *cf. United States v. Hay*, 231 F.3d 630, 638 (9th Cir. 2000) (holding that a district court's failure to consider theories such as spamming or automatic bulk downloading that might support the unlikely possibility that the suspect did not actually transmit 19 images of child pornography himself did not constitute error in a probable cause determination); *United States v. Wulferdinger*, 782 F.2d 1473, 1477 (9th Cir. 1986) (no Franks hearing required even though warrant affidavit failed to mention additional suspect).  Furthermore, not all information in the government's possession need be included in the warrant affidavit.  *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992).

### 1.       The Affidavit Did Not Need to Contain Agent Cauthen's Earlier Opinion.

Keys is not entitled to a *Franks* hearing about the omission of Agent Cauthen's discarded opinion.  Before he saw other evidence, Agent Cauthen opined:  (1) it seemed "incongruous" for Keys to disclose his identity in some, but not all of the pseudonymous e-mails; (2) Keys seemed baffled at the suggestion that he was involved; and (3) Keys' interest in hacking was journalistic, as opposed to criminal.

Keys has no viable claim under *Franks* or *Stanert* because the *facts* behind Agent Cauthen's early opinion are in the affidavit.  The affidavit disclosed that Keys' name was linked to some of the e-

mail addresses.  (Search Warrant ¶¶ 11-12, ECF No. 23-1.)  The affidavit disclosed that Keys had denied

his own involvement in the spurious emails.  (*Id*. ¶ 17.)  The affidavit disclosed Keys' journalistic

interest in Anonymous.[5]  (*Id*. ¶¶ 16-17, 19-20, 27, 36.)  The magistrate, like Agent Cauthen, had all he

needed to reach his own opinion in light of those facts and all of the other evidence that existed in

December 2012 indicating that Keys had evidence related to the *L.A. Times* hack.

A discarded opinion is not an omitted fact and is not material.  As the Statement of Relevant

Facts makes clear, Agent Cauthen made these observations earlier in 2011, before the FBI's December

2011 discovery that Keys was AESCracked and involved with the hack of the *L.A. Times* prompted it to

open a new case against Keys in Sacramento in January 2012.  When the FBI sought the search warrant

in October 2012, Agent Cauthen's observations were no longer significant because the FBI had

recovered chat logs tying Keys to the *L.A. Times* hack and the pseudonym AESCracked.  Agent

Cauthen's questions about Keys' involvement had been answered by the chat logs and Keys' own

statement, to the author of *We Are Anonymous*, that he had been AESCracked.

Moreover, since Agent Cauthen's full opinion was that Keys had evidence that required

compulsion, the inclusion of his full opinion would actually have supported probable cause to believe

that Keys had evidence of crime.  *See Zurcher v. Stanford Daily*, 436 U.S. 547, 553-569 (U.S. 1978)

(Fourth Amendment does not prevent issuance of search warrant for evidence simply because possessor

of place is not reasonably suspected of criminal involvement).

### 2.    The Affidavit Accurately Presented the IP Address Information Related to Keys' Various Pseudonyms.

Keys also argues that the search warrant affidavit's "selective use of IP address information

overstates the precision of that evidence."  (Def.'s Mot. to Suppress 19, ECF No. 23.)  This is incorrect.

Instead, the affidavit reconstructed for the magistrate the FBI's painstaking attempts to identify the

sender of the pseudonymous e-mails, and their gradual but eventual success at identifying Keys.  Keys

objects to the inclusion of "only a single IP address" located in Sacramento, and argues that the FBI

---

[5] The affidavit's attachments also demonstrated Keys' non-journalistic, and instead, *vandalistic* interest in Anonymous, as demonstrated by Keys' statement to Anonymous as AESCracked:  "also, i did not give you those passwords for 'research.'  i want you to fuck shit up."  (Search Warrant 44, ECF No. 23-1.)

1    should have stated in the affidavit that this Sacramento IP address was administered by Comcast, while

2    Keys was a customer of AT&T.  (*Id.*)  However, the inclusion of this information in the affidavit would

3    not have removed probable cause.  Keys was already a suspect in the investigation based on other

4    evidence, and given his location in Sacramento at the time of the offenses, the use of a Sacramento IP

5    address belonging to Comcast, AT&T, or any Internet Service Provider would have only added to

6    probable cause.  The affidavit did not overstate the evidence by, e.g., stating that the IP address

7    corresponded to Keys' residence.

8         Furthermore, there are a number of explanations why Keys could have used another Sacramento

9    IP address in the course of his conduct:  he could have accessed the Internet from a café, the home of

10   friends or family, or another location, possibly in order to further conceal his identity.  As the Ninth

11   Circuit stated in *Craighead*, a search warrant affiant need not provide information about every theory,

12   no matter unlikely, that would controvert the good-faith belief that probable cause existed for the search.

13   539 F.3d at 1081.

14        Keys' final arguments are that the affidavit failed to mention that "proxy servers often serve as

15   proxies for many people at a time," and made no effort to explain the month-long gap between

16   foxmulder4099's and AESCracked's use of the same IP address.  These arguments must fail as well.

17   The affidavit defines a "Proxy Server" as acting "as an intermediary for requests from clients seeking

18   resources from other servers."  (Search Warrant at 13, ¶ f, ECF No. 23-1.)  The affidavit further states

19   that "proxy servers are used by people on the Internet to avoid having their activity traced back to

20   them."  (*Id.* ¶ 15.)  These definitions are written in the plural and in no way served to mislead the

21   magistrate into believing that a proxy server can only be used by one person.  The affidavit nowhere

22   states that Keys was the sole user of any proxy server.  Here, there is no omission, not to mention a

23   material omission affecting probable cause.

24        As for the month-long gap, the affidavit laid out its existence for the magistrate's review, but the

25   government was not required to explain "how that time lapse affects the analysis."  (Def.'s Mot. to

26   Suppress 20, ECF No. 23); *see Craighead*, 539 F.3d at 1081.

27

28

**C.    Keys' Statements to the Government Were Obtained From an Independent Source and Should Be Admitted Into Evidence Even if the Court Finds the Warrant Defective.**

Keys attempts to link the FBI's execution of the search warrant to his voluntary, Mirandized statements to the FBI.  However, Keys' statements to the FBI were obtained via an independent source from the search warrant, and should be admitted into evidence even if the Court suppresses evidence obtained from the warrant.  Evidence that would otherwise be subject to the exclusionary rule might nevertheless be admissible if it was also obtained through a lawful "independent source."  *See Murray v. United States*, 487 U.S. 533 (1988).

Keys summarily concludes that the interview was a direct result of the search and seizure and therefore fruit of the poisonous tree, but the Ninth Circuit has employed a multi-factor test to determine the admissibility of statements made by a defendant whose property was searched illegally.  *United States v. Shetler*, 665 F.3d 1150 (9th Cir. 2011).  If the Court concludes that the search was unlawful, which it should not, the Court should only then hold a hearing to apply the *Shetler* factors to the interview.

**D.    Keys Validly Waived His *Miranda* Rights.**

Keys argues that his written and recorded oral statements to the FBI should be suppressed because, although the FBI Mirandized Keys, he did not waive his rights knowingly, intelligently, and voluntarily.  Keys bases his argument on his claim that, earlier on the morning of the search warrant's execution, he took double his prescribed dosage of a medication called Trazodone.  In addition to his own declaration describing his abuse of Trazodone (Decl. of Matthew Keys 2, ECF No. 23-6), Keys presents an affidavit from a doctor of Osteopathy who has apparently never met Keys, but bases his conclusions on consultations with defense counsel, and listening to portions of Keys' recorded oral statements.  (Decl. of Dr. Barry M. Cogen, ECF No. 23-7.)

A waiver of *Miranda* rights must be made knowingly, intelligently, and voluntarily. *See United States v. Binder*, 769 F.2d 595, 599 (9th Cir. 1985) (citing *Miranda*, 384 U.S. at 479 ).  Purported *Miranda* waivers are analyzed under a totality of the circumstances.  *See United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986).  Under this test, the prosecution has the burden of proving by a

preponderance of the evidence that a valid *Miranda* waiver occurred.  *See United States v. Garibay*, 143

F.3d 534, 536 (9th Cir. 1998) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).  In order for a

waiver to be made knowingly and intelligently, it must be shown that the accused was aware of "the

nature of the right being abandoned and the consequences of the decision to abandon it."  *Garibay*, 143

F.3d at 536.

The Ninth Circuit and district courts within it have held that simply being under the influence of

medication does not equate to coercion.  *See Cottrell v. Trimble*, 2012 WL 3042437 (E.D.Cal. 2012)

("[T]he Court notes that merely being under the influence of a medication does not constitute being

coerced.")  *Cf. United States v. Martin*, 781 F.2d 671, 672–74 (9th Cir.1993) (statements made to police

at a hospital were voluntary despite a defendant's being in pain and under the influence of Demerol, a

pain-killing medication, where he was conscious, relatively coherent during the questioning, and sat up

and spoke freely); *United States v. Kelley*, 953 F.2d 562, 565-66 (9th Cir. 1992), disapproved on other

grounds in *United States v. Kim*, 105 F.3d 1579, 1581 (9th Cir. 1997) (being on the verge of heroin

withdrawal was held insufficient to demonstrate involuntariness where the defendant exhibited the

ability to think rationally and where there were no circumstances of coercion); *United States v. Lewis*,

833 F.2d 1380, 1384–86 (9th Cir.1987) (statements taken at a hospital several hours after the defendant

was administered a general anesthetic were held to be voluntary where the defendant purported to feel

all right, was responsive, and demonstrated unimpaired recollection).

Against this authority, Keys' argument fails for multiple reasons.

**1.      Trazodone Is Primarily An Anti-Depressant and May Have Benefited Keys.**

First, Trazodone may have actually improved Keys' mental functioning and rational faculties,

and therefore his ability to waive his *Miranda* rights validly.  In answer to the question "Why is this

medication prescribed?" the National Institutes of Health (NIH) report that "Trazodone is used to treat

depression.  Trazodone is in a class of medications called serotonin modulators.  It works by increasing

the amount of serotonin, a natural substance in the brain that helps maintain mental balance."

MedlinePlus, A service of the U.S. National Library of Medicine, National Institutes of Health,

*Trazodone* (Dec. 30, 2013), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html.  The

NIH further reports that Trazodone is also sometimes used to treat insomnia, schizophrenia, and anxiety.

27

In the Ninth Circuit cases cited above, defendants who had ingested powerful drugs such as Demerol and heroin were still held to have made voluntary statements, even when being interviewed at a hospital.  In *Martin*, the defendant was "awake and relatively coherent" while being questioned in his hospital bed after being injured in an explosion.  781 F.2d at 674.  The Ninth Circuit approvingly quoted the district court's conclusion that "although the defendant was injured and under medical care at the time the statements were made, the type, dosage, and schedule of painkilling narcotic administered to [Martin] was not sufficient to overbear his will to resist the questioning or impair his rational faculties." *Id*.  In light of these cases involving stronger medications, Keys' ingestion of Trazodone could not have prevented him from waiving his *Miranda* rights validly.

> **2.     The Audio Recording and Transcript of Keys' Statements to the FBI Prove That Keys Waived His Rights Knowingly, Intelligently, and Voluntarily.**

The FBI recorded its conversation with Keys, and Keys has attached a transcript of this recording to his motion.  (Keys Interview Tr., ECF No. 23-5.)  This transcript is itself the clearest evidence that Keys was entirely capable of rational action throughout the interview.  For example, just after Keys complains of being interrupted after receiving his *Miranda* warnings, Keys confirms that he had spoken before with Agent Cauthen, and weighs in on where the interview should occur.  (*Id*. 2-3.)  Later in the interview, Keys compared his conduct to that of a night manager who, after ending his employment, still retained a key to a physical building.  (*Id*. 36.)

Keys further explained why he had decided to talk to the FBI, saying "This is one of the reasons why I'm talking to you as opposed to saying, you know, I want a lawyer, or I want to talk to, you know, counsel at Tribune, or, again I'm sorry, Reuters or anything like that is because, you know, I did it." (*Id*. 53.)

At the interview's conclusion, Keys expressed his desire that the investigation not be publicized: "I, I would ideally like this not to be released to the public and, but I understand that, you know, the Freedom of Information Act and there's all these different things that…." (*Id*. 64).  "My concern is this eventually getting out there under my name, um, and I know that there are ways that, you know, like calling me a cooperating witness or, or something like that.  There's, whatever in your ability to

minimalize [sic] . . . the impact. . . .  Well, part of the issue is that this offense was c-c-committed

against a news organization."  (*Id*. 65).

### IV.   CONCLUSION

For all the foregoing reasons, this Court should deny Keys' motion to suppress in its entirety.

Dated:  January 3, 2014

BENJAMIN B. WAGNER
United States Attorney


By:   /s/ MATTHEW D. SEGAL
MATTHEW D. SEGAL
Assistant United States Attorney

Dated:  January 3, 2014

MYTHILI RAMAN
Acting Assistant Attorney General
United States Department of Justice, Criminal
Division


By:   /s/ JAMES SILVER
JAMES SILVER
Trial Attorney
Computer Crime and Intellectual Property Section