1   BENJAMIN B. WAGNER
    United States Attorney
2   MATTHEW D. SEGAL
    PAUL A. HEMESATH
3   Assistant United States Attorneys
    501 I Street, Suite 10-100
4   Sacramento, CA 95814
    Telephone: (916) 554-2700
5   Facsimile: (916) 554-2900

6   LESLIE R. CALDWELL
    Assistant Attorney General
7   Criminal Division, United States Justice Department
    JAMES SILVER
8   Deputy Chief for Litigation
    Computer Crime and Intellectual Property Section
9   Washington, DC 20530
    Telephone: (202) 514-1026

10

11              IN THE UNITED STATES DISTRICT COURT

12              EASTERN DISTRICT OF CALIFORNIA

13

14  UNITED STATES OF AMERICA,          CASE NO. 2:13-CR-0082 KJM

                    Plaintiff,
15                                      TRIAL BRIEF OF THE UNITED STATES
           v.
16                                      DATE: September 28, 2015
    MATTHEW KEYS,                       TIME: 9:00 a.m.
17                                      COURT: Hon. Kimberly J. Mueller
                    Defendant.
18

19

20

21

22

23

24

25

26

27

28

# **CONTENTS**

I.  INTRODUCTION ...........................................................................................................1

II. STATEMENT OF FACTS ............................................................................................1

    A.  After Being Fired from KTXL FOX40 ("FOX40"), Matthew Keys Uses Email
    and the Internet to Harass the Station and Its Customers ......................................1

    B.  Matthew Keys Contacts Brandon Mercer and Predicts an Attack on the *Times* ................2

    C.  On IRC, Keys Seeks Help Attacking the *Los Angeles Times*, and Ultimately
    Finds It ...................................................................................................................2

    D.  After *Los Angeles Times* Personnel Lock Keys Out of the CMS, Keys
    Attempts to Regain Access and Attack Again .........................................................3

    E.  Keys Admits to the FBI That He Sent the Pseudonymous Emails and Attacked
    the *Los Angeles Times*. The FBI Finds Mementos of the Attack on Keys's
    Digital Media. ........................................................................................................4

III. EVIDENCE...................................................................................................................4

    A.  Witnesses ................................................................................................................4

    B.  Documents ..............................................................................................................4

    C.  Electronic Evidence ...............................................................................................5

IV. SUBSTANTIVE LAW ..................................................................................................5

    A.  Conspiracy ..............................................................................................................5

    B.  Transmitting Code with Intent to Damage..............................................................6

        1.  The Damage Element.................................................................................7

        2.  $5,000 Loss ...............................................................................................9

    C.  Attempted Transmission of Code with Intent to Damage .......................................9

V.  TRIAL ISSUES ...........................................................................................................11

    A.  Lay Testimony is Sufficent to Establish Loss.......................................................11

        1.  Tribune Company witnesses may offer their own lay opinions about
        their actions..............................................................................................11

        2.  Tribune witnesses may offer their own lay opinion that a reputation for
        editorial control over the front page to its web site is worth more than
        $5,000......................................................................................................12

        3.  This reasoning does not preclude Defendant from proffering an expert. ..............13

    B.  Co-conspirator statements.....................................................................................13

C.    Special Agent John Cauthen's Potentially Dual Role As Both Percipient and Expert Witness ..................................................................................15

D.    Issues Related to Closing Arguments .........................................................16

E.    Stipulations ..................................................................................................16

F.    Pending Motion to Quash ............................................................................17

VI.    CONCLUSION .......................................................................................................18

# **TABLE OF AUTHORITIES**

## **Cases**

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000)........................................................................... 5

*Bourjaily v. United States*,
    483 U.S. 171 (1987)......................................................................... 14

*Callanan v. United States*,
    364 U.S. 587 (1961)........................................................................... 6

*CDN Inc. v. Kapes*,
    197 F.3d 1256 (9th Cir.1999) ......................................................... 16

*Cheney v. IPD Analytics, L.L.C.*,
    No. 08-23188-CIV, 2009 WL 1298405 (S.D. Fla. Apr. 16, 2009)........ 8

*Coop. Pub. Co. v. Comm'r of Internal Revenue*,
    115 F.2d 1017 (9th Cir. 1940) ........................................................ 11

*Creative Computing v. Getloaded.com LLC*,
    386 F.3d 930 (9th Cir. 2004) .......................................................... 10

*Dana Ltd. v. American Axle and Mfg. Holdings, Inc.*,
    No. 1:10-CV-450, 2012 WL 2524008 (W.D. Mich. 2012) ................. 8

*Grant Mfg. & Alloying, Inc. v. McIlvain*,
    No. CIV.A. 10-1029, 2011 WL 4467767 (E.D. Pa. Sep. 23, 2011) ..... 8

*Los Angeles Times Commc'ns, LLC v. Dep't of Army*,
    442 F. Supp. 2d 880 (C.D. Cal. 2006) ............................................ 12

*Metro. Nat. Bank v. St. Louis Dispatch Co.*,
    149 U.S. 436 (1893)........................................................................ 11

*Newark Morning Ledger Co. v. United States*,
    507 U.S. 546 (1993)........................................................................ 10

*Parente v. United States*,
    249 F.2d 752 (9th Cir. 1957) .......................................................... 14

*Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*,
    320 F.3d 1213 (11th Cir. 2003) ................................................. 11, 12

*United States v. Baker*,
    63 F.3d 1478 (9th Cir. 1995) ............................................................ 6

*United States v. Banuelos*,
    322 F.3d 700 (9th Cir. 2003) ........................................................ 6, 8

*United States v. Cabrera*,
    201 F.3d 1243 (9th Cir. 2000) ........................................................ 16

*United States v. Crawford,*
    239 F.3d 1086 (9th Cir.2001) .................................................................. 12

*United States v. El-Mazain,*
    664 F.3d 467 (5th Cir. 2011) ................................................................... 13

*United States v. Feola,*
    420 U.S. 671 (1975) .................................................................................. 6

*United States v. Fiander,*
    547 F.3d 1036 (9th Cir. 2008) .............................................................. 6, 7

*United States v. Gewin,*
    471 F.3d 197 (D.C. Cir. 2006) ................................................................ 13

*United States v. Hill,*
    643 F.3d 807 (11th Cir. 2011) ................................................................ 12

*United States v. Iribe,*
    564 F.3d 1155 .............................................................................................. 6

*United States v. Larsen,*
    190 F. Appx. 552 (9th Cir. 2006) ............................................................. 9

*United States v. Larson,*
    495 F.3d 1094(9th Cir. 2007) ( ............................................................... 14

*United States v. Layton,*
    855 F.2d 1388(9th Cir. 1988), ................................................................ 13

*United States v. Lim,*
    984 F.2d 331 (9th Cir. 1993) .................................................................. 15

*United States v. Martinez,*
    657 F.3d 811 ............................................................................................ 15

*United States v. Middleton,*
    231 F.3d 1207 (9th Cir. 2000) ......................................................... 7, 8, 9

*United States v. Molina,*
    596 F.3d 1166 (9th Cir. 2010) ................................................................ 16

*United States v. Montgomery,*
    384 F.3d 1050 (9th Cir. 2004) .................................................................. 5

*United States v. Perez,*
    658 F.2d 654 (9th Cir. 1981) .................................................................. 14

*United States v. Regilio,*
    669 F.2d 1169 (7th Cir. 1981) ................................................................ 13

*United States v. Sablan,*
    92 F.3d 865 (9th Cir. 1996) ...................................................................... 9

*United States v. Sanchez-Lopez,*

879 F.2d 541 (9th Cir. 1989) .................................................................. 15

*United States v. Vera,*
770 F.3d 1232 (9th Cir. 2014) ............................................................. 15

*United States v. Yarbrough,*
852 F.2d 1522 (9th Cir. 1988) ............................................................. 14

*United States v. Zemek,*
634 F.2d 1159 (9th Cir. 1980) ............................................................. 14

*Weese v. Schukman,*
98 F.3d 542 (10th Cir. 1996) ............................................................... 12

## STATUTES

18 U.S.C. § 1030 ................................................................................... 10

18 U.S.C. § 1030(a)(5)(A) ...................................................................... 6

18 U.S.C. § 1030(c)(4)(B) ................................................................... 5, 6

18 U.S.C. § 1030(c)(4)(G) .................................................................... 10

18 U.S.C. § 1030(e)(8) ............................................................................ 7

18 U.S.C. § 1030(g) .............................................................................. 12

18 U.S.C. § 371 ...................................................................................... 5

## RULES

Fed. R. Evid. 403 .................................................................................. 13

Fed. R. Evid. 602 ............................................................................ 11, 15

Fed. R. Evid. 701 .................................................................................. 12

Fed. R. Evid. 701(c) .............................................................................. 11

Fed. R. Evid. 702 .................................................................................. 15

Fed. R. Evid. 801(c)(2) .......................................................................... 15

Fed. R. Evid. 801(d)(2)(E) ..................................................................... 13

# I.    INTRODUCTION

The government submits this brief to assist the Court in trial proceedings.

# II.    STATEMENT OF FACTS

### A.    After Being Fired from KTXL FOX40 ("FOX40"), Matthew Keys Uses Email and the Internet to Harass the Station and Its Customers

In October 2010, television station KTXL FOX40 ("FOX40") fired Matthew Keys from his position as Web Producer after Keys made disparaging statements about FOX40.  On or about December 1, 2010, Brandon Mercer, then employed as News Producer at FOX40, began receiving a series of pseudonymous emails whose author claimed to have stolen a list of email addresses that FOX40 had obtained from its viewers, and threatened to write to the viewers.

Keys would later admit to the Federal Bureau of Investigation ("FBI") that he sent the pseudonymous emails, and that he used a Virtual Private Network[1] ("VPN") to conceal his true Internet Protocol ("IP") address when sending them to Mercer.

Keys's first message came from the account foxmulder4099[2], with the subject line "Santa's Lap."  The message stated that "[w]e" have obtained the email addresses of several hundred FOX40 viewers who have registered in the 'iPad Giveaway' contest," and included five email addresses to demonstrate that the theft was real.  Keys went on to say that he would write to these addresses, "along with several hundred other names," within the next few days regarding FOX40's "rigged" contest, and its online registration process.  The message was signed "Happy Festivus, foxmulder4099[]."

Keys continued sending emails from multiple pseudonymous addresses such as cancerman4099[] and fox40truthers[], and Mercer responded and tried to reason with Keys.  One of Keys's messages contained the subject line "watch yourselves FOX40."  Another taunted FOX40 about its inability to respond effectively to his breach of FOX40's computer system:  "[D]espite contacting your legal and it departments, you not only can't figure out how we acquired the emails and what the loophole in your registration process is, but you really don't have much legal recourse because nothing false has been

---

[1] A virtual private network uses encryption to create a private network over the public Internet. Once connected to the virtual private network, its users are associated with the Internet Protocol address of the network itself, rather than the computer from which they are connecting.

[2] The email addresses are listed without their suffixes.

1 stated and no damage is present?"

2      Meanwhile, Keys was indeed sending messages that disparaged FOX40 to its viewers. One

3 message claimed to offer "yet another example of FOX40's inability to cover the news without whoring

4 out those involved for purposes of competition and ratings . . ." FOX40 customers contacted the station

5 to complain, and FOX40 staff contacted affected customers and investigated the underlying breach.

6      During this time, Keys was also using the VPN to connect to the online Content Management

7 System[3] ("CMS") that FOX40 shared with the *Los Angeles Times* in order to reconnoiter it, and to lock

8 current FOX40 employees, including Keys's successor, out of their accounts. In particular, Samantha

9 Scholbrock's credentials were repeatedly changed resulting in her inability to do her job as a producer

10 for the station.

11

12     **B.**     **Matthew Keys Contacts Brandon Mercer and Predicts an Attack on the *Times***

13      On or about December 12, 2010, Keys (using his true name) emailed Mercer and told him that he

14 had infiltrated the hacker activist collective Anonymous. Keys further said he had access to future

15 Anonymous operations against PayPal, Amazon, and the *Times*. Also on or around that day, Mercer and

16 Keys spoke by telephone. Mercer recorded the call, as he suspected Keys was behind the

17 pseudonymous emails, and had previously contacted the FBI.

18      Keys told Mercer that he had entered an Internet Relay Chat[4] room with over 2,000 participants,

19 and was invited from there into a private chat room containing 15 highly skilled hackers. Keys told

20 Mercer that he had computer records of his interactions with the hackers, and had told them about his

21 journalism experience. However, Keys denied any involvement with the aforementioned emails. Keys

22 expressly warned that there was going to be an attack on the *Times*.

23

24     **C.**     **On IRC, Keys Seeks Help Attacking the *Los Angeles Times*, and Ultimately Finds It**

25      Also in early December, using the moniker "AESCracked," Keys tried to drum up support in

---

26     [3] A content management system is software that allows an organization to create, edit, and publish electronic content.

27     [4] Internet Relay Chat, or "IRC," is a communications mechanism that lets multiple users send

28 messages to each other.

multiple IRC channels[5] for an attack on Fox News or the *Times*. He wrote "if you want to attack fox news, pm[6] me. i have a user/password for their cms[.]" Similarly, he wrote "Anyone interested in defacing FOX, LA Times? I have users/pass into their CMS." When others in the chat rooms resisted the suggestion to attack the news media, Keys responded "FOX News is not media. it's 'infotainment' for inbreds. I say we target them." Referring to a particular *Times* article, Keys wrote in an IRC channel named "InternetFeds": "Yet another reason the Times must be demolished."

Ultimately, Keys found hackers willing to help him attack the *Times*. On or about December 8, 2010, in an IRC chat room, Keys sent a username and password for the CMS to another individual who used the moniker "sharpie." Just after sending the login credentials, Keys wrote "go fuck some shit up!"

Sharpie used the credentials provided by Keys to change the headline, lede, and byline of a story about Congress. Immediately after discovering the alteration, the *Times* directed multiple employees in its editorial and information technology divisions to correct the story, determine how the unauthorized alterations were made, and generally investigate the breach to respond to the breach and and return the system to its previous state.

### D. After *Los Angeles Times* Personnel Lock Keys Out of the CMS, Keys Attempts to Regain Access and Attack Again

Shortly after the attack, Keys and sharpie corresponded via IRC. Sharpie told Keys that he "had a whole front page layout made for the *Times*.[7] Keys asked sharpie if the layout was "live," if he had a screenshot, and after sharpie answered these questions in the negative, Keys replied "Sucks." Keys then wrote "I can grant you access again…Standby. Have to use VPN to cover my tracks….damn they cut off my account….hang on. Nope, I'm locked out for good. :("

---

[5] IRC chats are organized by "channel," with each channel having a name that often reflects its topic of discussion or its usual participants. IRC channels can be public or private and channel operators can control certain elements of the chats, such as who may access them.

[6] "PM" is a common abbreviation for private message.

[7] In the IRC transcript, sharpie originally wrote that his front page layout was for the *Chicago Tribune*, but later corrected himself.

3

E. **Keys Admits to the FBI That He Sent the Pseudonymous Emails and Attacked the *Los Angeles Times*. The FBI Finds Mementos of the Attack on Keys's Digital Media.**

In October of 2012, FBI agents executed a search warrant at Keys's residence and interviewed Keys. Keys told FBI agents that he had selected the moniker AESCracked in order to appear authentic or knowledgeable to hackers: he knew that WikiLeaks had previously released a data file encrypted with the AES encryption algorithm, and although Keys did not know what AES was, he knew that Anonymous would.

Keys further admitted taking screenshots of Internet chats he wished to retain, and acknowledged participating in the chat referenced in the search warrant application. Subsequent forensic examination of his digital media revealed screenshots of IRC chats between AESCracked and sharpie, and a screenshot of the altered *Times* article that had been created in December 2010.

During his interview with the FBI, Keys analogized his situation to that of a former "night manager at a retail store" who still had the keys to the store. Keys also explained why he wanted to talk to the FBI: "This is one of the reasons why I'm talking to you as opposed to saying, you know, I want a lawyer, or I want to talk to, you know, counsel at Tribune, or, again I'm sorry, Reuters or anything like that is *because, you know, I did it*." (Emphasis added.)

Keys also expressed worry over what would happen if the FBI's investigation of him became public: "My concern is this eventually getting out there under my name, um, and I know that there are ways that, you know, like calling me a cooperating witness or, or something like that. There's, whatever in your ability to minimalize … the impact." He added "Well, part of the issue is that this offense was c-c-committed against a news organization."

III. **EVIDENCE**

A. **Witnesses**

The Government will present the testimony that roughly tracks the narrative set forth above.

B. **Documents**

The Government's trial exhibits are organized as follows:

"X-Files Emails" relating to FOX40          - 100 Series

| | |
|---|---|
| Keys's statements | - 200 Series |
| Log data | - 300 Series |
| Screenshots from Keys's computer | - 500 series |
| IRC chat records | - 600 series |
| Rule 1006 summaries | - 800 series |
| Documents supporting 1006 summaries | - 900 series |

## C.     Electronic Evidence

Counsel for the parties have conferred, and propose the following procedure for offering into evidence electronic documents that are not subject to stipulation. Each seized computer will be marked as an exhibit for identification only. A witness will identify the seized computer and the exhibits that were copied from that computer. Then, the particular copied exhibits will be offered into evidence. No whole computer or item of electronic media will go back to the jury room.

## IV.     SUBSTANTIVE LAW

### A.     Conspiracy

The Government's proposed conspiracy instruction goes beyond what is ordinarily required in a conspiracy case. This is to avoid any problems under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Ordinarily, "[t]o prove a conspiracy under 18 U.S.C. § 371, the government must establish: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Montgomery,* 384 F.3d 1050, 1062 (9th Cir. 2004) (citation and internal quotation marks omitted).

A conspiracy to commit a felony is a felony, and a conspiracy to commit a misdemeanor is a misdemeanor. 18 U.S.C. § 371. What is complicating in this case is that the Superseding Indictment charges Defendant with conspiring to commit a violation of the Computer Fraud and Abuse Act. What makes a CFAA crime a felony is whether it resulted in $5,000 in loss or would have so resulted if the attempt was completed. 18 U.S.C. § 1030(c)(4)(B). Ordinarily, under conspiracy law, to convict Defendant of conspiring to commit a felony, the jury would not need to make any finding about the offense's results or even anyone's state of mind with regard to "loss." That is because "[e]stablishing a defendant's guilt of conspiracy to commit a substantive crime requires proof of the *mens rea* essential

for conviction of the substantive offense itself. No greater or different intent is necessary." *United States v. Baker*, 63 F.3d 1478, 1493 (9th Cir. 1995). The $5,000 loss element is not part of the *mens rea* element for the substantive crime. *See* 18 U.S.C. § 1030(c)(4)(B).

Having found no case providing jury instructions for conspiracy to transmit code and cause damage without authorization, the Government proposes to borrow instructions from narcotics law. "It is well settled that, in determining for purposes of sentencing the quantity of drugs for which a conspirator will be held responsible, the district court is required to determine the quantity of drugs the conspirator 'reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators.' *United States v. Banuelos*, 322 F.3d 700, 702 (9th Cir. 2003). This must be found by the jury beyond a reasonable doubt, because, as here, the amount increases the statutory penalty. *Id.*

The proposed instruction does not ask whether the conspiracy resulted in loss. That would go well beyond what the law requires. Conspiracy to commit a crime "does not require completion of the intended underlying offense." *United States v. Iribe*, 564 F.3d 1155, 1160–61 (9th Cir. 2009). Indeed, "a conspiracy conviction may be sustained even where the goal of the conspiracy is impossible[.]" *United States v. Fiander*, 547 F.3d 1036, 1042 (9th Cir. 2008).[8]

Thus, as submitted, the Government's jury instructions allow an acquittal, a conviction for misdemeanor conspiracy, or a conviction for felony conspiracy.

## B. <u>Transmitting Code with Intent to Damage</u>

Count 2 charges defendant Keys with violating 18 U.S.C. § 1030(a)(5)(A). The statute provides:

> Whoever . . . knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer . . . shall be punished as provided in subsection (c) of this section.

*Id*.

Subsection (c)(4)(B)(i) provides that a violation of Section 1030(a)(5)(A) shall be punished by a

---

[8] This is because of a policy judgment about the perniciousness of conspiracy. "The law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed." *United States v. Feola*, 420 U.S. 671, 694 (1975); *see also Callanan v. United States*, 364 U.S. 587, 593-94 (1961).

fine and imprisonment for not more than 10 years, or both, if the offense caused a harm contained in subclauses (I) through (VI) of subparagraph (A)(i) of the statute. Subclause (I) specifies the following harm:

> Loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting or more other protected computers) aggregating at least $5,000 in value . . . .

*Id*.

### 1.    The Damage Element

Section 1030(a)(5) prohibits damaging a computer system. The statute requires only that the defendant's conduct "cause" damage. It is not necessary to prove that the damaged computer was the same computer that the defendant accessed. "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

In *United States v. Middleton*, 231 F.3d 1207, 1213-14 (9th Cir. 2000), the court held that damage included a user increasing his permissions on a computer system without authorization. In that case, the defendant was a dissatisfied employee who quit his job as a computer administrator and began sending threatening emails to his former employer. *Id*. at 1208. Defendant also connected to his former employer's computer network and accessed the network account of a current employee, and used her account to create new accounts and add features to accounts. *Id*. at 1208-9. Defendant ultimately used the new accounts he had created to change administrative passwords, alter computer files, and delete the billing system and two internal databases. *Id*. at 1209. Upon discovering the damage, the former employer's staff spent many hours restoring the network, and investigating the source and extent of the damage. *Id*.

On appeal, defendant argued that the district court instructed the jury improperly on the definition of "damage." *Id*. at 1213. Defendant had requested the instruction: "Damage does not include expenses relating to creating a better or making a more secure system than the one in existence prior to the impairment." *Id*. The district court refused the request and gave a different instruction. *Id*. The district court explained to the jury that "damage" is an impairment to the former employer's computer system that caused a loss of at least $5,000. *Id*.

The Ninth Circuit held that the district court's instructions on "damage" and "loss" correctly stated the applicable law. *Id*. The Ninth Circuit further held the district court's instructions adequately addressed defendant's argument that the jury should not be able to consider the cost of creating a better or more secure system than existed before the attack, and was limited only to those costs that would "resecure" the system to avoid "further damage." *Id*.

Defendant Keys's argument regarding damage at pages 4-5 of his Trial Brief is foreclosed by *Middleton*. In *Middleton*, the Ninth Circuit approved including as damage the hours that a victim company spent re-securing a system from an intruder, restoring deleted databases, billing software, and related applications. *Id*. at 1214. Thus, under Ninth Circuit precedent, a system breached by intruders is a damaged system. Fixing that and restoring deleted data or programs is cognizable damage.

Defendant has nothing to say about this damage to the integrity of the content management "system." He only contends that no data were harmed. For this irrelevant point, he relies on distinguishable civil cases from jurisdictions where *Middleton* did not control. In *Instant Technology, LLC v. DeFazio*, 40 F. Supp. 3d 989 (N.D. Ill. 2014), an employee of the plaintiff company deleted emails from her inbox before her resignation, but the emails remained in both her email trash folder and the company's exchange server. *Id*. at 1019. In *Grant Mfg. & Alloying, Inc. v. McIlvain*, No. CIV.A. 10-1029, 2011 WL 4467767 (E.D. Pa. Sep. 23, 2011), the data at issue was not actually deleted, but instead only marked for deletion, and therefore remained available and accessible. *Id*. at *8. In *Cheney v. IPD Analytics, L.L.C.*, No. 08-23188-CIV, 2009 WL 1298405 (S.D. Fla. Apr. 16, 2009), the court concluded that the deleted data remained available to the company through other means. *Id*. at *6. This case is inapposite here where, as discussed below, the *Los Angeles Times* readership did not have continued access to the altered story. In *Dana Ltd. v. American Axle and Mfg. Holdings, Inc.*, No. 1:10-CV-450, 2012 WL 2524008 (W.D. Mich. 2012), there was no evidence that original files were deleted, and the files that were deleted remained accessible without difficulty. *Id*. at *5-6.

Finally, defendant fails to address the fact that when he conspired to alter the contents of the *Los Angeles Times*, the original, unaltered content was therefore unavailable to that newspaper's readers. It is irrelevant to the damage analysis that the *Los Angeles Times*'s personnel were able to recover the original content, when the *Los Angeles Times*'s readership and customer base were instead forced to

8

read the altered version of the story.

### 2. $5,000 Loss

As the government's motion in limine already discussed at length the case law explaining the $5,000 Loss provision in Section 1030, this section merely supplements that discussion. As illustrated by *Middleton*, loss can include the prorated salaries of victim employees who check systems to make sure no information therein has been modified and re-secure a system to avoid further damage. 231 F.3d at 1213-14; *see also United States v. Sablan*, 92 F.3d 865, 869-70 (9th Cir. 1996) (in calculating "loss" for purposes of earlier version of sentencing guidelines, court properly included standard hourly rate for employees' time, computer time, and administrative overhead).

Finally, in *United States v. Larsen*, 190 F. Appx. 552 (9th Cir. 2006), the court rejected a defendant's argument on appeal that the government had exaggerated victim loss by inflating the amount of time that victim employees spent addressing the problem. The court reasoned that the government had presented evidence that defendant's conduct caused two companies to lose nearly $10,000 in direct expenses, computer support expenses, software updates, and employee labor, and that a rational jury could have concluded that the defendant caused more than $5,000 in loss. *Id*. at 553-4. Citing *Middleton*, the court also noted that defendant's argument turned on the credibility of the government's witnesses, which is the exclusive province of the jury. *Id*.

### C. Attempted Transmission of Code with Intent to Damage

Count 3 of the Superseding Indictment charges Keys with the crime of attempted transmission of code for trying to help "sharpie" back into the Tribune CMS in order to post "a whole front page layout" onto *The Los Angeles Times*. Keys's intent was clear from his statement on the "InternetFeds" IRC, in which he cited an unfavorable news story as "Yet another reason the Times must be demolished." The Government will seek to convict Keys for Count 3 as a principal, and aider and abettor, and/or as a co-conspirator.

The object of this attack was to "demolish" *The Los Angeles Times* through a very particular kind of interruption of service. Keys sought to publicly deprive *The Los Angeles Times* of control over the front page of its web site. The newspaper has a strong reputational interest in preventing interruptions to

that control, which reputation the Government's witness will testify is worth more than $5,000. This is important, because whether this attempt crime is a felony depends on whether the attempt, if completed, would have caused $5,000 in loss in any one-year period. 18 U.S.C. § 1030 (c)(4)(B), (a)(i). If not, the attempt is a misdemeanor. 18 U.S.C. § 1030(c)(4)(G).

The Government will proffer evidence that by attempting to escalate the attack and post an entire *Los Angeles Times* front page layout, Keys and sharpie attacked the integrity of the news, a reputational asset of Tribune Company worth more than $5,000. The Ninth Circuit has already held that injury to goodwill is "loss" for purposes of 18 U.S.C. § 1030. *See Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935 (9th Cir. 2004), citing *Black's Law Dictionary* 552 (8th ed. 2004) (including "lost profits and loss of good will or business reputation" in the definition of consequential economic losses). Goodwill may be hard to measure, but it is real. As of December 26, 2010, Tribune Company valued its total goodwill at $409,428,000.[9] In this trial, the Government will proffer testimony that these attacks and attempted attacks on *The Los Angeles Times* attempted to harm the paper's credibility by attacking its control over its most visible content.

The Government anticipates calling the online editor of *The Los Angeles Times* to testify that the paper's credibility is its most important asset and thus the reputational loss from control over content is easily worth more than $5,000. This harm is no less real for its difficulty to measure with precision. The Government's witnesses' broad valuation of the harm to newspaper's credibility will be clearly demonstrated as sincere and reasonable when they tell the jury that Tribune Company spent $1.5 million on information technology improvements in response to this incident. This was to protect the integrity of the news from further harm.

News organization goodwill is a real asset, important enough to have been the subject of Supreme Court litigation on more than one occasion. "Although the definition of goodwill has taken different forms over the years, the shorthand description of good-will as 'the expectancy of continued patronage' provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business. *See Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555-

---

[9] http://www.tribune.com/emergence/Tribune_2010_2011_Q32012_Financial_Statements.pdf (page 4, viewed Sept. 6, 2015).

56 (1993). "As applied to a newspaper, the good will usually attaches to its name, rather than to the place of publication. The probability of the title continuing to attract custom in the way of circulation and advertising patronage gives a value which may be protected and disposed of, and *constitutes property*." *Metro. Nat. Bank v. St. Louis Dispatch Co.*, 149 U.S. 436, 446 (1893) (emphasis added). News organization goodwill may be difficult to value, but it is error for a fact finder not to consider it. *See Coop. Pub. Co. v. Comm'r of Internal Revenue*, 115 F.2d 1017, 1020 (9th Cir. 1940) (reversing tax court for not accounting for good will of newspaper in valuing a transaction).

## V. TRIAL ISSUES

### A. Lay Testimony is Suffcent to Establish Loss

The Government's loss witnesses will be actual percipient witnesses from the time of the attack. Collectively, these witnesses all worked for Tribune Company on matters concerning information technology, editorial judgment, and business management and were all involved in the response to Keys's attack on their company. These are not expert witnesses. Rather, they will testify about matters within their personal knowledge: their own observations, actions, motives, and business. *See* Fed. R. Evid. 602.

#### 1. Tribune Company witnesses may offer their own lay opinions about their actions.

Percipient witnesses who work in a specialized field may answer questions about the reasonableness of their own work without being qualified as experts. *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003) ("Tampa Bay's witnesses testified [about reasonableness of their own charges] based upon their particularized knowledge garnered from years of experience within the field."). If Defendant does not like their answers, he can cross-examine these witnesses or attempt to notice his own experts. While Fed. R. Evid. 701(c) prohibits lay testimony from being "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," that proviso was never intended to affect the prototypical examples of the type of evidence subject to lay opinion. *See Tampa Bay Shipbuilding & Repair Co.*, 320 F.3d at 1223, citing 2000 advisory committee's note. Indeed, in 2000 the Rules Committee specifically identified damages to a business as exactly the kind of thing about which the people in the business may opine about

without being qualified as accountants, appraisers, or similar experts. *See* Fed. R. Evid. 701, 2000 advisory committee note. "Such opinion testimony is admitted not because of experience, training, or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment [Rule 701(c)] does not purport to change this analysis." *Id.* Even a specialist does not require expert witness qualification in order to give opinions about his own work was reasonable. *See Weese v. Schukman*, 98 F.3d 542, 550 (10th Cir. 1996) (doctor defendant testifying about his own medical work). If a percipient witness may answer based on his work at the victim company, he may give lay opinion. *See also United States v. Hill*, 643 F.3d 807, 842 (11th Cir. 2011) ("[T]he district court did not abuse its discretion by permitting the [lender bank] witnesses who had personally dealt with the fraudulent loan transactions at issue to respond to the government's questions about what would have happened if the facts had been different").

**2.    Tribune witnesses may offer their own lay opinion that a reputation for editorial control over the front page to its web site is worth more than $5,000.**

Keys and sharpie tried to take away the *Los Angeles Times'* editorial control over its website and make it known to the world. These co-conspirators did this when they successfully altered a news story and unsuccessfully attempted to post a whole front page layout that sharpie had created for the website of *The Los Angeles Times*. Employees of the *Los Angeles Times* with day-to-day responsibility for editorial control will testify that the paper's reputation for editorial control is the paper's credibility -- the most important asset of the newspaper. These witnesses will not be asked for a precise number because this is not a civil section 1030 case in which a plaintiff is required to litigate a precise amount of loss. *See* 18 U.S.C. § 1030(g). Rather, it is a criminal case in which people involved in the day-to-day operations of the website will state a fairly obvious point: a newspaper's reputation for control over its own content is worth at least $5,000. This is the lay opinion of people actually involved in the incident. *See* Fed. R. Evid. 701, 2000 advisory committee note. "[C]ourts may allow lay witnesses to testify to opinions based on a combination of their personal observations regarding the incident in question and their specialized knowledge obtained through their vocation." *Los Angeles Times Commc'ns, LLC v. Dep't of Army*, 442 F. Supp. 2d 880, 887 (C.D. Cal. 2006), citing *United States v. Crawford*, 239 F.3d

1086, 1090-91 (9th Cir.2001) (witness could testify to a university's use of a term, based on his

experience with university policies).

The Tribune Company witnesses' words will be corroborated by actions that speak even louder. Specifically, they will testify that editorial control over online content is worth so much, that after this incident, Tribune Company spent $1.5 million upgrading its systems to ensure that this would never happen again.

### 3. This reasoning does not preclude Defendant from proffering an expert.

The Government's view is that loss testimony is most credible from the actual people who were involved in this event. Some expert's opinion would be both superfluous to, and less persuasive than, the testimony of these people who were actually involved in what happened. Their opinions are based on personal knowledge are rather obvious: a national newspaper's reputation for controlling its own content is worth rather more than $5,000. In the Government's view, an outside expert witness on its side would waste the jury's time. Fed. R. Evid. 403. If Defendant can find someone to give contrary testimony, the jury can decide who is more persuasive.

### B. Co-conspirator statements

Each IRC participant's out-of-court statements are admissible co-conspirator statements, whether or not the Anonymous "hacktivist" enterprise was illegal. Co-conspirator statements made during and in furtherance of a conspiracy are admissible against all conspirators. Fed. R. Evid. 801(d)(2)(E). Under the Federal Rules of Evidence, the predicate "conspiracy" does not have to be an illegal enterprise. Rather, "Rule 801(d)(2)(E) applies to statements made during the course and in furtherance of any enterprise, whether legal or illegal, in which the declarant and the defendant jointly participated." *United States v. Layton*, 855 F.2d 1388, 1400 (9th Cir. 1988), *overruled on other grounds in Territory of Guam v. Ignacio*, 10 F.3d 608, 612 n.2 (9th Cir. 1993).[10] Whether conspiracy is charged has no effect on the admissibility of statements under this rule. *See Layton*, 855 F.2d at 1398.

A statement is "in furtherance" if it "furthers the common objectives of the conspiracy or sets in

---

[10] "[T]he question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture." *Layton*, 855 F.2d at 1398; *accord United States v. El-Mazain*, 664 F.3d 467, 503 (5th Cir. 2011); *United States v. Regilio*, 669 F.2d 1169, 1174 n.4 (7th Cir. 1981); *United States v. Gewin*, 471 F.3d 197, 200-202 (D.C. Cir. 2006).

motion transactions that are an integral part of the conspiracy." *United States v. Yarbrough*, 852 F.2d 1522, 1536 (9th Cir. 1988). This includes:

- "Statements made to induce enlistment or further participation in the group's activities;"

- Statements made to prompt further action on the part of conspirators;

- Statements to "reassure" members of a conspiracy's continued existence;

- Statements to allay a co-conspirator's fears; and

- Statements made to keep co-conspirators abreast of an ongoing conspiracy's activities.

*Id.* at 1535. It is immaterial whether a statement is made to a co-conspirator or an outsider, so long as it was during and in furtherance of the conspiracy. The Confrontation Clause allows admission of co-conspirator statements. *See United States v. Larson*, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (en banc).

None of this should affect the order in which witnesses are called and exhibits offered. It is entirely proper for courts to admit co-conspirator statements before the existence of a conspiracy is established, with the statements to be stricken from evidence if the government ultimately fails to satisfy foundational requirements. *See United States v. Perez*, 658 F.2d 654, 658 (9th Cir. 1981); *United States v. Zemek*, 634 F.2d 1159, 1169 n.13 (9th Cir. 1980); *Parente v. United States*, 249 F.2d 752, 754 (9th Cir. 1957).

The preponderance of the evidence standard applies and the Court may consider the statements themselves in conjunction with surrounding circumstances. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). Here, the Government will offer into evidence that Keys was communicating with Anonymous members about taking certain actions on the Tribune CMS server, and subsequent analysis of the server's logs confirmed that these actions were completed. Moreover, Keys actually confessed to the FBI that he was AESCracked, that he gave logon credentials to the hackers, and that when he saw the *Los Angeles Times* defacement, he felt that he had incited it. That is more than enough foundation for the admission of these co-conspirator statements.

Finally, an out-of-court statement that does not meet the requirements for admission as a co-conspirator statement may nonetheless be admissible, not for the truth, but as evidence linking those

14

involved to the conspiracy or as a verbal act establishing the conspiracy. *See United States v. Sanchez-Lopez*, 879 F.2d 541, 554 (9th Cir. 1989); *United States v. Lim*, 984 F.2d 331, 336 (9th Cir. 1993), or as a non-hearsay statement offered to prove its falsity, not its truth. Fed. R. Evid. 801(c)(2) (defining hearsay as a statement offered to prove its truth).

### C. Special Agent John Cauthen's Potentially Dual Role As Both Percipient and Expert Witness

The government intends to call case agent and FBI Special Agent John Cauthen as a percipient witness to testify regarding his summary of voluminous electronic evidence obtained from multiple sources, as well as his recorded interview of defendant Keys and writings that Keys provided Cauthen at the end of the interview. Although the government expects that the bulk of Agent Cauthen's testimony will be based on his personal knowledge, Fed. R. Evid. 602, some testimony that the government intends to elicit from Agent Cauthen may arguably fall within the category of expert testimony. Fed. R. Evid. 702. The government's difficulty in characterizing this testimony arises from, e.g., the presence of statements located within computer log files that may require some degree of interpretation, and some widely-used but still technical concepts such as Internet Protocol addresses and Virtual Private Networks. The government has provided expert witness discovery for Special Agent Cauthen and is prepared to offer him as an expert witness if the Court decides it is necessary.

The Ninth Circuit has recognized that a case agent may testify as both a lay witness based on his knowledge of an investigation, and as an expert based on his specialized knowledge. *United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014). However, such dual status can create risks. *Id*. For example, the agent's expert status could lend him unmerited credibility when testifying as an expert witness. *Id*. Other risks include the inhibition of cross-examination, juror confusion, or the agent's reliance on hearsay instead of reliable methodology. *Id*.

To reduce these risks, the government requests that the Court instruct the jury on the difference between expert and lay testimony and the significance of these dual roles. *Vera*, 770 F.3d at 1242-3. Further, the government will endeavor to clarify when it is asking Agent Cauthen a question in his lay capacity, as opposed to his expert role. *United States v. Martinez*, 657 F.3d 811, 817 (noting that "[t]he government was nearly always exact in specifying when it was asking for [the agent's] testimony as an

expert" in affirming admission of the agent's hybrid testimony).

### D. Issues Related to Closing Arguments

Defendant may call witnesses and the Government may comment on his failure to do so. "A prosecutor's comment on a defendant's failure to call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify." *United States v. Cabrera*, 201 F.3d 1243, 1249 (9th Cir. 2000) (citing cases). If a defendant does testify, a prosecutor may characterize the defendant's testimony as false. *Id.* at 1250. In this case, especially if Defendant makes an issue of Xavier Monsegur ("Sabu") without calling Monsegur, the Government is very likely to comment on Defendant's failure to call that witness.

### E. Stipulations

In the interest of conserving trial time, the parties have agreed to stipulate to the definition of certain terms, as well as the authenticity of certain documents. Those definitions and documents are set forth in two documents filed with the Court at Docket Numbers 66 and 84 ("the Stipulations").

This Court may accept stipulations, and should do so in the interest of time and justice. *See United States v. Molina*, 596 F.3d 1166, 1169 (9th Cir. 2010) ("[S]tipulations serve both judicial economy and the convenience of the parties, [and] courts will enforce them absent indications of involuntary or uninformed consent.") (quoting *CDN Inc. v. Kapes*, 197 F.3d 1256, 1258 (9th Cir.1999)).

With regard to the definition of terms, the parties have agreed to the meanings of technical definitions set forth on pages two and three of the Stipulation at Docket Number 66. Those terms relate to records kept by Overplay, a provider of Virtual Private Networks.

With regard to documents, the parties have agreed to stipulate to the authenticity (but not the relevance) of documents listed in the Stipulations.

With regard to the Selected Records from the Tribune Assembler Log ("Assembler Log"), the records refer to portions of lengthy data files, which were provided to defense counsel in native form. The government will show that the Assembler Log is a record of user activity on its system, which is the same system the government alleges was the subject of the malicious code transmission specified in the

indictment.  The government expects that it will present portions of that evidence, pursuant to the Stipulations and other foundational testimony.   Data from the Assembler log is not currently Bates-stamped because it is an extremely lengthy database—to attempt to apply traditional Bates numbers to such a document would fail because the whole database is not reducible to printable pages.  The government has specified to defense counsel which of the log entries it will be introducing through a previous of Special Agent John Cauthen's proposed summary exhibit.

The parties have also stipulated to the chain-of-custody for the Dennis Collins computer, from when it was seized by the FBI through its introduction as evidence in this trial.  The parties have <u>not</u> agreed about the admissibility of the Collins computer for other reasons, which are the subject of a Motion in Limine currently pending before the Court.

The parties have also stipulated, conditionally, to the authenticity of documents that are the subject of a motion to quash currently pending before the Honorable Allison Claire.  Should the trial subpoena requesting the documents survive the motion to quash, the parties have agreed that they are authentic.

The parties may agree to modify or add to the existing stipulations as the trial progresses.

## F.    <u>Pending Motion to Quash</u>

Defendant has moved to quash a trial subpoena issued by the government to Google for basic subscriber information associated with an email account.  (Docket No. 64.)  A motion hearing is currently set for September 25, at 2 p.m. before Magistrate Judge Allison Claire.  If the motion is denied, the government anticipates that it will insert information obtained from this subpoena into the summary presentation that it plans to introduce via Special Agent Cauthen.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## VI. CONCLUSION

The United States expects that this trial will be concluded before October 9, 2015. The Government anticipates calling a fair number of witnesses whose testimony will be short. As soon as practicable, the Government will send courtesy copies of its exhibit binders to chambers so that the Court may get a better pre-trial sense of the nature and volume of documentary evidence to be presented.

Dated: September 21, 2015

BENJAMIN B. WAGNER
United States Attorney

By:  /s/ MATTHEW D. SEGAL
MATTHEW D. SEGAL
PAUL A. HEMESATH
Assistant United States Attorneys


LESLIE R. CALDWELL
Assistant Attorney General
United States Department of Justice, Criminal
 Division


 /s/ JAMES SILVER
JAMES SILVER
Deputy Chief for Litigation
Computer Crime and Intellectual Property Section