BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
PAUL HEMESATH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

LESLIE R. CALDWELL
Assistant Attorney General
United States Department of Justice, Criminal Division
JAMES SILVER
Deputy Chief for Litigation
Computer Crime and Intellectual Property Section
Washington, DC 20530
Telephone: (202) 514-1026

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>             v.<br><br>MATTHEW KEYS,<br><br>                              Defendant. | CASE NO.  2:13-CR-82 KJM<br><br>UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR<br><br>DATE: March 23, 2016<br>TIME: 9:00 a.m.<br>COURT: Hon. Kimberly J. Mueller |

### I.        INTRODUCTION

The PSR correctly applies the sentencing guidelines to the real conduct of this case.  Throughout his objections, and without citation to any case law applicable in criminal sentencing, Defendant assumes that sentencing facts must be limited to the elements of the offenses pleaded in the indictment and proven at trial.  But the Supreme Court teaches that sentencing is based on whatever real conduct and harm are provable at the time of sentencing.  Defendant's reliance on civil cases on how to calculate civil damages under the CFAA is similarly misplaced.  The guidelines provide the governing definition of loss.

## II. RELEVANT CONDUCT INCLUDES THE HARM THAT RESULTED FROM KEYS'S THEFT AND USE OF THE FOX 40 REWARDS EMAIL LIST

Sentencing is based on what Defendant actually did rather than on the elements of the crime of conviction. The objective of sentencing, both before and after the guidelines, is to sentence defendants based all of their conduct, rather than on what particular offense the prosecutor decided to charge. *See United States v. Booker*, 543 U.S. 220, 253 (2005). According to the Supreme Court, "This point is critically important. Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity. That uniformity does not consist simply of similar sentences for those convicted of violations of the same statute . . . It consists, more importantly, of similar relationships between sentences and *real conduct*." *Id.* at 253-54 (emphasis added). Defendant's argument that loss cannot include conduct that he contends "is covered by an entirely different section of the CFAA" misses the point of the sentencing guidelines and *Booker*, which is to focus sentencing courts on "real conduct," which includes even "charged, uncharged, and acquitted conduct" that occurred during the offense of conviction. *See United States v. May*, 706 F.3d 1209, 1213 (9th Cir. 2013) (applying U.S.S.G. § 1B1.3(a)(1)(A) to hold that guidelines loss properly included cost of Postal Service's foreseeable anti-theft measures during period overlapping defendant's charged *possession* of stolen mail but preceding defendant's charged mail *theft*).

Defendant's "Cancer Man" emails were admitted at trial because they were inextricably intertwined with the other things that he did out of his anger at Tribune Company. All of the things Keys did occurred in the same period (October 28, 2010 to January 5, 2011), were directed at the same victim (Tribune Company), using the same instrumentality (Keys's Macintosh computer running the Firefox browser), from the same location (Keys's home IP address), using the same proxy service to conceal his conduct (Overplay), and derived from the same motive (Keys's anger at Tribune Company). There is no need for the Court to re-hear Defendant's unsuccessful arguments from the hearing on motions in limine. The trial Rules of Evidence do not apply at sentencing. U.S.S.G. § 6A1.3(a). For real conduct sentencing, relevant conduct includes "*all acts* and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . *that occurred during the commission of the offense of conviction*, in preparation for that offense, or in the course of

attempting to avoid detection or responsibility for that offense[.]" U.S.S.G. § 1B1.3(a)(1)(A) (emphasis added).  Keys's theft and use of the email list happened during the commission of the offense of conviction.  Count 2 occurred between October 28, 2010 and January 5, 2011.  (Superseding Indictment, Dkt. 44, Count 2, ¶ 2.)  The "Cancer Man" emails were sent between December 1, 2010 and December 20, 2010.  (*See* GX 101-126.)  This temporal overlap makes this conduct relevant conduct for the same reason that it was in *May*.  U.S.S.G. § 1B1.3(a)(1)(A) makes this conduct relevant conduct.[1]

The Ninth Circuit applies this principle of real conduct sentencing with full force even to harm caused by conduct that is not a federal crime.  In a criminal tax sentencing, a convicted defendant was held accountable even for unpaid taxes to state authorities.  *See United States v. Yip*, 592 F.3d 1035, 1038 (9th Cir. 2010).  In a false statements case in a federal government contracting case, a convicted defendant was held accountable for money he looted from contracts over which there was no federal jurisdiction.  *United States v. Newbert*, 952 F.2d 281, 284 (9th Cir. 1991).

It is no surprise that Defendant cannot cite a single case holding that Guidelines "loss" is limited to what damages a civil plaintiff could recover when suing for the same conduct.  That is not how the guidelines work.  "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."  U.S.S.G. § 1B1.3, background comment.

### III.     RESPONSES TO PARTICULAR OBJECTIONS

¶ 1     "Malicious" means "intending or intended to do harm."  Oxford Dictionaries, Oxford University Press.  Title 18, Section 1030(a)(5)(A) prohibits "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, *intentionally caus[ing] damage* with authorization, to a protected computer" (emphasis added).  It is not unduly prejudicial to

---

[1] Even if there were no temporal overlap, the "Cancer Man" emails would be relevant conduct for the independently sufficient reason that they were part of the same course of conduct or common scheme or plan as the offense of conviction. *See* U.S.S.G. § 1B1.3(a)(2). Everyone agrees that the applicable offense guideline is § 2B1.1. That is one of the guidelines that automatically triggers grouping based on a "measure of aggregate harm." *See* § 3D1.2(d). The loss calculation is therefore based on "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." § 1B1.3(a)(2). "[T]he essential components of the section 1B1.3(a)(2) analysis are similarity, regularity, and temporal proximity." *United States v. Hahn*, 960 F.2d 903, 910 (9th Cir.1992); *see also United States v. Vargem*, 747 F.3d 724, 731 (9th Cir. 2014) (same).

distill this statutory language into the phrase "transmission of malicious code," as there is no material difference in meaning between the term "malicious" and the statutory language "intentionally causing damage."

¶ 4     The Probation Officer was provided with the United States' trial exhibits, the discovery, and descriptions of the trial testimony.  The transcripts are now available, and, anyway, the Court saw the trial and may sentence based on what it saw.  If the Court asks, it is expected that the Defense will concede that any delay in obtaining the transcripts was not attributable to the Government.

¶ 5     "Argument" is the word that Keys used in his confession.  (Dkt. 23-5 at 56.)  There were loud words and probably some expletives exchanged in the news room during a breaking news event. (R.T. 53.)  It was heated enough that Brandon Mercer, then-News Director for Fox 40, sent Keys home and deactivated the one network user account provided to Keys that Mercer knew about.  (R.T. 54-55.) This is consistent with what Keys said about his conduct in the newsroom generally:  "I threw fits in the newsroom."  (Dkt. 23-5 at 56.)  Samantha Cohen, another witness who was then employed as a Senior Producer for Fox 40's morning show, called the incident "a verbal argument" that was loud enough for her to hear through the glass window between the control room and the newsroom.  (R.T. 440.)

The rest of Defendant's objection is legal, not factual, and it is without merit because it ignores the definition of relevant conduct.

¶ 6     The record amply supports the conclusion that Keys created back door access points. The Court remarked that the evidence of back door construction, if credited by the jury, could support the charges in the indictment.  (R.T. 801.)  The jury, who returned guilty verdicts, certainly appeared to credit this evidence.  Dylan Kulesza, who at the time was Vice President of Engineering Security and Architecture for Tribune Company, described what "back door" means in this context.  "In security terms, a back door is a way for an attacker or a hacker to regain access.  And so generally if the original way they were able to break into the system, if that is terminated or if that access is no longer available, an attacker will try to establish a back door, which is a way that they can gain access again."  (R.T. at 345.)  Timothy Rodriguez, another former Tribune employee who was responsible for security and investigating compromises and incidents, testified to the same fact.  (R.T. 414.)[2]

---

[2] Rodriguez was responsible for damage assessment in this incident.  When asked about the

1     Mr. Kulesza examined the CMS server logs, (GX 303), identified particular commands, and testified about the creation of the user account "Anon1234." Mr. Kulesza said, "Anon1234 is not the name of an actual user. And from experience looking at this behavior, it's telling me that someone is trying to put in a back door or an account that they can in the future regain access if the primary account that they have compromised becomes inaccessible." (R.T. 352-353.) The Anonymous chat logs show that Keys is the one who granted this username "permission to every site" and gave it to Anonymous along with instructions and encouragement to use it for vandalism. (GX 611.)

    The following is from SA Cauthen's presentation that displayed evidence together to show Keys, through the Overplay proxy, created the Anon1234 username on the Tribune CMS and gave it to the Anonymous chat room:

**Time Comparison Between Tribune Server Logs, Overplay Logs, and IRC Logs**

- 80.74.135.87 -     08/Dec/2010:17:57:04 -     0800] " POST    /access/savegroups.ldap HTTP/1.1" 200 578 "https://assembler.tribuneinteractive.com/access/editgroups.ldap?username=anon1234" "Mozilla/5.0 (Macintosh; U; Intel Mac OS X 10.6; en-US; rv:1.9.2.8) Gecko/20100722 Firefox/3.6.8

- UserName | NASIPAddress  | AcctStartTime       | AcctStopTime        | FramedIPAddress | CallingStationId
  keysjom  | 80.74.135.87  | 2010-12-09 01:31:39 | 2010-12-09 03:57:46 | 10.12.0.10      | 75.53.168.11

- 08/Dec/2010:17:57 Los Angeles Time    AESCracked: It takes a while to grant one username permission to every site
- 08/Dec/2010:17:57 Los Angeles Time    AESCracked: Im doing that now.
- 08/Dec/2010:18:00 Los Angeles Time    AESCracked: yes, those are the three cms that this user/pass gives access to
- 08/Dec/2010:18:00 Los Angeles Time    AESCracked: user: anon1234
- 08/Dec/2010:18:00 Los Angeles Time    AESCracked: pass: common2
- 08/Dec/2010:18:01 Los Angeles Time    AESCracked: go fuck some shit up!

(GX 1004.)

    That was not the only back door. When an Anonymous hacker did not like the conspicuousness of the username anon1234, Keys responded, "Okay, create a fictitious name then . . . if you're on the assembler site, scroll down on the left to 'user preferences.' Click on that, then 'edit users.'" (GX 604-003.) Finally, after the Los Angeles Times defacement, Keys tried to help Sharpie regain access to the CMS and wrote, "Let me see if I can find some other users/pass I created while there." (GX 507.) In other words, Keys created backdoor access points and showed others how to do the same thing to

---

importance of assessing the existence of other back doors, he responded, "That was critical because an open back door would not only give them access to resources now but resources in the future, and they could pull down other information unbeknownst to us." (R.T. 414.) Tribune had to assess whether back doors existed for the plates and for financial systems. (R.T. 417-418.)

1  accomplish their common objective.

2    ¶ 7 The evidence is supported by the record:

3    *Deletion of Twitter followers*.  Brandon Mercer testified that when his employment ended, Keys
4  controlled the Fox 40 Twitter account and that thousands of users were deleted before Fox 40 could take
5  control of the account.  (R.T. 177-178.)  Responding to cross-examination, Mercer explained how this
6  could be done.  (Id.)

7    *Theft of the email list*.  The trial evidence supports the PSR's conclusion that Defendant stole the
8  Fox 40 email list.  In his handwritten confession, Defendant stated, "I gained access to a list of emails
9  (email addresses) from the Tribune Company content management system.  I used these email addresses
10 to send correspondence to people I have reason to believe were viewers of my former employer KTXL,
11 a part of Tribune Company."  (GX 204.)  He said the same thing in the audio recorded statement.  (Dkt.
12 23-5 at 51.)  Keys downloaded the Fox 40 email list on November 3, 2010 and November 22, 2010,
13 which was after his employment and "during the offense of conviction."  (GX 303-004, 005;
14 Superseding Indictment, Dkt. 44, Count 2, ¶ 2.)  Under the sentencing principles set forth above, it does
15 not matter what subsection of 18 U.S.C. § 1030 is charged or uncharged.  *May*, 706 F.3d at 1213
16 ("charged, uncharged, and acquitted conduct").

17   *Intent to disrupt business operations*.  The evidence supports that this was Keys's purpose in
18 sending menacing emails to Fox 40 and its customers.  Keys admitted that he wanted to tell Fox 40
19 viewers that they were being "suckered" by "gimmicky things."  (Dkt. 23-5 at 51.)    If Keys had
20 intended merely to communicate with Fox 40 viewers, he would have simply done that.  Instead, he
21 preceded his communications to viewers with various warning emails to Brandon Mercer and followed
22 up with taunting messages that Tribune Company's network was not secure.  (GX 109, 110, 125.)
23 Mercer testified, "Dealing with the e-mails in general, what was at stake was basically the reputation of
24 our company."  (R.T. at 127.)  Keys knew what he was doing and reveled in the effect he was having on
25 his former employer.  Mercer emailed Keys's "Cancer Man" address and asked, "Do you guys have any
26 idea what sort of distraction this is causing for the company?  I still can't understand what your goal is.
27 If the goal is to frustrate us, well, mission accomplished."  (GX 125.)  Keys replied, "i told you were are
28 busy. not sure what you think you found but we continue to gather information in the same manner that

we did last week and weeks before." (*Id.*)  At least one of his emails to the Fox 40 Rewards list gave out the number to the Fox 40 newsroom and encouraged each recipient to call.  (GX 1006.)  Keys knew how expensive responding to this kind of conduct would be -- he bragged about the expense of dealing with the problem.  (GX 103.)  He obviously did this for the effect it had on his former employer.  As "Cancer Man," Keys wrote to Mercer, "We've got your attention . . . wonder how long that will last?"  (GX 123.)  Even on December 20, 2010, after the Los Angeles Times defacement, Keys had not caused enough distraction at Fox 40, so wrote Mercer a one-word email, apparently just to keep Mercer uncertain.  (GX 126.)

*Hostility and distrust*.  Evidence and common sense support the PSR's conclusion that Keys's emails had the effect of engendering hostility and distrust among the viewers who had signed up for the loyalty program.  It does not matter that "there was no testimony from any Fox 40 viewers at trial."  (Def. Objs. at 4.)[3]  Customer hostility and distrust is exactly what one would expect after the hack of corporate database that had stored customer credit card information.  Keys appreciated this and, as "Cancer Man," told viewers that his message "just may change the way you view their station forever."  (GX 107.)  According to News Director Brandon Mercer, the email list was part of the Fox 40 Rewards Program, whose whole purpose was to build viewer loyalty.  (R.T. 47-48.)

Keys's emails show an intent to destroy the Fox 40 Rewards program.  The PSR understates when it says Defendant's "emails had the effect of engendering hostility and distrust among the viewers who had signed up for the loyalty program.  They no longer trusted FOX40 with their information."  Some Fox 40 Rewards members had entered credit card information, so a number had voiced questions about the security of their credit cards and bank accounts.  (R.T. 196-198; GX 1002.)  This was the natural effect of the emails that "Cancer Man" sent to each viewer.  He wrote, "you're giving the company access to your Facebook, your Twitter, your email, your passwords . . . and even your credit card information," and suggested that Fox 40 and Tribune were secretly viewing customers' credit card statements.  (GX 107.)

Brandon Mercer testified that in responding to viewer calls, Fox 40 employees were in part

---

[3] The Government had initially planned on calling these witnesses but changed course in order to shorten the trial.  (R.T. at 465.)  That does not make their information inadmissible at sentencing.

U.S. RESPONSE TO DEFENDANT'S
OBJECTIONS TO PSR

7

"trying to calm the viewers down because they were frankly terrified[.]" (R.T. 196.) Keys's response to this is worth noting as the Court evaluates his character for sentencing. On December, 3, 2010, Brandon Mercer wrote to Keys's "Cancer Man,"

> I hope you're proud of yourself.
>
> I just had to talk down a crying senior citizen whose husband is in kidney failure. She's having a panic attack on the phone because of you. She's so scared of your stupid emails that she's in tears talking with me. Her husband just started dialysis . . . . and now you have her worried about her account, and all this mess that she doesn't understand, instead of thinking about her FAMILY.
>
> Are you really trying to scare poor senior citizens with husbands in kidney failure?
>
> [ . . . ]
>
> THESE ARE REAL PEOPLE YOU'RE MESSING WITH.

(GX 1001.) Keys arrogantly responded, "perhaps fox40 is in need of a new slogan: 'we report to the old folks home.' if she's so worried about her husband, why is she worried about her email? seems like the priorities are in the wrong place there." (*Id.*) In a subsequent email bragging about still more email address he had downloaded from the Fox 40 Rewards list, Keys wrote, "our newest batch of e-mail recipients. you fox people make it incredibly easy to gain access to your subscriber list. think any of these guys are elderly?" (GX 108.)

It was not just the elderly who expressed understandable concerns after their information was compromised. One told the FBI that he "never participated in any more FOX40 promotions . . . and the credibility of the station went down in his eyes." (GX 1005.) Another said that after he thought the station had been hacked, "he did not trust the station anymore because he thought his information was vulnerable." (GX 1006.)

¶ 8   Ms. Cohen's testimony supports the statement in the PSR. She testified that she could not work for five days. (R.T. 461.) "There was -- I mean, it was a week of resetting my password, and all I could do is just sit at my desk and twiddle my thumbs." (R.T. 462.) One email string on this subject was admitted as GX 112, but it did not reflect all of Cohen's difficulties with her user credentials. (R.T. 483.) The brief cross-examination of Ms. Cohen did not result in her changing her estimate of how much time she lost. (R.T. 475-482.) Indeed, on redirect, she clarified that GX 112 did

1  not document all of the password difficulties she had in the week in question.  (R.T. 482-483.)  Even
2  tested by re-cross-examination, Ms. Cohen was firm about the effect that a week of random password
3  resets had on her ability to do her job.  (R.T. 483-485.)

4  ¶ 10   The trial evidence proved beyond a reasonable doubt that "Sharpie accessed a server
5  without authorization and affected the database used by the Tribune Media to alter the online version of
6  a news feature published on the website of the LA Times."  That was the whole point of Keys's giving
7  Anonymous the super user credentials and telling them to "go fuck shit up."  *Los Angeles Times* Deputy
8  Online Editor Dan Gaines, who first noticed the defacement, testified that the credentials used for the
9  web defacement were not associated with anyone who normally touches stories at the *Los Angeles*
10 *Times*.  (R.T. 216.)  According to Jason Jedlinski, who in December 2010 was Vice President of
11 Products for Tribune Digital, when "Dan Gaines reported that someone had made an unauthorized edit
12 to a story on the L.A. Times website," the reaction at Tribune Company was "panic," the personal
13 involvement of the Chief Technology Officer, and a report to the Chief Executive Officer.  (R.T. 506-
14 507.)  They had discovered loose super user accounts and need to shut down any other such access
15 points to Tribune Company's network.  (R.T. 513-515.)  Brian Hanrahan, who in 2010 was Chief of the
16 *Los Angeles Times* morning copy desk, testified that the "ngarcia" username did not match any
17 employee of the Tribune Company.  (R.T. 291-292.)  In the thirty-three years that Hanrahan worked at
18 the *Los Angeles* Times, there was no other security incident that could compare to this one.  (R.T. 297.)
19 Senior Engineer Tom Comings analyzed the logs and concluded that someone had used credentials
20 "ngarcia" to post those edits from an IP address in Ireland.  (R.T. 266-267.)  Because super user
21 credentials had been used, Tribune had to spend substantial time locating whether other user names had
22 been created in order to restore the integrity of Tribune's CMS.  (R.T. 273-276.)  Finally, in explaining
23 the digital evidence, SA Cauthen freely and without objection referred to this defacement as "the
24 alteration on the Los Angeles Times that was affected from the changes to -- or the unauthorized access
25 to the CMS."  (R.T. 638.)

26 ¶ ¶ 14-15, 17, 24     Objections to Loss
27  The PSR properly calculated loss under the guidelines and did not limit loss to any particular
28 subsection of the CFAA.  This is straightforward application of the sentencing law set forth above.  The

guidelines themselves provide that in a CFAA case, loss shall include "any reasonable cost to any victim," whether foreseeable or not. U.S.S.G. § 2B1.1, application note 3(A)(v)(III).

Defendant's first objection may be quickly disposed of. He has made no showing sufficient to warrant an evidentiary hearing. Hearsay is admissible in sentencing provided it meets a minimum indicum of reliability. *See United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir.1993); U.S.S.G. § 6A1.3. Defendant's general assertion that the loss calculations are "are largely based on unsubstantiated hearsay," is insufficient. (Def. Objs. at 4.) Where, as here, "the district court allows the defendant to rebut the recommendations and allegations of the presentence report either orally or through the submission of written affidavits or briefs, Rule 32 does not require an evidentiary hearing." *United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001). The Defendant has submitted nothing at all, despite the fact that he served a rather substantial trial subpoena on Tribune Media. (GX 1007.) A district court may rely on a PSR if Defendant has only argued that the government has not sustained its burden of proof. *See United States v. Hernandez-Guerrero*, 633 F.3d 933, 937 (9th Cir. 2011).

Keys's objection assumes that guidelines loss in this criminal sentencing is limited to what loss would be recoverable in a civil case for damages. This ignores real conduct sentencing. What matters is what happened, not what charges were chosen. Thus, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction [or] in preparation for that offense, and "all harm that resulted" therefrom. U.S.S.G. § 1B1.3(a)(1), (3). Here, the conduct all involved the same defendant using the same computer from the same IP address through the same proxy service to send commands to the same content management system to strike back against the same company. But because it all happened while Defendant was committing the crime of conviction and a guideline provision can be applied to the conduct, nothing more need be said. *See United States v. Johnson*, 187 F.3d 1129, 1134 (9th Cir. 1999). It does not matter what sub-section of § 1030 Keys was convicted of. "The principles and limits of sentencing accountability under this [relevant conduct] guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is

criminally liable for an offense[.]" U.S.S.G. § 1B1.3, application note 1.

¶ 25   This adjustment is well supported, either because of the use of a foreign proxy server to "cover tracks," the sophistication, or both. Trial evidence showed that Keys was aware that using a foreign service would help him avoid detection. He used Overplay, a European proxy service, to mask his IP address when he accessed Tribune Company's content management service. (GX 904.) On December 2, 2010, as "Fox Mulder," he taunted Brandon Mercer,

> In order to 'prosecute' us, first you have to find out who we are and where we live. Consider it's a lot harder to prosecute individuals whom you consider to live abroad. Those cases end up being very lengthy, very messy federal matters if they even reach that level to begin with. And then you have to keep in mind the laws of the countries where we reside and whether or not they're up to playing ball with the federal investigators in your country. That, indeed, can be messy.

(GX 103.) When trying to help Anonymous re-enter Tribune Company's CMS, Keys first said, "Standby. Have to VPN to cover my tracks." (GX 506.) Finally, he admitted that he used Overplay and even checked to make sure that Overplay functioned to make it appear that his IP was in a foreign country. (Dkt. 23-5 at 48.) They did. At the time of the offense, Overplay's IP addresses geolocated to Switzerland and other countries in Europe. (R.T. 664-665.)

In light of those facts, Defendant's objections are without merit. First, whether Keys was charged with fraud is irrelevant. Second, while there is nothing wrong with using a pseudonymous email address, what the PSR accurately describes is that Keys used false names in order to help conceal his identity in the course of a crime. Third, there is ample evidence of Keys's intent in using Overplay. Fourth, while others may use proxy services for legitimate purposes, here Keys used it expressly to "cover his tracks" in a crime. It's like wearing a mask. While a mask may be legal and unremarkable on Halloween, it is an important part of the plan in a bank robbery. Finally, the crime was sophisticated. Keys himself admitted that he sought out Anonymous's assistance mess things up at Tribune Company knowing of their skill and ability to do serious damage without regard to consequence. (Dkt. 23-5 at 33.)

Keys's final objection, that the PSR omits to mention that Tribune Company's difficulties in ensuring that all rogue accounts had been deleted omits mention that Tribune Company had a large number of inactive accounts, is true but immaterial to sentencing. Fed. R. Crim. P. 32(i)(3).

¶ 26. Defendant's objections to the enhancement are without merit. The guideline applies if the offense involved intent to obtain personal information *or* the unauthorized public dissemination of personal information. U.S.S.G. § 2B1.1(b)(17). Again, that particular § 1030 subsection of conviction involved unauthorized damage to a computer and a different section involves theft of information. (Def. Objs. at 7.) By its own terms, the specific offense characteristic applies to any conviction under § 1030. U.S.S.G. § 2B1.1(b)(17). The guidelines define "the offense" is as all relevant conduct, not just the elements of any particular statutory sub-section. U.S.S.G. § 1B1.1, application note 1(H). The relevant conduct in this case certainly involved the theft of the email list. Keys does not dispute the PSR statement that Keys "attempted to sell said email addressed to members of Anonymous," which is not contradicted by Defendant's (correct) objection that there is no evidence that the list was ever disseminated.

Defendant has waived the objection that email addresses are not "personal information" as defined in U.S.S.G. § 2B1.1, application note 1:

> "Personal information" means sensitive or private information involving an identifiable individual (including such information in the possession of a third party), including (A) medical records; (B) wills; (C) diaries; (D) private correspondence, including e mail; (E) financial records; (F) photographs of a sensitive or private nature; or (G) similar information.

*Id.* The Government cannot find any case that evaluates whether email addresses do or do not fall within this definition. The Court may want to exercise its discretion to consider the waived-but-straight-faced objection that emails are not "personal information" in the way contemplated by the guideline. But Defendant's objection, which ignores fundamental principles of relevant conduct, is without merit.

¶ 29. Keys obviously qualifies for an aggravating role adjustment. He makes a conclusory objection and denies that there were five participants. But he does not factually contest that "The defendant obtained access into a chat room and communicated with . . . members/associates of Anonymous, whom he encouraged to deface the Los Angeles Times website. After securing co-conspirators, Keys provided the username and password to infiltrate the computer, trained them in how to use the CMS, and even sent over a copy of the manual for the CMS." The chat logs support this conclusion. (*See, e.g.,* GX 205.) There were a lot of participants in the various Anonymous chats. The chat logs in GX 205, GX 604, and GX 611, which are duplicative, show that there were five participants

U.S. RESPONSE TO DEFENDANT'S
OBJECTIONS TO PSR

12

in Keys's narrower conspiracy to hack Tribune's CMS:

1. "The [Defendant] himself is a participant." *United States v. Egge*, 223 F.3d 1128, 1134 (9th Cir. 2000).
2. "Sharpie" was in the chat room on December 8, 2010, when Keys disclosed the credentials, told them about the Tribune CMS network and its various media properties, and encouraged them attack. (*See, e.g.*, GX 611-001.) Sharpie also personally executed the Los Angeles Times defacement and sought with Keys to get back in order to do more. (GX 506.)
3. "Sabu," whose true name was Hector Monsegur, entered the network, inspected the user accounts, and followed Keys's how-to instructions to create super user credentials with less obvious names. (GX 611-002.) *U.S. v. Monsegur*, No. 1:11cr666 (S.D.N.Y. filed June 8, 2012).
4. "Kayla," whose true name was Ryan Ackroyd, agreed with and supported Keys's suggestion to deface Tribune Company websites. He said, "Stick a big fucking Operation Payback log on it." (GX 611-002.) *U.S. v. Ackroyd*, No. 1:12cr185 (S.D.N.Y. filed Feb. 27, 2012).
5. "Switch" is the one who invited Keys into the room in the first place. (GX 611.)
6. "Chronom" said he would put the credentials in "our intel database" and gave Keys a particular URL in which to paste them. (GX 604-002.)

The chat log at GX 604 shows Keys managed and supervised. He was the source of unauthorized credentials. He trained the others in how to create more such credentials, instructing them exactly where to type in order to create more super user credentials. Keys directed his co-conspirators as to which newspapers and broadcast stations to attack "for the largest impact" and warned "make your move soon, 'cause they will wise up." Keys distributed the user manual, and, in case there was any doubt as to his role, stated, "i can tell you who i am – i am the man :)". (GX 604-007.) Replicating and distributing an unauthorized means of network access and training people in how to use it is a sufficient basis for this adjustment. *See United States v. Watson*, 118 F.3d 1315, 1320 (9th Cir. 1997) (cloned cellular telephones). Keys did more than just that. He drove Anonymous's decision to target the *Los*

U.S. RESPONSE TO DEFENDANT'S
OBJECTIONS TO PSR

13

*Angeles Times*. As reflected in undisputed Paragraph 9 of the PSR, when, for days, nothing happened, Keys continually urged his co-conspirators to attack the Los Angeles Times until they did.[4]

¶ 30 Abuse of Position of Trust

The adjustment for abuse of position of trust applies when legitimate network access facilitates the offense of conviction. *See United States v. Pedersen*, 3 F.3d 1468, 1472 (11th Cir. 1993) (position of trust adjustment based on sensitive network access); *United States v. Mackey*, 114 F.3d 470, 476 (4th Cir. 1997) ("[S]he was authorized to possess and utilize a computer authorization code, which gave her special access to the company's data base, and enabled her to commit the fraud and conceal it from detection."). It does not matter that the Cancer Man emails and *Los Angeles Times* defacement began after Keys left his position. The only question is whether his position facilitated the offense. *See United States v. Castagnet*, 936 F.2d 57, 60 (2d Cir. 1991) (applying adjustment to former airline agent who wrongfully accessed computer after his employment); *United States v. Magnuson*, 120 F.3d 263 (4th Cir. 1997) (Magnuson was given a special password which permitted him broad access to the Devereaux computer system, access not available to all users of the system. Magnuson abused this trust [when he used it to damage employer systems after he was fired].") (unpublished).

Keys himself understood how his position as a trusted insider facilitated the offense. On December 5, 2010, as "Cancer Man," Keys emailed Brandon Mercer that "Even when security technology is doing its job, it is a poor match if someone with legitimate access decides to go rogue." (GX 109.) In his recorded statement to SA Cauthen, Keys compared his situation to the night manager of a physical building who had been given keys to that building. (GX 215.) He committed the offense with credentials that he had obtained while a Tribune employee trusted with network access. (GX 225.)

Keys's objection, that Tribune Company widely distributed access to its CMS and did not deactivate the credentials of a lot of former employees, fails in two ways. First, it still shows that Keys was different from people who had never worked for Tribune Company and never had had network access. *Castagnet* applied the adjustment to a ticket agent, not some special network administrator. Second, Keys's network responsibilities at Tribune Company were different and more sensitive from

---

[4] The PSR is kind to Keys because he actually was the organizer, which merits an even greater adjustment if the number of participants is five or more. U.S.S.G. § 3B1.1(a).

ordinary employees'. Keys was Fox 40's system administrator, and had responsibility for managing others' CMS login credentials. Samantha Cohen testified, "He trained me on the CMS system. He also was our station's administrator, so he would assist with passwords and log-in issues. He trained new employees when they started." (R.T. 439.) According to Jason Jedlinski, only a handful of employees at each Tribune Company property had these responsibilities and they gave Keys opportunity to gain special insight into the vulnerabilities of Tribune's network. (GX 1003.)

¶ 35    The PSR properly calculates the Offense Level at 29.

¶ 57    The Probation Officer obtained this information after direct contact with the Defendant and the statement should not be revised without evidence. The averment of counsel is not evidence.

## IV.    CONCLUSION

The PSR is supported by the evidence and properly applies relevant conduct rules, not civil damages rules, to the facts of this case. In a civil case, the question is how much money is required to compensate the plaintiff for the loss he has pleaded. But in a criminal sentencing, the question is how to evaluate a convicted defendant's real conduct and judge, based on who he is and what he actually did, what punishment is sufficient but not greater than necessary to accomplish the purposes of sentencing. Defendant's objections, by continually complaining that he was not charged with an additional CFAA count for unauthorized access, miss that point entirely. It was not necessary to pile on charges in order to get a sentencing in which relevant conduct rules apply.

The United States will address variance considerations in a separate sentencing memorandum that addresses non-guidelines factors. That memorandum will address Defendant's objections to ¶¶ 75, 80, 84, 87, 88, and 90.

Respectfully submitted,

Dated: March 9, 2016

BENJAMIN B. WAGNER
United States Attorney

By: /s/ MATTHEW D. SEGAL
MATTHEW D. SEGAL
Assistant United States Attorney