BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
PAUL HEMESATH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

LESLIE R. CALDWELL
Assistant Attorney General
United States Department of Justice, Criminal Division
JAMES SILVER
Deputy Chief for Litigation
Computer Crime and Intellectual Property Section
Washington, DC 20530
Telephone: (202) 514-1026

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>MATTHEW KEYS,<br><br>        Defendant. | CASE NO. 2:13-CR-82 KJM<br><br>UNITED STATES' RESPONSE TO DEFENDANT'S FURTHER OBJECTIONS TO PSR<br><br>DATE: March 23, 2016<br>TIME: 9:00 a.m.<br>COURT: Hon. Kimberly J. Mueller |

## I.    INTRODUCTION

Defendant's filing of last week raises new objections to the PSR. These objections are waived absent good cause. *See* Loc. R. 460(h), (g); Fed. R. Crim. P. 32(i). If the Court finds good cause, it may exercise its discretion to hear these new challenges to the PSR's guidelines calculations, Fed. R. Crim. P. 32(i)(1)(D), but it should not resolve them before the United States has an opportunity to be heard on them.

## II.    RESPONSES TO DEFENDANT'S NEW GUIDELINES ARGUMENTS

   **A.**    **The PSR Correctly Applied the Specific Offense Characteristic for Foreign**

## Jurisdiction or Sophisticated Means

Defendant's conduct satisfies each prong of the disjunctive test in U.S.S.G. § 2B1.1(10):

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; *or* (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels.

U.S.S.G. § 2B1.1(10) (emphasis added). This adjustment applies even when a defendant opens a single deceptively named bank account using his real name as the signor. *See United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013) (analyzing analogous specific offense characteristic for tax offenses). Here, Defendant helped co-conspirator Sabu create a false user account that appeared to be that of a real person. Specifically, Sabu did not like the conspicuousness of the username anon1234, so Keys responded, "Okay, create a fictitious name then . . . if you're on the assembler site, scroll down on the left to 'user preferences.' Click on that, then 'edit users.'" (GX 604-003.) It was the inconspicuous, but spurious, username ngarcia that was used for the *Los Angeles Times* defacement. (R.T. 291-292.)

PSR ¶ 25's finding that Keys (A) relocated a substantial step of the scheme to a foreign jurisdiction to evade law enforcement and (B) a substantial part of the scheme was committed from outside the United States is based on the evidence summarized in the United States' Response to Defendant's Objections. Defendant used Overplay, a Virtual Private Network or "VPN" service, to conceal his identity and location while carrying out his attack on the Tribune Company. Defendant had previously used Overplay to cause his computer to appear to be located in Europe rather than the United States in order to watch BBC's coverage of the Olympics, and he calculated that his use of Overplay would give him a foreign IP address and put an "extra layer" between him and anyone else. (Transcript of Keys Statement to FBI, Dkt. 23-5, at 48-49.) Keys's own statements during the offense show why Keys used Overplay. He taunted Brandon Mercer that his foreign location made him harder to catch, (GX 103), and he told Sharpie that he used a VPN to cover his tracks. (GX 506.)

The PSR also correctly applies subpart (C), sophisticated-means adjustment, for the above-listed reasons and also for the independently sufficient reason that "[Keys] enlisted the services of highly skilled hackers to carry out his ploy to cause harm to the victim." (PSR ¶ 25.) This is supported by

1  Keys's own statements about Anonymous.  Keys was in awe of the skills of this group.  He called it "[a]
2  group of individuals who could do significant damage who felt free discussing in the presence of people
3  they didn't know, doing significant damage and not getting caught."  (Transcript of Keys Statement to
4  FBI, Dkt. 23-5, at 33.)  He elaborated,

> It became very clear to me that these were the people who were doing the most damage. The kind of things you would hear about on the news . . . A few things stressed me out. That was, um. I mean it's, it's still even just thinking about it, like the gravity of the skill that was in that room and blatant disregard for any kind of consequence.

(*Id*.)  Keys explained the network infrastructure and user manuals, and Anonymous helped avoid detection by, for example, choosing usernames that did not stand out to network administrators.  Such usernames had to be located in server logs and then compared against a list of all Tribune Company employees in order to be identified as spurious.  *Los Angeles Times* editor Brian Hanrahan testified that this was the way the ngarcia credentials were identified as unauthorized.  (R.T. 291-292.)  This kind of concealment was sophisticated for the same reasons that the deceptively named bank account in *Jennings* was sophisticated: it added an extra layer of complexity to conceal the crime as it was occurring.

> [T]he fact that the concealment might not have been total does not mean that there was no effort at concealment or that the method employed was not sophisticated.  Application of the enhancement does not necessarily turn on the scheme's likelihood of success in remaining undetected. *See Fife*, 471 F.3d at 754 (noting that defendant's argument "confuses 'sophisticated' for 'intelligent'").  Opening the account under Jennings's real name and social security number might have made it somewhat less likely that the diversion of funds would go undetected, but the scheme could have been figured out only by someone who knew that the Ecologic account was controlled by Jennings, or who knew to look at both the ESS records and the Ecologic account ownership records. Someone looking only at ESS's records would not have been able to tell that payments to the Ecologic account went to an account actually controlled by Jennings. Someone looking only at the Ecologic account records would not know that the funds deposited in that account were not proper business receipts.

*United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013).  This is more than enough.  *See United States v. Musacchio*, 590 F. App'x 359, 366-67 (5th Cir. 2014) ("Though many individuals familiar with computers likely could have developed a similar process, we previously have applied the enhancement 'in cases involving some method that made it more difficult for the offense to be detected, even if that method was not by itself particularly sophisticated[.]'"), *cert. granted*, 135 S. Ct. 2889 (2015) and *aff'd*,

136 S. Ct. 709 (2016); *United States v. Makwana*, 445 F. App'x 671, 673 (4th Cir. 2011) ("Though not every aspect of Makwana's scheme was complex or intricate, we easily conclude that, viewed as a whole, Makwana's mode of access to the Fannie Mae server in which he embedded malicious code, coupled with his efforts to conceal the presence of the code and his connection to it, were unambiguously sophisticated.").

By using a foreign VPN and recruiting skilled members of Anonymous to attack for him, the Defendant actually did successfully direct suspicion away from himself as the offense was occurring. (This is explained more fully in the United States' Sentencing Memorandum.) His use of Overplay protected his residential Internet Protocol (IP) address from appearing in Tribune server logs associated with his attacks, and denied law enforcement one method of associating him with his transmission of malicious code. Defendant was able to throw even a technologically-sophisticated FBI investigator, Special Agent John Cauthen, off of Keys's trail. The Keys investigation was closed and remained closed until the FBI caught a lucky break. Using these sophisticated means, Defendant had effectively transformed himself from Matthew Keys in Sacramento into foxmulder, cancerman, and fox40truthers, apparently located in Europe.

Defendant's conduct fits within the definition of "sophisticated means" set out at Application Note 9(B), which provides in pertinent part that "[c]onduct such as . . . the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Here, defendant's multiple pseudonymous email accounts were fictitious entities, and instead of an offshore financial account, he used an offshore VPN account. These are analogous and equally sophisticated. Notably, the Ninth Circuit instructs, "the list contained in the application note is not exhaustive. We agree with other circuits that the enhancement properly applies to conduct less sophisticated than the list articulated in the application note." *Jennings*, 711 F.3d at 1147.

Defendant points out that the Sentencing Commission considered amending section 2B1.1 to automatically include the use of a proxy server as a sophisticated means, but ultimately decided against it. That the Commission even considered such an amendment illustrates the high potential for the use of a proxy server to trigger the enhancement.

Witnesses who opposed the proxy server amendment characterized the use of proxies broadly

and favorably, and in ways that highlight and distinguish Defendant's particular use of a proxy in this case. As one witness, Seth Schoen from the Electronic Frontier Foundation, stated, "[proxies] don't necessarily contribute to avoiding detection, and they don't necessarily indicate pre-meditation or a commitment to a course of criminal conduct, which might all be possible rationales for imposing additional incarceration for this behavior." United States Sentencing Commission, Public Hearing, March 17 and 18, 2009, available at <http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20090317/Transcript.pdf>, at 49. However, in this case, the proxy did in fact contribute to avoiding detection and further indicated pre-meditation and a commitment to criminal conduct. Defendant's use of Overplay helped him avoid getting caught, and was a critical part of his plan of attack.

Furthermore, Schoen stated that whether the use of a proxy server should trigger the enhancement should be considered on a "case-by-case" basis. This is a case where the enhancement should apply: Defendant used Overplay to watch the BBC, checked its effects and realized that it made his IP address look like it was in a foreign country, and then deliberately used it to conceal his identity and location while attacking Tribune Company. With these specific factual circumstances in place, Defendant's arguments about the legitimate uses of proxy servers fall short: Defendant, in his own words, explained that he used Overplay not to conduct journalistic research or conduct other legitimate business, but instead to add an "extra layer" between him and Tribune Company and "cover [his] tracks."

### B. Aggravating Role

In its response to Defendant's Objections to the PSR, at ¶ 29, the government explained why this enhancement properly applies here.

### C. Loss

The Court should accept the already-reduced loss figure contained in the PSR. Defendant's arguments in support of further reductions all fail.

First, without citing any supporting authority, defendant argues that the government has failed to support its loss claim because it has offered insufficient billing or business records, and because the jury was not asked to endorse a specific loss amount beyond the $5,000 required for a felony conviction.

1  These arguments fail because the government was not required to do these things.

2  Second, defendant offers an overly-narrow characterization of "unrelated" costs that, he argues, should be excluded from loss. For example, defendant argues that telephone calls, meetings, and emails should be excluded from the loss figure. However, at trial, several Tribune witnesses recounted the calls, meetings, and emails that were necessary as Tribune responded to defendant's attack. Defendant improperly characterizes them as "peripheral or administrative activities," but this is how organizations operate. They work through people, who talk to each other to make decisions and relay instructions. The costs associated with these necessary internal communications and the time they consumed should be included in the loss amount.

### III.   CONCLUSION

If the Court considers them, it should overrule the objections to the PSR found in Defendant's Sentencing Memorandum. Additionally, if the Court accepts Defendant's sealed filing, the government requests that it be permitted to respond.

Respectfully submitted,

Dated: March 16, 2016

LESLIE R. CALDWELL
Assistant Attorney General
U.S. Department of Justice,
Criminal Division

By: /s/ JAMES SILVER
JAMES SILVER
Deputy Chief for Litigation,
Computer Crime and Intellectual
Property Section