IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

---o0o---

UNITED STATES OF AMERICA,

           Plaintiff,

vs.                                No. 2:13-CR-00082

MATTHEW KEYS,

           Defendant.

_____/


---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JUDGMENT AND SENTENCING

WEDNESDAY, APRIL 13, 2016, 9:00 A.M.

---o0o---


For the Government:     BENJAMIN B. WAGNER, U.S. ATTORNEY
                        501 I Street, Suite 10-100
                        Sacramento, California  95814
                        BY:  MATTHEW DEAN SEGAL
                        and  PAUL ANDREW HEMESATH
                        Assistant United States Attorneys


(Appearances continued next page...)


Reported by:    KATHY L. SWINHART, CSR #10150
               Official Court Reporter, 916-446-1347
               501 I Street, Room 4-200
               Sacramento, California  95814

APPEARANCES (Continued)


For the Government:        UNITED STATES DEPARTMENT OF JUSTICE
                          Computer Crime and Intellectual
                          Property Section
                          1301 New York Avenue NW, Suite 600
                          Washington, D.C.  20530
                          BY:  JAMES ANTHONY SILVER
                          Deputy Chief


For the Defendant:        LAW OFFICES OF JAY LEIDERMAN
                          5740 Ralston Street, Suite 300
                          Ventura, California  93003
                          BY:  JASON SCOTT LEIDERMAN

                          TOR EKELAND, P.C.
                          195 Plymouth Street, Fifth Floor
                          Brooklyn, New York  11201
                          BY:  MARK H. JAFFE

1          SACRAMENTO, CALIFORNIA

2        WEDNESDAY, APRIL 13, 2016, 10:32 A.M.

3                  ---o0o---

4          THE CLERK:  Calling criminal case 13-82, the United

5    States versus Matthew Keys.  This is on for judgment and

6    sentencing.

7          MR. SEGAL:  Good morning, Your Honor.  Matthew Segal,

8    Jim Silver, Paul Hemesath for the United States.

9          THE COURT:  Good morning to you all.

10         And for the defense?  I understand we have one

11   microphone not working, but we have a work around, so if you

12   can make certain you are using a microphone.

13         MR. LEIDERMAN:  Thank you, Your Honor.  Mr. Ekeland is

14   going to speak to the objections and the guidelines, and then I

15   will speak to the sentencing later on, if that pleases the

16   Court.

17         THE COURT:  All right.  And did you state your

18   appearance clearly for the record?

19         MR. LEIDERMAN:  No, I did not.  Jay Leiderman for

20   Mr. Keys.

21         MR. JAFFE:  Mark Jaffe for defendant Matthew Keys.

22         THE COURT:  All right.

23         MR. EKELAND:  And Tor Ekeland for defendant Matthew

24   Keys.

25         THE COURT:  All right.  Good morning to you all.

1          MR. LEIDERMAN:  Good morning.

2          THE COURT:  And I'm in this courtroom because we have a

3    water leak in the other courtroom, but are you satisfied with

4    this set-up?

5          MR. SEGAL:  Yes.

6          THE COURT:  The government would use the podium.  The

7    defense would -- would the defense plan to come to the podium

8    during any argument?

9          MR. LEIDERMAN:  I would.  I would come to the podium

10   after -- may I ask the Court if they plan on allowing the

11   government to speak first regarding sentencing and then allow

12   the defendant to speak next?

13         THE COURT:  Let me -- I'll run through the order of

14   business.  As a threshold matter, I want to clarify one thing

15   Ms. Schultz has already clarified I believe off the record.

16         We are in federal court, and federal courts have an

17   old-fashioned rule that there are no photographs in the

18   courtroom.  There is no audio recording in the courtroom unless

19   authorized by the Court.  And I want to clarify that those

20   rules remain in effect, I have not lifted any of those rules,

21   so any audio recording or video recording or photography would

22   be unauthorized and would be a violation of the order of this

23   court.

24         I have provided, in response to requests from members

25   of the press who have identified themselves to Ms. Schultz,

1   that they may use the modern version of a paper -- a paper

2   tablet.  That is, they may use an electronic device, a laptop

3   or a tablet simply for the purposes of taking notes to aid them

4   in reporting.  That's the only exception I've made, and

5   Ms. Schultz has had those persons identify themselves to her,

6   we've checked them in, and anyone else should not be using an

7   electronic device.  Those electronic devices should be off and

8   stored, and the security officers are authorized without any

9   further direction from the Court to seize any device that has

10  not been authorized simply for the purposes of note-taking.

11          So, again, that's an order of the Court, and any

12  violation would be in contempt of court.  I assume I will not

13  have to do anything about that.

14          In terms of the order, I do want to deal with

15  housekeeping matters, there are a number of them, then we'll

16  move to a discussion of the guidelines.  It is required that

17  the Court calculate a guideline range even though the

18  guidelines are advisory.  There are quite a few objections, and

19  we'll work through those.

20          We'll then turn to a discussion of the sentencing

21  factors.  After the Court calculates the guidelines, the Court

22  is required to consider sentencing factors adopted by the U.S.

23  Congress.  They're set forth in Title 18 U.S. Code Section

24  3553.  I have had substantial briefing on those factors.  I

25  have some questions in each case.  We'll start with my

questions, and then I'll allow the attorneys to argue to the extent they think there is something not fully covered by the briefing or our discussion on the record.

At the end of the hearing, I'll give the attorneys a chance to make wrap-up arguments. And then, as is his right, I will give Mr. Keys the right to what we call allocute, to make an allocution to the Court. He is not required to, but he may make a statement if he wishes.

All right. And then I anticipate imposing sentence today. We should let -- Mr. Keys is present out of custody. We also are joined by representatives of the U.S. Probation Office. If those persons could state their appearances.

PROBATION OFFICER MODICA: Alicia Modica.

PROBATION OFFICER ORTIZ: Hugo Ortiz.

THE COURT: The probation office assists the Court in preparing a presentence report. I have the final report before me and the objections that are lodged against that final report. That report itself is not a public document. It contains some personal identifying information and information provided to -- by probation staff to the Court.

In terms of housekeeping, there are no victim impact statements currently before the Court to support a restitution request?

MR. SEGAL: There will be -- the victims have not submitted restitution claims. However, we have two victim

1   statements that they're going to be making to exercise their

2   CVRA rights.

3          THE COURT:  So persons asking to address the Court?

4          MR. SEGAL:  Yes.

5          THE COURT:  All right.  Who are those two persons?

6          MR. SEGAL:  We're going to play Brandon Mercer's

7   representing Tribune Media.  He is in Siberia, but he's

8   recorded something which we did after the original sentencing

9   was continued; and Mr. Dan Gaines, who was an editor of the Los

10  Angeles Times is here, and he will personally address the Court

11  live.

12         THE COURT:  And the right to address the Court in a

13  sentencing hearing extends to having a prerecorded audio

14  recording played during the sentencing hearing?

15         MR. SEGAL:  Well, Your Honor, I could read -- I believe

16  so.  They have a reasonable opportunity to be heard.  We know

17  that I could sit here and read the same statement.

18         THE COURT:  Do you have a written version?

19         MR. SEGAL:  I do.

20         THE COURT:  All right.  I'll consider that.

21         MR. SEGAL:  I prefer -- right.  I mean --

22         THE COURT:  In terms of restitution itself, is the

23  government anticipating the Court would deliver a final

24  decision as to restitution and set a hearing to follow this

25  hearing approximately 60 days out?

1          MR. SEGAL:  Please, Your Honor.

2          THE COURT:  All right.  No objection to that approach

3     to restitution, Mr. Leiderman?

4          MR. LEIDERMAN:  I was unable to hear what the

5     government said.  If the government said please, Your Honor, we

6     concur.

7          THE COURT:  All right.  So the Court will not make a

8     final determination as to restitution today.  That's a separate

9     question from loss.

10          MR. SEGAL:  Actually -- I'm sorry.  Your Honor,

11     paragraph 80 of the PSR, which I believe is not objected to,

12     provides for $249,956 of restitution.  That's at page 15.

13          MR. LEIDERMAN:  That was objected to.

14          MR. SEGAL:  Oh, then it's my mistake.  We'll set it

15     out -- may I have a moment with counsel, Your Honor?

16       (Counsel conferring.)

17          MR. SEGAL:  We'd like to go out 60 days, Your Honor.

18     If we can work something out in the meantime, that will be

19     fine.

20          THE COURT:  All right.  That doesn't preclude the

21     Court's finding a loss amount for purposes of the guidelines,

22     but we will set a restitution hearing for 60 days out.

23          And what will that date be?  Do you have that handy,

24     Ms. Schultz, while we're thinking about it?

25          THE CLERK:  Yes, Your Honor.  That date is June 8th,

1  2016 at 9:00 a.m.

2         THE COURT:  All right.  That will be the date for the

3  restitution hearing.

4         I have reviewed character reference letters.  I have

5  four letters or e-mails.  I just want the record to be clear

6  I've reviewed those.  One of them is Mr. Keys' either current

7  or most recent employer.  I had denied a request to seal.  I do

8  not believe the defense has renewed a request to file anything

9  under seal.

10         Is that correct, Mr. Leiderman?

11         MR. LEIDERMAN:  No.  Based on the nature of the filing

12  and the Court's ruling, we have determined to abandon that

13  argument.

14         THE COURT:  All right.  That is clarified.

15         MR. LEIDERMAN:  Yeah, I think we made clear that we

16  didn't want that public, so we'll -- we'll go without it.

17         THE COURT:  All right.  Also, for the record,

18  Ms. Schultz did receive in her court in-box communication from

19  someone identified as a Sam Snow.  It's identified as a

20  sentencing letter.  I have not read that letter because

21  Ms. Schultz, as is our practice, anything we see or she sees,

22  she shares with the parties.  Both -- if I understand

23  correctly, the parties do not want the Court to rely on that

24  letter.  I have not read it.

25         Is that correct?

1          MR. SEGAL:  Yes, Your Honor.

2          MR. LEIDERMAN:  Yes, Your Honor.

3          THE COURT:  So Mr. Snow is not identified as a victim.

4          MR. SEGAL:  No.

5          THE COURT:  Agreed?

6          MR. LEIDERMAN:  Oh, most certainly not.

7          THE COURT:  And so there's no -- there's no basis by

8     which I'm required to consider what Mr. Snow may have intended

9     the Court to read?

10          MR. SEGAL:  I have read the letter.  I can think of no

11     legal basis that requires the Court to consider it.

12          THE COURT:  You agree with that, Mr. Leiderman?

13          MR. LEIDERMAN:  I do.

14          THE COURT:  All right.  Then I am disregarding and have

15     not read whatever was transmitted.

16          MR. SEGAL:  Just for the record, Mr. -- I think that

17     Mr. Leiderman -- I can't think a legal basis that that letter

18     would need to be known to the defense.  So if the record might

19     just reflect that the defense has had an opportunity to review

20     it before they make their position clear on whether it's

21     admissible.

22          MR. LEIDERMAN:  The letter?

23          MR. SEGAL:  Yeah.

24          MR. LEIDERMAN:  Yes, I have.  I can speak more to that,

25     but --

1          THE COURT:  I don't need --

2          MR. LEIDERMAN:  -- I don't think that's necessary.

3          MR. SEGAL:  Just that they've read it, that's all.

4          THE COURT:  All right.  At this point, no evidentiary

5   hearing is contemplated.  The government has not requested an

6   evidentiary hearing.

7          MR. SEGAL:  Correct, Your Honor.

8          MR. LEIDERMAN:  In the -- we may want -- when it comes

9   to restitution, we may need an evidentiary hearing.  We'll rely

10  on what happens today before we -- before we determine if 60

11  days out we will want to seek subpoenas and -- and further

12  challenge.  But I addressed -- I will address that in my

13  remarks to the Court.

14         THE COURT:  So only as to restitution?  Is that right

15  preserved?

16         MR. LEIDERMAN:  Yes.  But I will also address it as to

17  loss as well.

18         THE COURT:  Well, that's my question.  At this point,

19  the Court is not contemplating holding an evidentiary hearing.

20  I understand your position in objecting to loss.

21         MR. LEIDERMAN:  Yes.

22         THE COURT:  We'll cross that bridge when we come to it.

23         MR. LEIDERMAN:  That's what I'm thinking, Your Honor.

24  Thank you.

25         THE COURT:  All right.  This morning the government

1    provided two cases to the Court, the Court has not reviewed

2    them, U.S. v. Doe and U.S. v. Ringold, copies of them.

3            MR. SEGAL:  Thank you, Your Honor.

4            THE COURT:  Did the defense receive those cases?

5            MR. LEIDERMAN:  Yes, but late enough that we haven't

6    had a chance to fully review them.

7            Moreover, Your Honor, as of yesterday when we met, we

8    have some additional we believe congruous cases that we may

9    discuss in terms of consistent sentencing.  And we have -- we

10   pulled the DOJ press releases on those.  That was yesterday,

11   and we have three copies if the Court wants to see them.  My

12   intention was to speak to them, but I will be happy to turn

13   them over.

14           THE COURT:  We will, again, cross that bridge when we

15   come to it.  I have not reviewed anything filed in the last 24

16   hours.  I've reviewed everything filed before.

17           MR. LEIDERMAN:  It's --

18           THE COURT:  That cutoff will -- at this point, if I do

19   need to review any additional cases, it would be over a lunch

20   break, for example.  So we'll go as long as we need to to get

21   to everything we need for the Court to do its job.

22           MR. LEIDERMAN:  I think it will be okay just to mention

23   them, they're short, and we can move on.  So I don't expect

24   that to be much of an issue.

25           THE COURT:  All right.  Let's start, then, with the

1  objections unless there's any other housekeeping.

2      I understood the parties each had audiovisual.  I don't

3  anticipate allowing presentation of audiovisual material --

4      MR. SEGAL:  Okay.

5      THE COURT:  -- so that is clear.

6      All right.  In terms of objections, I'm starting with

7  the defense, the defense's formal objections to the presentence

8  report, docket No. 128, a nine-page document.

9      So, Mr. Ekeland, you're handling these?

10     MR. EKELAND:  Yes, Your Honor.

11     THE COURT:  Are you comfortable doing that from there

12 or do you wish to come forward?

13     MR. EKELAND:  We can -- I thought we were going to do

14 this at the podium.  If the Court is not hearing AV, we'll just

15 pull this computer out and start arguing.

16     THE COURT:  All right.

17     MR. EKELAND:  Your Honor, we don't have much really to

18 add to what we've submitted in the briefing to this court.  But

19 if the Court has any particular questions on any of our

20 objections, we're happy to answer them.

21     THE COURT:  Let me just go through one by one your

22 objections.

23     So first objection to paragraph 1, characterization of

24 Counts Two and Three involving transmission of malicious code.

25 I'm prepared to strike the use of that language where it

1    appears in the report, "transmission of malicious code," and

2    rely on the wording used in the verdict form.

3          So I think that addresses the objection and doesn't

4    remove anything material.  Agreed, Mr. Segal?

5          MR. SEGAL:  Yes, Your Honor.

6          THE COURT:  All right.  Paragraph 4 in terms of the

7    trial record not being consulted.  I gather it took some time

8    for the transcripts to be made available.  My question to you,

9    Mr. Ekeland, would be is there anything you have not already

10   brought to the Court's attention where you believe the

11   information in the presentence report conflicts with the trial

12   record?

13         MR. EKELAND:  Off the top of my head, Your Honor, no,

14   but I do believe there are a few instances where there are some

15   differences.  Mainly I'm thinking particularly of the Green

16   Links database being deleted.  I don't believe there was

17   evidence in the record of that database being deleted.  I think

18   there are a number of minor things like that which we would be

19   happy to provide briefing to the Court on, if that's what the

20   Court is asking.  So I'd ask that we can sustain this objection

21   and, if necessary, if it becomes an issue after today, submit

22   briefing on it to the Court.

23         THE COURT:  I think we can address it as we go through

24   the balance of your objections.  I think anything like that

25   would be raised in the context of the objections you've already

1   made.  So let me know when we get to the point where you think

2   there's a correction in the PSR that needs to be made.

3          MR. EKELAND:  Yes, Your Honor.

4          THE COURT:  Paragraph 5, there's an objection to use of

5   the language that Mr. Keys and his supervisor had a fight in

6   the newsroom.  Any objection to replacing a fight with an

7   argument to clarify there was no physical altercation?

8          MR. SEGAL:  No, Your Honor.

9          THE COURT:  Mr. Ekeland?

10         MR. EKELAND:  No objection, Your Honor.

11         THE COURT:  There's also an objection to the last

12  sentence, Keys' actions resulted in a substantial loss to

13  Tribune Media.  My plan would be to strike "substantial."

14         MR. EKELAND:  No objection, Your Honor.

15         THE COURT:  Mr. Segal?

16         MR. SEGAL:  I think at trial we proved that it was

17  substantial, and at sentencing we've proved that it's even more

18  substantial.  But --

19         THE COURT:  I think the numbers speak for themselves

20  once we get there.

21         MR. SEGAL:  Right.

22         THE COURT:  I'm prepared to address -- I'm not --

23         MR. SEGAL:  Got it, Your Honor.

24         THE COURT:  -- signaling where I'm going with it,

25  but --

1           MR. SEGAL:  Yep.

2           THE COURT:  Paragraph 6, here the objection is to the

3     characterization of Mr. Keys using his log-in credentials to

4     construct back door access points to allowing intrusions into

5     the CMS.  Here, in the government's response to the objections

6     at page 5, it details the evidence it believes does support

7     that characterization, references among other things the

8     creation of a user account anon1234.

9           So, Mr. Ekeland, my question to you is, do you disagree

10    with any of the information set forth in the government's

11    response on page --

12          MR. EKELAND:  Your Honor, I object to the

13    characterization that it's a back door.  It actually was a

14    front door.  There was nothing nefarious in what happened here.

15    There was no hacking of the L.A. Times' CMS system.  The system

16    functioned exactly like it was programmed to, and somebody just

17    simply set up another username and password.  That's not a back

18    door, Your Honor, that's a front door.

19          And to the point of it's sort of -- back door seems to

20    be implying some sort of nefarious thing going on, some kind of

21    hack involving changing the code of the L.A. Times' CMS system

22    to put in some sort of secret back door.  We object to that and

23    say that that's completely an incorrect characterization of

24    what happened in this case.

25          THE COURT:  So construction of access points to allow

1    intrusions into the CMS, no objection?

2         MR. EKELAND:  No, Your Honor.  We'd say -- I do object

3    to that.

4         What we would say is that the only thing that happened

5    here is that a new username and password was put in place using

6    a valid username and password to the L.A. Times' content

7    management system.  There was no intrusion point in the sense

8    that the system, the content management system functioned

9    exactly like it was programmed to, a valid username and

10   password that the Tribune Company had done nothing to check or

11   erase or anything, just like they had, I believe, hundreds of

12   other employees who had left the company whose usernames and

13   passwords were still valid.

14        THE COURT:  I understand that argument.  I'm prepared

15   to sustain the objection only to the extent of deleting the

16   words "back door."  I don't think they're material.

17        MR. SEGAL:  I do, Your Honor.  I think that that was

18   what the Court said about -- during its Rule 29 motion, and

19   it's what the evidence was at trial.

20        THE COURT:  What's the material difference if it says

21   access points to allow intrusions into the CMS?  I'm not

22   sustaining the objection in full.

23        MR. SEGAL:  Can you -- access points to allow

24   intrusions.  I would say --

25        THE COURT:  I'm just trying to eliminate semantical

1  argument and get to the meat of this.

2      MR. SEGAL:  Right.  The important part that I think the

3  defense is alighting is that this happened on December 8th,

4  which -- and the Court will recall the defendant was out of a

5  job at Fox 40 --

6      THE COURT:  I understand that.  Intrusions, allowing

7  intrusions into the CMS content.

8      MR. SEGAL:  Secret -- secret access points to allowing

9  unauthorized intrusions, and I think we're fine.

10     THE COURT:  I think the totality of the record will

11 clarify.

12     MR. SEGAL:  Right.

13     THE COURT:  And ultimately the trial record speaks for

14 itself.  That is the record --

15     MR. SEGAL:  Thank you, Your Honor.

16     THE COURT:  -- of what happened.

17     Paragraph 7, objections to the characterization of

18 Mr. Keys as deleting Twitter followers; that he accessed

19 without authorization the CMS; and stole the Fox 40 News

20 customer list; that he sent e-mails with the intention to

21 disrupt the business operations; and that his e-mails had the

22 effect of engendering hostility and distrust among viewers.

23     Here again, the government responded in detail at pages

24 6 through 8 of its response to the objections.  It's agreed

25 this is not a misappropriation case, and so whenever the word

1   "stole" appears, perhaps the more neutral characterization is

2   took a copy of.

3          MR. EKELAND:  Copy of the e-mail address list.

4          THE COURT:  So that's the one change I'm prepared to

5   make having reviewed the government's response.

6          Anything else you want me to know about?

7          MR. EKELAND:  We just stand by our objections there,

8   Your Honor.

9          THE COURT:  All right.  So the objection is overruled

10  except as to the word "stole," and that is replaced with

11  copied.

12         Paragraph 8, this is the characterization of the effect

13  on Samantha Cohen, the individual who took over Keys' duties,

14  and the objection is she was not negatively impacted for

15  approximately one week.  The government has responded at page 8

16  pointing to trial testimony where she did say off and on over

17  the course of a week she was essentially blocked from doing her

18  job.

19         Any response to that?

20         MR. EKELAND:  Yes, Your Honor.  If I recall the

21  transcript correctly, what we're objecting to here is the

22  statement that she was unable to log into the CMS for one week,

23  whereas I believe what the trial testimony establishes is that

24  she was able to log into the CMS during that week, but then her

25  password would get changed, and she had to go get it fixed

1   again so she could get access.

2        We're just objecting to the characterization of her

3   being locked out of the CMS for completely one week as being

4   incorrect.

5        THE COURT:  So I don't know if it's material she could

6   not log onto the CMS and maintain consistent access to the CMS.

7        With that clarification, Mr. Segal?

8        MR. SEGAL:  So if it says for approximately one week

9   she could not maintain consistent access to the CMS because her

10  user credentials kept failing?

11       THE COURT:  Correct.

12       MR. SEGAL:  That's fine.

13       THE COURT:  All right.  That modification is raised and

14  addresses the objection to the extent the Court is prepared to

15  do that.

16       Paragraph 10, here the objection is to the

17  characterization of the edit to the L.A. Times news story as an

18  instance of unauthorized access.

19       I believe, Mr. Ekeland, you've already articulated your

20  theory --

21       MR. EKELAND:  Yes.

22       THE COURT:  -- that it was allowed access.

23       MR. EKELAND:  Yeah.

24       THE COURT:  All right.  The government responds at page

25  9.  I'm prepared to overrule that objection.

1          Paragraphs 14 to 15 on the loss calculation, the

2    defense agrees with the probation officer to the extent that

3    she is not incorporating the impact on the a.m. news ratings

4    decline -- and on the news ratings, that is the decline in

5    ratings; the database loss and the database loss with respect

6    to the iPad contest.

7          The defense does object to the balance being

8    incorporated into loss --

9          MR. EKELAND:  Yes, Your Honor.

10         THE COURT:  -- figure.

11         MR. EKELAND:  I'm sorry.  Did the Court say that we

12   weren't objecting to the iPad database?

13         THE COURT:  You do not object to the probation

14   officer's not including that --

15         MR. EKELAND:  Yes.

16         THE COURT:  -- in her calculation.

17         MR. EKELAND:  Yes.

18         THE COURT:  Paragraph 14 simply recounts what the

19   victim Trib Co is identifying as its losses, so I'm not going

20   to modify paragraph 14 in any respect.

21         With respect to paragraph 15, again, this records the

22   probation officer's calculation.  I'm not going to modify that.

23   That's her recommendation to the Court.  I ultimately make an

24   independent determination as to loss.

25         The government is correct that the guidelines are a

1  different framework than the Computer Fraud and Abuse Act.

2      MR. EKELAND:  I don't know if I'm ready to agree with

3  that, and the Court -- Your Honor, I think that's an unsettled

4  question, a somewhat murky area of law just like I think the

5  whole question of loss under the CFAA is highly problematic.

6      THE COURT:  I understand that's a key issue raised by

7  this sentencing.  So it's clear, I'm accepting the government's

8  argument that the guidelines set up their own -- their own

9  framework.

10     MR. EKELAND:  Just for the record, Your Honor, we're

11  going to object to that.

12     THE COURT:  I understand that, and that's overruled.

13     So we'll get into loss details when we get into the

14  actual guidelines calculations.

15     Paragraph 17 is the same objection to the loss amount.

16  I've already addressed that to the extent I'm prepared to.  I'm

17  not modifying paragraph 17 at all.

18     And then that gets us into the Court's offense level

19  computation.  Do I have that right, Mr. Ekeland, I've addressed

20  all your objections --

21     MR. EKELAND:  Yes, Your Honor.

22     THE COURT:  -- up to that point?

23     So the base offense level, grouping -- first of all,

24  all the parties agree grouping applies here under the

25  guidelines?

1          MR. SEGAL:  Yes.

2          THE COURT:  So the three offenses are grouped, the

3     three counts are grouped for guideline calculation purposes.

4          The base offense level is 6.  In terms of the loss, the

5     probation officer has calculated the loss at $249,956.  And

6     under the guidelines, that would mean a 10-level increase.

7          The defense objects.  First of all, the standard of

8     evidence applicable here.

9          MR. SEGAL:  Your Honor --

10         THE COURT:  Would the defense concede that it's at

11    least 5,000 given the jury's finding?

12         MR. EKELAND:  No, Your Honor.  We're going to --

13         THE COURT:  How can that -- given the jury had to

14    find --

15         MR. EKELAND:  We'll concede that that's what the jury

16    found, Your Honor, but we're not going to say there was

17    evidence necessarily sufficient to support that.

18         THE COURT:  So if it's 5,000, there's no increase.  If

19    it's the 249,000 sum, there's a 10-level increase.

20         MR. SEGAL:  Well, the Court will recall the jury made

21    the offense element finding that it exceeded 5,000, but we put

22    over $17,000 on that chart, if I can turn around and confirm it

23    with my colleagues.

24         THE COURT:  But the jury wasn't asked to make a

25    specific finding as to loss amount.

1          MR. SEGAL:  No, and they shouldn't have been.

2          THE COURT:  I'm not saying they should be for the

3     purposes of conviction.

4          MR. SEGAL:  Okay.

5          THE COURT:  But in thinking about -- so answer my

6     question on the standard, is this preponderance or clear and

7     convincing?

8          MR. SEGAL:  The U.S. believes it's preponderance of the

9     evidence, Your Honor, because the defendant has been convicted

10    of conspiracy, and the magnitude of the adjustment is not alone

11    sufficient to -- to warrant a higher standard of proof.

12         I would add that the Court heard from all those

13    witnesses at trial.  And I think for what we proved at trial,

14    on any standard of proof, the number that ended up on that

15    chart was proved beyond a reasonable doubt actually.  The rest

16    of the loss numbers that were introduced in the sentencing

17    phase are uncontested in the sense that the defendant hasn't

18    come up with any alternate evidence, they've just complained

19    that it's hearsay, that standard under U.S. v. Treadwell is

20    preponderance because of the defendant's conspiracy conviction.

21         THE COURT:  Do you agree with that, Mr. Ekeland?

22         MR. EKELAND:  No, I don't, Your Honor.

23         First, just to address the evidentiary standard, I'd

24    say it should be clear and convincing because by far the

25    largest factor affecting Mr. Keys' guidelines range is the loss

1    amount.  And here, as the Court notes, if the loss amount is

2    $5,000, there's no increase.  If it is the $249,000, you have a

3    10-point increase to the guidelines range, and that's

4    substantial.  And because of that, and because of the sort of

5    murkiness of these loss calculations, we believe that the Court

6    should apply the clear and convincing standard.

7        Furthermore, it's not the defense's burden to prove the

8    loss.  And as the Court notes, there was no finding by the jury

9    as to any loss amount.  But as the Court noted, of course, by

10   finding Mr. Keys committed a felony, they obviously -- implicit

11   in that, it matched the $5,000 threshold necessary for that

12   under the CFAA.  But there is, we submit, nothing strong in the

13   record to mitigate for this 249,000 loss number.

14       THE COURT:  And Treadwell?  Do you read Treadwell

15   differently than the government does in terms of standard of

16   evidence?

17       MR. EKELAND:  We believe the standard of evidence

18   should be clear and convincing given the substantial impact

19   upon Mr. Keys' sentencing.

20       THE COURT:  All right.  So if it's the 17,000 that was

21   presented at trial --

22       MR. SEGAL:  It wasn't seventeen.  My colleague has just

23   come up with the numbers that came out of trial.  At trial, the

24   low estimate was $10,206, and the high estimate was $13,147.

25       And I would add, Your Honor, you know, if we had to

1  prove everything at trial that was going to be used at

2  sentencing, which is not the law under Booker, trials would

3  take a lot longer.

4       THE COURT:  But it's not.

5       MR. SEGAL:  Fine, yeah.

6       THE COURT:  I'm not suggesting that, but there still

7  can be in certain instances -- the Court has to apply a clear

8  and convincing --

9       MR. SEGAL:  Right.

10      THE COURT:  -- standard in some instances.

11      MR. SEGAL:  The part of Treadwell I'm citing, it's 593

12 F.3d 1001 to 1002.

13      THE COURT:  All right.  If I relied on the trial

14 amount, there would be a two-level enhancement.  I need to

15 check Treadwell.  I'm going to come back to this issue, which

16 is a critical issue.

17      Paragraph 25, here the defense objects to the two-level

18 enhancement for allegedly engaging in fraud and using,

19 quote/unquote, fake e-mail addresses.

20      Do you agree the defense objection that fraud is not in

21 play here is well taken, Mr. Segal?

22      MR. SEGAL:  I want to reread the defendant's objection.

23      THE COURT:  I'm looking at page 6, starting line 16.

24      MR. SEGAL:  I'm just looking -- comparing it to the PSR

25 notes.

1        So I think all of that -- what the defendant did --

2   what the PSR says is, in an effort to evade detection by law

3   enforcement or regulatory officials, the defendant used fake

4   e-mail addresses and a proxy service which was based in

5   Switzerland to send harassing e-mails to Fox 40 employees and

6   customers.  That was proved at trial.  And we, you know,

7   respond to that in our -- in the record with record citations.

8        And, in fact, it was one of the things that Keys

9   taunted Brandon Mercer about.  In order to prosecute us, you

10  have to find us in whatever country we are, and it's an

11  expensive process, et cetera, et cetera.

12       In Keys' statement to John Cauthen -- we'd never heard

13  of Overplay before until Cauthen hit Keys' door, and Keys

14  started telling us about the proxy service that he had used,

15  and he said it gave him a layer of an anonymity, and it gave

16  him a foreign IP address.

17       And then it says he enlisted the services of highly

18  skilled hackers to carry out his ploy to cause harm to the

19  victim.  That was amply proved in the record.  In particular,

20  in Keys' statement when he said these are the people who were

21  doing the most damage.  The magnitude of the skill in that

22  room, you know, made me lose sleep.

23       Since the defendant relocated a fraudulent scheme to

24  another jurisdiction to evade law enforcement or regulatory

25  officials, and he intentionally engaged in -- all of these

1  things were proved at trial.

2       THE COURT:  All right.  Well, on sophisticated means,

3  I'm inclined to delete the language about fraud.  I think it's

4  a red herring.  I don't think it changes the bottom line.

5       I think a fair characterization is the defendant used

6  e-mail addresses that did not clearly identify him --

7       MR. EKELAND:  Didn't use --

8       THE COURT:  -- on their face.

9       MR. EKELAND:  Yes, as millions of Americans do.

10      THE COURT:  And delete the language at the beginning of

11 the last sentence "since the defendant relocated a fraudulent

12 scheme to another jurisdiction to evade law enforcement or

13 regulatory officials."  But I'm prepared to leave the language

14 that he intentionally engaged in or caused the conduct

15 constituting sophisticated means for reasons including the use

16 of Overplay.

17      MR. EKELAND:  Your Honor, might I just be heard briefly

18 on that?

19      THE COURT:  You may.

20      MR. EKELAND:  It's our position that the use of VPNs

21 are quite common.  The corporate world uses them all the time.

22 As a matter of fact, you may have heard of Citrix, which is the

23 way that most people working for corporations use to log into

24 their corporate servers when they are on the road.  That's a

25 VPN service.

1          I don't -- we just don't see -- and I'll just stop

2     here.  We do not consider the VPN to be anything that is

3     sophisticated.  It's something that is quite commonly used by

4     millions of people in the United States.  And if the use of a

5     VPN is somehow sophisticated means, then we've just sort of

6     gotten far afield of what actually is sophisticated in the

7     computer world and what's not.  And use of a VPN is not

8     sophisticated in the computer world.

9          THE COURT:  The Court, even if unsophisticated itself,

10    does not rely only on use of a VPN.  It's a combination

11    factors, the use of e-mails that didn't clearly identify

12    Mr. Keys as the sender, the use of Overplay in combination with

13    simultaneous, concurrent conversations he was having with

14    Mr. Mercer.

15         I'm finding on balance, given in a court of law, that

16    that qualifies as sophisticated means --

17         MR. EKELAND:  And we reiterate our objection for the

18    record.

19         THE COURT:  -- under 2B1.1(b)(10)(C).

20         So there is a two-level enhancement at that paragraph.

21    The objection is sustained in part, overruled in part.

22         Also the Court's relying on the --

23         MR. SEGAL:  Construction of back doors without using

24    that word?

25         THE COURT:  The communications with Anonymous in the

1    chat rooms, and we'll hear more about that I'm certain.

2            MR. EKELAND:  Your Honor, I just wanted to understand

3    it.  So essentially the Court is just looking at the totality

4    of circumstances and saying that that is what constitutes

5    sophisticated means rather than any particular --

6            THE COURT:  I'm considering the context in which the

7    use of technology was being deployed.

8            MR. EKELAND:  Rather than what type of technology was

9    being used?

10           THE COURT:  Well, I'm considering the Overplay, the use

11   of Overplay and the use of -- e-mail itself, of course, is not

12   sophisticated, but the use of Overplay with a non-identifying

13   e-mail.

14           MR. EKELAND:  So the use of the -- I just want to be

15   clear.  The use of a VPN with not identifying the e-mails is

16   what the Court is considering to be sophisticated means?

17           THE COURT:  I think that's fundamentally right, but

18   specifically Overplay --

19           MR. EKELAND:  Okay.

20           THE COURT:  -- not any other old VPN.

21           MR. EKELAND:  Well, we reiterate our objection, Your

22   Honor.

23           THE COURT:  All right.

24           MR. SEGAL:  And as the Court knows, he used Overplay to

25   access Tribune's server when he was constructing the -- what we

1    are calling them, the unauthorized access points.

2         THE COURT:  All right.  Then paragraph 26, Mr. Keys

3    objects to the two-level enhancement under -- the brief says

4    (b)(10) but I think it means (b)(17) -- 2B1.1(b)(17), saying

5    that the offense did not involve the intent to obtain personal

6    information or the unauthorized public dissemination of

7    personal information.

8         While clarifying, again, this is not a misappropriation

9    case, the factual record beyond that needed to convict can be

10   considered as relevant conduct.  I don't think the defense

11   brief --

12        MR. EKELAND:  We're not arguing that, but I just

13   don't -- honestly I don't recall from the record where there

14   was any testimony that that was ever disseminated anywhere or

15   any sort of arguments over, you know, Mr. Keys' intent, you

16   know, in downloading this list.

17        I mean, again, the Court understands this is one of our

18   big issues with what happened, are the prosecution -- you've

19   got unauthorized access of a fact pattern under 1030(a)(2)(C)

20   that is being boot-strapped into a 1030(a)(5)(A), unauthorized

21   damage prosecution, and this objection goes to that point, Your

22   Honor.

23        THE COURT:  The Court would not rely on the

24   unauthorized public dissemination of personal information.  It

25   would be the intent to obtain personal information.  That's the

1    only portion of (b)(17) on which the Court would rely.

2         Remind me, Mr. Segal, do you address whether or not the

3    record supports a conclusion that Mr. Keys attempted to sell

4    the addresses?

5         MR. SEGAL:  He didn't try to sell it.  AESCracked pops

6    up in one of the Anonymous chat rooms and asked if anyone wants

7    an e-mail list.  And let me -- I've got my colleagues finding

8    the exact exhibit for that.

9         Maybe we can --

10        THE COURT:  No sale.  I'm going to strike that sentence

11   about attempting to sell.

12        MR. SEGAL:  No.

13        THE COURT:  I do think the first part of paragraph 26,

14   "The defendant obtained the personal information of at least 20

15   individuals and used their e-mail addresses," these are

16   individuals in the CMS system, Fox 40 customers, and he used

17   their e-mail addresses to communicate with them in a harassing

18   and disparaging manner.

19        MR. EKELAND:  May I elaborate on our objection here?

20        Your Honor, I don't believe that there was any evidence

21   in the record that anything beyond e-mail addresses were

22   obtained.  The government can correct me on that.  So what

23   we're talking about here is a list of e-mail addresses.  And we

24   also object to the characterization that the e-mail addresses

25   are necessarily personal identifying information.

1          THE COURT:  Well, that's the second question.

2          So it is obtained the e-mails of at least 20

3     individuals.

4          MR. EKELAND:  Your Honor, e-mail addresses.

5          THE COURT:  E-mail addresses.

6          That's correct, Mr. Segal?  No Social Security

7     numbers --

8          MR. SEGAL:  That's --

9          THE COURT:  -- nothing to support that conclusion?

10         MR. SEGAL:  That's right.

11         I just want to note, in case it comes up later, that

12    that is a new objection that was not made to the probation

13    officer or even in their formal objections.  I don't -- you

14    have discretion to consider it if you find good cause.  I'm the

15    one who brought it up in my brief actually for you to consider.

16         THE COURT:  Well, I read your brief after I identified

17    it as an issue.

18         MR. SEGAL:  Okay.

19         THE COURT:  I have an independent obligation to apply

20    the guidelines correctly.

21         So my question, you did anticipate --

22         MR. SEGAL:  Yeah.

23         THE COURT:  -- the definition of personal information

24    in the application notes.

25         MR. SEGAL:  Uh-huh.

1          THE COURT:  The only -- it talks about --

2          MR. SEGAL:  Content.

3          THE COURT:  I mean, this is -- yes, medical records,

4    wills, diaries, private correspondence including e-mail.  It

5    does not say e-mail addresses.

6          And so what are you signaling in your briefing?  You

7    think that should be read to include the addresses themselves?

8    Or is the e-mail address inconsistent with the notion of

9    personal information as defined in the guidelines?

10          MR. SEGAL:  I have asked myself that question as well.

11   It's not clear in the guidelines, Your Honor.  Probation didn't

12   get an opportunity to consider that objection because it wasn't

13   made to them.

14          My own view is that when people give over e-mail

15   addresses and so forth to these affinity programs, they are

16   assured we're not going to sell or distribute your e-mail

17   address, so there's some professional confidentiality.  But as

18   the Court points out, and I did as well, it's not at the same

19   level as a medical record, a will or a diary and that sort of

20   thing.  So, you know, if you read it in pari materia, then the

21   adjustment doesn't -- I'll talk with the reporter later.

22          THE COURT:  All right.  Recognizing the probation

23   officer didn't have a chance to consider an objection, and even

24   though there's no formal objection before the Court on those

25   grounds, given my independent obligation, I think carefully

1   reading the definition suggests that there should not be a

2   two-level enhancement at paragraph 26.

3         MR. SEGAL:  I understand, Your Honor.

4         THE COURT:  So that paragraph will score as zero, and

5   that objection is sustained.

6         I'll leave the language as modified in paragraph 26 and

7   clarify why I'm sustaining that objection to the extent the

8   Court would need to refer again to this issue on any remand.

9         29, Mr. Keys objects to the three-level enhancement

10  under 3B1.1(e) for being a manager or supervisor involving five

11  or more participants.  He says he was neither a manager nor a

12  supervisor.  The guidelines have three tiers essentially, a

13  kingpin, a leader, manager or supervisor mid level, and neither

14  at the lowest level.  So there are two issues here.  Is

15  Mr. Keys' role properly characterized as a manager or

16  supervisor, and were there at least five participants?

17        The government identifies the five persons.  It says

18  there are more.  It identifies Mr. Keys, Sharpie, Sabu aka

19  Hector Monsegur, Kayla aka Ryan Ackroyd, Switch and Chronom.

20  So six people, five other than Mr. Keys.

21        The defense at least in a buried objection, if I

22  understand correctly, believes that's only two persons.  Can

23  you clarify the defense position?

24        Assuming I find manager or supervisor --

25        MR. EKELAND:  Uh-huh.

1    THE COURT:  -- why is it not six or at least five?

2    MR. EKELAND:  Because really the only people or

3  individuals, if I'm recalling from the record correctly, the

4  IRCs, Your Honor, that were involved in the passing of this

5  username and password and actually going into the L.A. Times'

6  CMS is Sharpie, who the username and password was handed over

7  to, and Sabu, who was sort of the ring leader of Internet Feds.

8  All the other actors we maintain were just peripheral actors,

9  and Mr. Keys was not managing or supervising them in any way.

10  He's perhaps providing an opportunity to them to act, but he

11  was not -- by no means was he, ah, directing them.

12    And, as a matter of fact, later he was thrown out of

13  the room.  There were a number of people in the room who

14  actually didn't like Mr. Keys or want him involved.

15    THE COURT:  So what about Switch?  Do you agree that

16  Switch invited Keys into the room in the first place?

17    MR. EKELAND:  If that's what the record reflects, I

18  think that's right.  But an invitation into a room again just

19  shows the fact that Mr. Keys is not managing or supervising

20  anything because the room was under other people's control.  He

21  was there as a guest, not as a manager or supervisor.

22    THE COURT:  Is that the only role Switch played,

23  Mr. Segal, was to serve as a host at the front door in this

24  instance?

25    MR. SEGAL:  Well, what happened -- let me get

1    Government Exhibit 611, Your Honor.  May I have a moment?

2           THE COURT:  You may.

3           MR. SEGAL:  All right.  So at 611, there's a

4    conversation for a log that we don't have, right?  They were --

5    Switch and Keys as AESCracked were talking and then -- and with

6    Sharpie as well.  And Sharpie puts into the room that -- his

7    conversation with AESCracked where Keys is explaining how it

8    takes a while to grant one username permission.  He's doing it

9    now.  And then Switch says, I'm talking to him, too.  Why can't

10   we just invite him here?

11          Later on, Switch, in the same conversation, you know,

12   does one of these that -- he hearts AESCracked for what he's

13   done, one of these emoticons.  And, you know, bringing him into

14   that room, and the conversation that you can infer happened

15   before where he's doing what he's doing with Sharpie is enough

16   for you to infer that Switch is in on it.

17          Now, remember, we're not saying --

18          THE COURT:  All right.  That's --

19          MR. SEGAL:  Okay.

20          THE COURT:  On Chronom.

21          MR. SEGAL:  Yep.

22          THE COURT:  So, Mr. Ekeland, Chronom said he would put

23   the credentials in our intel database and gave Keys a

24   particular URL in which to paste it.  Now that's engagement,

25   active engagement in the activity leading to the modification

1    of the successful modification of the one article.

2         MR. EKELAND:  Chronom there is essentially saying that

3    he's going to store the information, but he's not -- if I

4    recall, he's not saying anything about actively attacking the

5    L.A. Times' CMS.  So we would argue that he's not part of it.

6    He's essentially acting as an archivist.

7         THE COURT:  So archiving for future use, like changing

8    the front page maybe.

9         MR. EKELAND:  Potentially saving it for future use,

10   Your Honor.

11        THE COURT:  And Kayla, in part of the discussion,

12   says -- this is in the chat room, correct, Mr. Segal?

13        MR. SEGAL:  Yes, Your Honor.

14        THE COURT:  Stick a big you know what Operation Payback

15   log on it.  I mean, that's a part of the discussion leading to

16   the -- that's the front page discussion, correct?

17        MR. SEGAL:  Well, this precedes the front page

18   defacement by days.  Right?  This is happening on December 8th,

19   and the front page deface -- and nothing happens after this.

20   And so Keys pops back in and says, hey, you know -- I'm kind of

21   paraphrasing but, hey, when are you guys going to do something?

22   I didn't give you this for research.  I told you to go F stuff

23   up.  They criticize WikiLeaks, they talk about demolish it, and

24   eventually something happens.

25        But these are the words of conspiracy right here.

1  Right?  He's -- Count One is a conspiracy count.  All these

2  people joined the conspiracy and, you know, there's an overt

3  act.  There's a complete crime in this chat log.  He turns over

4  chat credentials.  They're stored in the intel database.  And

5  they discuss their conspiratorial objectives, the very ones

6  that are charged in the indictment that he was convicted of.

7          MR. EKELAND:  We disagree with that characterization,

8  Your Honor.  Operation Payback has nothing to do with this

9  case.  That was an Anonymous operation going after I believe it

10  was PayPal, Visa, Mastercard for the fact that they had

11  stopped --

12          THE COURT:  Yeah, that's understood.

13          MR. EKELAND:  Yes.  So --

14          THE COURT:  But it was referenced in this comment

15  related to potential defacement of Tribune Company websites.

16          MR. EKELAND:  If that's what the log says, Your Honor.

17          Also I would just point out here where Mr. -- where

18  Sharpie is saying are you guys going to do anything?  That is

19  not the language of somebody who is managing or supervising

20  anything.  That's the language of somebody, you know,

21  potentially hoping somebody may do something, but doesn't have

22  managerial or supervisorial control, like Sabu did in that

23  room.

24          THE COURT:  All right.  I believe I understand the

25  parties' positions.

1    With the -- I thought Switch was the closest call with

2  the clarification.  I think he is properly on the list.  I'm

3  prepared to find that there were five or more participants.

4  And I'm also prepared to find, given the role that Mr. Keys

5  played, as the government sets forth in its brief at docket

6  145, page 13, he was the source of unauthorized credentials.

7  He provided information to the others on how to create more

8  credentials, instructed them where to type in order to create

9  more super user credentials, identified newspapers and

10  broadcast stations to attack for the largest impact.

11    I'm prepared to find that he did play in the role of a

12  manager, not necessarily the or the only manager.  So the

13  objection is overruled.  Paragraph 29 scores as three.

14    Paragraph 30, the defense objects to the two-level

15  enhancement, specifically to the language saying that Mr. Keys

16  took criminal advantage of an opportunity not easily afforded

17  to other persons.  And here again, it points to an argument Mr.

18  Ekeland has previously made that Tribune Company widely

19  distributed usernames and passwords and did not deactivate

20  usernames and passwords.

21    First of all, under the guidelines, this is called

22  abuse of a position of trust, and that position of trust can be

23  either a public trust, such as a postal carrier working for the

24  government, or a position of private trust.  And the Court does

25  find that Mr. Keys, as the key manager for Fox 40 while he

1    worked there of its social media operations, was in a position

2    of private trust.  And that did provide him with access to the

3    computer access codes and the CMS.

4         The guidelines talk about a bank teller or a hotel

5    clerk not being on the hook.  But I think given Mr. Keys'

6    greater level of responsibility as that social media manager,

7    he was in a position of private trust here.

8         Is there anything more I need to know about this?  I'm

9    inclined to overrule the objection.

10        MR. EKELAND:  I'll just submit that all this happened

11   when he was no longer with the company, and the company had had

12   an ample opportunity to deactivate his username and password

13   but, like with a lot of other ex-employees, they failed to do

14   so.  So in a certain sense, I don't know how you can have this

15   position of trust when you no longer have this

16   employer-employee relationship.

17        THE COURT:  I think the law is to the contrary, so the

18   objection is overruled.

19        We'll come back to the total offense level.

20        Paragraph 57, the defense indicates that its position

21   is that in fact Mr. Keys has sold numerous news stories in the

22   last year.  The report says at one point he had indicated he

23   had not sold any stories in the past year.  The government says

24   I shouldn't rely on the attorney's representation alone.

25        Is this material?

1          MR. EKELAND:  I don't think this is a -- this was just

2     a minor correction from our end, and I don't see -- unless the

3     government somehow thinks it's material, we don't consider it

4     material.

5          THE COURT:  I'm prepared to strike the last sentence

6     and resolve the objection in that way.

7          In terms of the other objections, objections to

8     restitution, that's deferred.  I understand the position that

9     the ultimate sentence should be probation from the defense.

10    We'll get to that after we consider the sentencing factors.  I

11    believe the balance of the objections are really arguing the

12    ultimate sentence.

13          Agreed with that, Mr. Ekeland?

14          MR. EKELAND:  Yes.

15          MR. SEGAL:  Well, we haven't decided loss yet, have we?

16          THE COURT:  No, I said we'll come back to that.

17          MR. SEGAL:  Okay.

18          THE COURT:  I've addressed all of the defense

19    objections at this point except for loss?

20          MR. EKELAND:  I believe that's correct, Your Honor.

21          THE COURT:  Agreed, Mr. Segal?

22          MR. SEGAL:  Yes, Your Honor.

23          THE COURT:  And there are no separate government

24    objections?

25          MR. SEGAL:  No.

1       THE COURT:  All right.  We can go ahead and begin with

2  the sentencing factors, if it's all right.

3       (Off-the-record discussion with Court Reporter.)

4       THE COURT:  I think we'll go to noon.  We aren't going

5  to get through this in half an hour, and so we'll take a lunch

6  break.  It can be a relatively short lunch break.  That will

7  give me a chance to check Treadwell, and then I'll be prepared

8  to wrap up I think fairly shortly after lunch.

9       MR. SEGAL:  I mean, I'm here whenever the Court wants,

10  but I think under Carty, we probably should do the guidelines

11  first before getting into the -- you know, sort of this

12  two-step process.  And I would -- even if we make arguments

13  right now, the Court should make the guidelines determination

14  before it decides on any variance.

15       THE COURT:  All right.  For clarity, I'm prepared to

16  take a break and check Treadwell and make a final decision on

17  loss.

18       MR. SEGAL:  Thank you, Your Honor.

19       THE COURT:  Let me tell you, though, while I'm doing

20  that, the questions that I'll have on the sentencing factors so

21  you can be thinking about those.

22       For the defense, a critical question to the Court is,

23  isn't the defense argument -- and I understand this will be

24  Mr. Leiderman's -- isn't the defense argument really

25  understating the role Mr. Keys played by focusing only on the

1    one article which was modified for a brief period of time,

2    given the evidence demonstrating that there were steps being

3    taken to also modify front pages not just of the L.A. Times?

4         Doesn't the defense really try to put blinders on the

5    Court, or have blinders on itself, in focusing on that one

6    article, which all by itself might look like a simple prank,

7    you know, an amusing reference to Chippy leet, for those who

8    know what Chippy leet means, but that's not all that was going

9    on or that the evidence ties Mr. Keys to?  That's one critical

10   question.

11        For the government, any response it has to the

12   environment in which these activities were taking place,

13   hyperactivity where pranks like this were the norm.  Is there a

14   contextual argument that somehow places Mr. Keys' activity in

15   context and reduces his overall culpability?

16        Critically in terms of unwarranted disparities, one of

17   the sentencing factors is how does the Court avoid unwarranted

18   disparities.  Even if I disregard the sentences imposed or not

19   by courts outside of this country, what are the cases that

20   provide any kind of benchmark for the Court considering

21   unwarranted disparity here?

22        The defense points to Sabu Monsegur, the seven months,

23   out of the Southern District of New York --

24        MR. SEGAL:  A cooperator.

25        THE COURT:  At least it argues -- well, you don't need

1   to respond now.

2           MR. SEGAL:  Sorry.

3           THE COURT:  I'm giving you the courtesy so you can

4   respond when I come back.

5           MR. SEGAL:  I appreciate that, Your Honor.

6           THE COURT:  -- PayPal 14 out of the Northern District

7   of California and Payback 13 as well as Cowden in St. Louis.

8           So I'm just giving you a list so you can organize your

9   thoughts for efficiency when we come back.

10          MR. SEGAL:  So --

11          THE COURT:  No, I'm not asking for a response now.  You

12  yourself said we shouldn't go there.  I'm telling you what I'm

13  currently thinking.

14          Those are the key questions I'll have on the sentencing

15  factors.  So we'll take a recess for about 10 minutes.

16          MR. SEGAL:  Your Honor, when we come back, if the Court

17  is interested in other CFAA sentences, I brought some actual

18  judgments with me.  In particular, Jeremy Hammond was one of

19  the, you know --

20          THE COURT:  Well, have you provided these to the

21  defense?

22          MR. SEGAL:  They're the ones that they left off their

23  list, and I have copies for them.

24          THE COURT:  Well, share them during the break, and you

25  can argue them when I come back.

1          MR. SEGAL:  All right.  Thanks, Your Honor.

2          THE COURT:  If you didn't provide them --

3          MR. LEIDERMAN:  I believe Hammond was discussed in our

4    attachment Exhibit 1.  And in terms of turning things over, I

5    worked very peripherally, but I worked on the Hammond case, so

6    I'm more than familiar with it.

7          THE COURT:  All right.  Those are my questions.  We'll

8    be back in about 10 minutes.

9          MR. SEGAL:  Thank you, Your Honor.

10         MR. EKELAND:  Thank you, Your Honor.

11       (Recess taken.)

12         THE CLERK:  Come to order.  Court is back in session.

13         THE COURT:  All right.  Come to order.

14         Mr. Segal, on the loss I've checked Treadwell.  And

15   while Treadwell does say we have repeatedly held that

16   sentencing determinations relating to the extent of a criminal

17   conspiracy need not be established by clear and convincing

18   evidence, the case does go on to note that disproportionate

19   impact may require a clear and convincing standard of proof,

20   the touchstone being due process.  And then it does note that

21   the court's amount of loss finding was based on the evidence

22   presented at trial.

23         All things considered, I'm prepared to sustain the

24   objection in part and rely on the number presented at trial,

25   which means a two-level increase at paragraph 24.

1          MR. SEGAL:  All right.  So our objection is preserved

2     to the standard of proof and --

3          THE COURT:  Your position and disagreement is, yes.

4          MR. SEGAL:  Thank you, Your Honor.

5          THE COURT:  So that means, before paragraph 25, the

6     offense level is 8.  But then when we get to paragraph 25 --

7     Officer Modica, can you help me out there?  I'm applying the

8     two-level enhancement, but is there a provision that requires

9     that the total offense level there increase to 12?

10          THE PROBATION OFFICER:  Paragraph 25, Your Honor?

11          THE COURT:  I'm looking at paragraph 25, and I've

12     applied the two-level enhancement under 2B1.1(b)(10)(C).  If I

13     look at (b)(10), it says if the resulting offense level is less

14     than 12, increase to 12.  So does that mean at that stage of

15     the guidelines calculation process at paragraph 25?

16          THE PROBATION OFFICER:  Yes, Your Honor, it will

17     increase to 12.

18          THE COURT:  All right.  Agreed, Mr. Segal?

19          MR. SEGAL:  It will increase to 12.  I think that my --

20     I'm trying to add it up.  Is that the -- is the question what

21     the ultimate guidelines is?

22          THE COURT:  I'm getting there.  So paragraph 23 is six.

23     Paragraph 24 is two.

24          MR. SEGAL:  Twenty --

25          THE COURT:  And I'm doing this because I am required

1    to.

2         MR. SEGAL:  Uh-huh.

3         THE COURT:  Paragraph 25 is two.  And so that would

4    mean we've reached 10 just adding cumulatively.  But I think

5    (b)(10) says if the resulting offense level at this stage is

6    less than 12, it increases to 12.  So I think, by operation of

7    the guidelines, at paragraph 25 we're at 12.

8         MR. SEGAL:  Yes, I agree.

9         THE COURT:  Agreed, Mr. Leiderman?

10        MR. LEIDERMAN:  I think so.

11        MR. SEGAL:  Also, Your Honor, I would say that since

12   the Court has found the actual loss to be only what was proved

13   at trial, what you have to do now under the application notes

14   is impose the greater loss number between the actual loss and

15   the intended loss.  And what he intended to do and what he was

16   convicted of in the attempt charge in Count Three was change

17   all of the front page layouts for all of the Tribune newspapers

18   in the country.

19        THE COURT:  Well, the numbers you gave me earlier were

20   between ten and 13,000.  That contemplated everything.

21        MR. SEGAL:  No.

22        THE COURT:  Was there additional information presented

23   at trial?

24        MR. SEGAL:  Yes.  What --

25        THE COURT:  With a dollar figure?

1          MR. SEGAL:  No, what happened -- it's hard to put a

2     dollar figure --

3          THE COURT:  I understand.

4          MR. SEGAL:  -- on any --

5          THE COURT:  I remember Mr. Gaines' and Mr. Mercer's

6     testimony.

7          MR. SEGAL:  Right.  That was the cost of the -- that is

8     just what we put on to show that we cleared $5,000 in their

9     response to the headline edit.  We did not attempt to put a

10    dollar value on the e-mail, although there was plenty of

11    testimony about the e-mail at trial.  And it was clear, and the

12    jury accepted, that what the loss would have been for Count

13    Three was more than what the loss was for Count Two.

14         THE COURT:  Are you now arguing something that goes

15    beyond what's in your briefing?

16         MR. SEGAL:  Well, I am -- I did not object to the PSR

17    because it came up with a number that I thought, you know,

18    accurately reflects the defendant's culpability.

19         THE COURT:  I understand that.

20         MR. SEGAL:  But now you have the independent -- now

21    that you have rejected the PSR and accepted the defendant's

22    objections --

23         THE COURT:  In part.

24         MR. SEGAL:  In part.

25         THE COURT:  You're asking me to go back and revisit now

1  paragraph 24?  Is that what you're asking me to do?

2         MR. SEGAL:  I think you have to at least consider,

3  based on the circumstances, what his intent was.  And what he

4  told Anonymous was the L.A. Times had to be demolished.

5         THE COURT:  All right.  Well, your record is made.

6         MR. SEGAL:  Thank you, Your Honor.

7         THE COURT:  Paragraph 26 scores as zero.  Paragraph 27,

8  while deleting the reference to malicious code, scores as four.

9  And so at that point, we're at 16.

10        Paragraph 29 scores as three.  We're at 19.  Paragraph

11  30 remains at two.  And so the adjusted offense level is 21.

12        Do I have that right, Officer Modica?

13        THE PROBATION OFFICER:  Let me double-check, Your

14  Honor.

15        Yes, Your Honor.  It's 21.

16        THE COURT:  Anyone disagree with my math?  Mr. Segal?

17        MR. SEGAL:  No, Your Honor.

18        THE COURT:  Mr. Leiderman?

19        MR. LEIDERMAN:  No.

20        THE COURT:  Mr. Ekeland, you're the guidelines guy.

21  21, you agree that's the correct number all things considered?

22        MR. EKELAND:  All things considered, yes, Your Honor.

23        THE COURT:  All right.  And it's not disputed --

24        MR. LEIDERMAN:  Pardon me, Your Honor.  While

25  preserving our objections.

1          THE COURT:  Of course.  Of course.

2          Criminal history it's not disputed is zero.  Mr. Keys

3    has zero.  It's not just a matter of his criminal history --

4    having a criminal history and it's still scoring as I.  He has

5    zero criminal history, and that means he's criminal history

6    category I.

7          So 21 and I, what does that make the range, Officer

8    Modica, if I could rely on you once again?

9          THE PROBATION OFFICER:  37 to 46 months.

10          THE COURT:  All right.  And there's no statutory

11    minimum here?

12          MR. SEGAL:  Right.

13          THE COURT:  All right.  I believe that concludes the

14    guidelines calculation.  Agreed, Mr. Segal?

15          MR. SEGAL:  Yes.

16          THE COURT:  Mr. Ekeland?

17          MR. EKELAND:  Yes, Your Honor.

18          THE COURT:  All right.  Let me just hear briefly your

19    argument in response to the questions I posed before the break.

20    We'll take then a short lunch break, half an hour at 12:15, and

21    then come back for final argument and any statement from

22    Mr. Keys, if he wishes.  And then I believe I'll be prepared to

23    pronounce sentence, but I'll know at that point.

24          So your response to my questions relative to the

25    sentencing factors.  Mr. Segal, do you want to go first on

1  unwarranted disparity?

2        MR. SEGAL:  Yes, Your Honor.  Thank you.

3        Your Honor, first under Treadwell, again, it is

4  impractical and impossible for you to kind of take a list of

5  other hacking sentencings, and not having seen those PSRs, just

6  looked at press releases, and try to figure out where the

7  defendant fits into those.

8        Under Treadwell and its progeny in the Ninth Circuit,

9  3553(a)(6) means calculating the guidelines.  That is how to

10  arrive at a uniform sentence, and there are all kinds of

11  reasons for that.

12        The first is, you know, if one defendant got a below

13  guidelines break maybe that he didn't even deserve, then why

14  undermine sentencing uniformity even more by giving yet another

15  defendant a below guidelines and off uniform sentence.

16        The second is, defendants who plead guilty and/or

17  cooperate are not similarly situated.  That is clear in the

18  Ninth Circuit's teaching.

19        THE COURT:  Accepting that, so who -- just looking at

20  the defense list of those I identified previously, who of those

21  did not --

22        MR. SEGAL:  The --

23        THE COURT:  -- plead and/or cooperate?

24        So Monsegur --

25        MR. EKELAND:  Monsegur is the only cooperator.

1          MR. SEGAL:  And the PayPal 14 were --

2          THE COURT:  Those were essentially deferred

3     prosecutions?

4          MR. SEGAL:  They were mopes who entered into agreements

5     with the Northern District, Your Honor.  Those were -- the Low

6     Orbit Ion Cannon was this tool that they used to kind of

7     create, you know, mischief if they were not -- and without

8     their PSRs, it's really quite hard, Your Honor.

9          THE COURT:  So of those, who would you say is anywhere

10    close to Mr. Keys?  Is it Cowden in St. Louis?

11         MR. SEGAL:  None of them because none of them was a

12    site administrator for the network that he hacked, right?

13         There is a lot more at stake here -- I mean, Your

14    Honor --

15         THE COURT:  Okay.  I understand that argument.

16         MR. SEGAL:  I want to get to that.

17         THE COURT:  So tell me the cases on which you rely.

18    You make a pretty sweeping statement at the beginning of your

19    brief saying, of the cases you're familiar with, 60 months is

20    the right sentence when you have white collar defendants who

21    don't accept responsibility.  So what are the cases you are

22    relying on when you make that statement?  Because I don't think

23    you identified them in your brief.

24         MR. SEGAL:  Your Honor, that's my own view of -- yeah,

25    the defense has made a lot out of the view that I expressed

1    that this is not the crime of the century.  The full quote is

2    but you can't do this stuff, it's illegal, and for a good

3    reason.  And I come to that view really having done this job

4    since 1997.

5           When I think what the defendant did in this case, I

6    think his culpability fits in somewhere worse than like a

7    drug-addicted mail thief who is washing checks or stealing

8    identities and taking money from people's bank accounts that

9    then are restored by the banks.  Probably also -- you know, he

10   is an insider.  That is another network crime we want to

11   defend, the postal network, because people -- postal thieves

12   are both harming the individual victims, as Keys did in this

13   case, and undermining the network that our economy relies on to

14   transmit information and assets among, you know, people who are

15   not face to face.  That's what Keys did, too.

16          And my own view of Keys is he deserves a sentence that

17   is no less than that of one of these mail thieves who just

18   routinely come into these courts and are sentenced to three,

19   four, five years in prison often on pleas.

20          Or the other way to think of him is -- okay.  So find

21   another insider.  Where is an insider that is a common crime

22   that we've seen a lot of and is also kind of in that ballpark,

23   maybe higher after trials.  How -- look at him as a mortgage

24   broker, right?  Those people were insiders who used their, you

25   know, privileged position to, you know, transmit false

1       information and to get substantial gains.

2               And the weird thing about this case that makes Keys I

3       think more culpable than -- before you consider his tweets and

4       his post-verdict conduct basically spitting in the face of the

5       jury, he did this crime not for personal gain.  He got nothing

6       out of this except to hurt people, right?  This is a crime

7       of -- not of mischief, right?  You gotta read those e-mails and

8       think of what he said about the -- you know, after he learned

9       that an old woman was reduced to tears.

10              THE COURT:  All right.  I understand.  This is

11      essentially your wrap-up argument.

12              MR. SEGAL:  No, this is why he's different.

13              THE COURT:  All right.

14              MR. SEGAL:  And this is why he's more culpable than a

15      mail thief or a mortgage broker who routinely get years in

16      prison in every court here.  Or --

17              THE COURT:  I understand that argument.

18              What about Hammond?  You were starting to say something

19      about --

20              MR. SEGAL:  Hammond got a decade.  Hammond pleaded to

21      an offense that had a statutory maximum of a decade.  His

22      guidelines were substantially higher.  He was a higher level

23      hacker than Keys, and we're not here asking for a double-digit

24      sentence.

25              I'll tell you what --

1          THE COURT:  Was Keys himself a hacker?  Or is he the

2     instigator with pretty modest computer skills who got the

3     hackers to do the hacking?

4          MR. SEGAL:  I mean, I don't want to -- as the Court did

5     when we were calculating the -- I'm sorry -- resolving the

6     objections to the PSR, I don't know if it's helpful to get kind

7     of wrapped up in the nomenclature for purposes of

8     characterization.  But this is -- these are the nouns and verbs

9     that I know about keys.

10          He was the site administrator for Fox 40 on the CMS.

11     He had sufficient computer skills to be hired as the social

12     media editor and then to be the guy at the station trusted to

13     create usernames.  All right.  He was the -- he knew enough to

14     learn their content management system and have -- even after

15     his MPS credentials were deactivated when he had the fight with

16     Mercer, to preserve access points into that network and the

17     ability to build further access points.

18          Now was he as skilled as the other guys?  Was he as

19     skilled as the other people in Anonymous?  No.  So, you know,

20     I'm not sure about, like, what's the answer on whether it's

21     right to use the vernacular hacker.  I'm not sure that it does.

22          THE COURT:  So Hammond, apples and oranges, how does --

23     what is his relative culpability compared to Hammond?

24          MR. SEGAL:  I don't know.  I haven't seen Hammond's

25     PSR, and that's why I don't think you should engage in this

1    exercise.

2        I mean, I do remember the last 1030 defendant that was

3    sentenced in this very courtroom that I can remember, and that

4    was Greg King.  He in 2008 was sentenced by Judge Karlton for

5    maintaining a botnet, he was a script kid who was stupid enough

6    to do it from his own house, and he got two years.  You know,

7    so if a site administrator who directs an attack against his

8    own network doesn't get that sentence, what are you going to

9    tell Greg King who got two years on a guilty plea?  And the

10   judgment in that case, not just a press release, I've handed to

11   the Court's clerk.

12       But I --

13       THE COURT:  So the guideline range as the Court has

14   calculated with your objection to the loss amount is 37 to 46.

15   So your position would be someplace in that guideline range

16   makes sense?

17       MR. SEGAL:  Yes.

18       THE COURT:  All right.

19       MR. SEGAL:  Yes.

20       THE COURT:  That is an advisory guideline range.  The

21   circuit doesn't say if I sentence in that range, it's not

22   automatically correct to do so.  But -- all right.

23       Anything else to say on this issue, Mr. Leiderman?  I

24   have read all of your -- all the other cases you have pointed

25   the Court to.  I don't really think at this point I can -- I

1    understand the worldwide context in which we're operating.  In

2    this court, it's interesting backdrop.  I think I really look

3    to cases within this country.

4         MR. LEIDERMAN:  I understand, but it's certainly of

5    note that the sentences on both sides of the Atlantic have been

6    congruous.  And, you know, similar conduct in similar countries

7    have been punished similarly, and not one person got as much as

8    37 months.  The largest sentence was for John Burrell who got

9    36 months, who was indicted in five or six different districts

10   for hacking police databases and dumping them online, a much

11   more egregious offense than the one here and a much more

12   violative offense.  And if we're going to talk about, you know,

13   trust in the system and, you know, violations, that's a much

14   more serious type of case.  And if he got 36 months, you know,

15   it's completely out of line for Mr. Keys to get somewhere

16   between 37 and 46.

17        Now, having said that, you know, each and every case is

18   significantly worse.  If I understand it, the Court didn't want

19   to hear about Hammond because he had a level VI offense -- a

20   level IV criminal history.  He had a prior CFAA violation for

21   which he went to prison for two years, and his case involved

22   800,000 credit cards that were accessed and hundreds that were

23   used on Christmas day to make donations to, like, the Red Cross

24   and the Tor Project and things like that.

25        You know, not to mention he --

1    THE COURT:  The government's conceded he's --

2    MR. LEIDERMAN:  Okay.  That's fine.

3    THE COURT:  -- different.

4    MR. LEIDERMAN:  I think the analogies to bank fraud and

5  a mortgage broker have no case -- have no place here.  They are

6  just -- they're just totally incongruous and out of place with

7  the type of conduct here.  Like cases are CFAA cases.  They do

8  not involve the type of activities that Mr. Segal is talking

9  about.

10    Bank fraud, which the only one in this whole thing that

11  committed bank fraud is Mr. Monsegur, who got seven months.

12  And drugs, by the way.  He had pounds of marijuana.  He's the

13  only one involved in that, and I don't see those as in any way

14  related to this.

15    Likewise with someone who has a botnet.  A botnet

16  affects thousands, sometimes hundreds of thousands of

17  computers.  I believe some of the bigger ones they have found

18  were over two million computers and are able to do much more

19  significant damage and, in fact, do much more significant

20  damage to a wide range and a wide array of people.  They

21  violate the privacy of, you know, perhaps hundreds of thousands

22  of people's computers without people knowing that.

23    A botnet is a very serious tool and not congruous --

24    THE COURT:  And that's not the case here.

25    MR. LEIDERMAN:  Yeah, that's just simply not the case

1    here.

2          THE COURT:  So just address briefly -- and you can come

3    to this in your wrap-up argument, but what about my question

4    about consistent understatement of Mr. Keys' culpability?

5          MR. LEIDERMAN:  May I say one more thing just related

6    to Mr. Segal's statement?  And that is that Mr. Keys exercised

7    his constitutional right to put the government to their burden

8    of proof, and that is not a -- other than the fact that he's

9    penalized by not getting a two- or three-level reduction for

10   acceptance of responsibility, that's what he gets.  He gets

11   that lack of reduction.  He does not get a penalty for going to

12   trial.

13         There is no penalty that comes with --

14         THE COURT:  The Court understands that.

15         MR. LEIDERMAN:  Okay.  Thank you.  I'll submit it.

16         THE COURT:  I'm also not -- I mean, I'm not giving

17   weight to what purportedly has been said or tweeted or

18   communicated outside of this --

19         MR. LEIDERMAN:  Okay.  I will strike that from my

20   wrap-up argument, then.

21         THE COURT:  -- courtroom --

22         MR. LEIDERMAN:  Okay.  Thank you.

23         THE COURT:  -- by Mr. Keys.

24         I don't have the evidentiary record.  I mean, I

25   understand what the government's position is.

1          MR. SEGAL:  It is in the record.  We submitted it with

2     our sentencing memorandum.

3          THE COURT:  I understand that, but I'm not going to

4     have an evidentiary hearing to nail down when they were

5     tweeted, how they were communicated.

6          MR. SEGAL:  He gave an interview to the Los Angeles

7     Times.

8          THE COURT:  I understand that.  I'm asking about

9     understatement.  I'm looking at the narrow record here.

10          And isn't -- even if I don't think about those

11     statements, isn't there a consistent understatement of -- I

12     mean, there's overstatement in some respects with respect to

13     the gun to the head, and there's understatement with respect to

14     culpability.

15          MR. LEIDERMAN:  Right.

16          Okay.  So the Court specifically asked regarding the

17     potential defect -- pardon me -- the potential deface of the

18     Chicago Tribune's front page.  Now, I believe when the Court

19     stated it, the Court stated it was the Chicago Tribune and the

20     L.A. Times, et cetera.

21          Now, the evidence was that Sharpie had been -- you

22     know, without contact from Mr. Keys, Sharpie had been studying

23     the manual on the CMS and, you know, had a plan to do an

24     Anonymous-based deface of the Chicago Tribune.  He had never

25     taken -- and, you know, part of that we dispute the evidence on

1   as we did at trial.  He had never taken that direct step, we

2   assert, never taken that direct step toward the commission of

3   that.  However, the Court's correct that he was planning to do

4   that, you know, being mindful it was just the Chicago Tribune.

5   THE COURT:  And egged on by Mr. Keys, who attempted --

6   MR. LEIDERMAN:  Later.

7   THE COURT:  -- access to allow that to happen.

8   MR. LEIDERMAN:  Later and was blocked out.

9   THE COURT:  Not that much later.

10  MR. LEIDERMAN:  It was about a week later when Sharpie,

11  a week and a half later when Sharpie came to him and said this

12  is what I'm trying, I've gained this additional skill by

13  looking at the book.

14  So the Court's correct, and I don't know that that's a

15  minimization.  The jury found that, and that's something that

16  we have to -- we have to accept and respect.

17  However, you know, it bears mention that that wasn't --

18  that wasn't his, you know, idea.  He wasn't involved until the

19  very end, and at that point he was locked out.

20  THE COURT:  But he was making instigating comments.

21  MR. LEIDERMAN:  He was, and that's -- and that's the

22  evidence.  And, you know, if it seems that we've duplicitously

23  attempted to, you know, white wash that, you know, that wasn't

24  our intent.  You know, what was proven was proven and, you

25  know, what the evidence was is what the evidence was.  And, you

1    know, I have to -- you know, I have to concede that point to

2    the Court.

3         So in terms of, you know, an argument against it, there

4    was that.  However, you know, these are still within the

5    neighborhood of pranks.  And as I believe I wrote in the --

6         THE COURT:  Let me just hear -- before lunch, the lunch

7    break, a short lunch break, let me just hear from the

8    government on that.

9         MR. LEIDERMAN:  Okay.

10        THE COURT:  The defense argument, which is laid out in

11   full in the briefing --

12        MR. LEIDERMAN:  Right.

13        THE COURT:  -- is that this was an era of -- you know,

14   that the hackers were feeling their oats.  They were proving

15   what they could do.  Mr. Keys got caught up in that, was

16   invited into a chat room, maybe did have some journalistic

17   purposes, wanted to get back at his former employer.

18        So what about the context in some ways explaining

19   and/or excusing Mr. Keys' activity?

20        MR. SEGAL:  I think the chronology rebuts that

21   inference.  Right?

22        THE COURT:  The chronology in the chat room.

23        MR. SEGAL:  No, before the chat room, the chronology of

24   the trial.

25        He gets fired on October 28th, fired or leaves,

whatever. This fight in the newsroom is October 28th of 2010.
Okay. Between then and early December, he's hitting through
his -- through Overplay that CMS server like he's still at
work. He's doing stuff. He downloads the e-mail list. This
is before he meets anybody at Anonymous. Okay.

THE COURT: The defense argues it's in the time frame
where this frenzy had already begun.

MR. SEGAL: He's not talking about Anonymous until
December 12th when he tries to pitch the scoop on Anonymous to
Brandon Mercer. There is nothing in the record at all about
him being swept up in the chat room or the kind of spirit of
the time or whatever it was until that point.

What you have to rely on is Keys' own statements,
right, which is in the record, and a lot of it was played, but
the full transcript is in the docket. He was an angry
ex-employee. That's what he told Cauthen, and he said that
Brandon Mercer was terrified. Keys said -- and we're talking
about the Cancer Man e-mails now -- that he was hurt, and he
wanted there to be consequences. This is an angry, vindictive,
hurtful person who, when he was anonymous on the Internet,
shows his true character.

Then, only later, after he's been engaged in the Cancer
Man campaign for about a week, he pops up in the Anonymous chat
room advertising super user access to their CMS. Then -- and
he didn't do it, you know, for a story. He said he was an

1    ex-journalist when he talked to them.  That's in the chat logs.

2    And he discloses the passwords, and he says go F stuff up.

3         And then when they talk about research, he says, no,

4    no, no, I didn't do that for you guys to do research.  I did it

5    for, you know, the purpose that I explained before.

6         And then for this guy saying he's a journalist, when

7    nothing happens, he pops up again in the chat room.  And he

8    knew about the spirit at the time that Anonymous was concerned

9    about WikiLeaks.  He posts an L.A. -- a link to an L.A. Times

10   blog piece that is critical of WikiLeaks, and he says one more

11   reason why the L.A. Times must be demolished.

12        THE COURT:  And I read that in your brief.  I think I

13   understand your essential response to that.

14        MR. SEGAL:  Well, I have a couple of -- if we're going

15   to do this before lunch, I would like to be heard on a couple

16   of other things, Your Honor.

17        THE COURT:  What things?  Related to any of my

18   questions?

19        MR. SEGAL:  Yes.

20        THE COURT:  So two minutes.

21        MR. SEGAL:  Okay.

22        THE COURT:  You'll have plenty of time after our break.

23        MR. SEGAL:  Oh, I will get to wrap up after?

24        THE COURT:  Yes.  We'll come back.

25        MR. SEGAL:  Okay.  Then --

1          THE COURT:  Victim statements, you can read

2     Mr. Mercer's statement.  Mr. Gaines can address the Court.

3     Attorney wrap-up.  Any statement from Mr. Keys if he wishes to

4     give one.  That's the agenda after a 30-minute break.

5          MR. SEGAL:  Okay.  Then I want to just say one thing

6     about the extent of the harm.

7          The story defacement and what the Court's asking about,

8     the attempted front page layout defacement, was only what was

9     visible to the public on the front end of the website, but it

10     understates what happened at Tribune and what Keys intended to

11     happen.

12          Jedlinski -- they had that urgent night where they were

13     deactivating everybody's passwords and imposing a system-wide

14     reset.  But, more importantly, the Court heard about a day and

15     a half of testimony about, you know, what Keys did with these

16     super user credentials that required the Tribune company to

17     conduct a damage assessment that lasted till late January or

18     early February of 2011.  And it wasn't about changing back

19     headlines.  It was about assessing the extent of the harm

20     because they were super user credentials.

21          So Armando Caro, who was the managing director of the

22     architecture and security operations -- and this is where the

23     grown-ups came in, this guy made a 180 grand -- spent weeks

24     accessing the extent of the compromise and how the breach had

25     occurred.

1    Dylan Kulesza testified that he worked to figure out

2  who had conducted the attack and helped review logs to identify

3  these back door access points.  I don't know, this may have

4  gone by quickly, but Kulesza testified that going through those

5  logs meant going through records that included one or 200,000

6  log events per day.

7          THE COURT:  That's in your briefing as well.

8          MR. SEGAL:  That is not in my briefing.

9          THE COURT:  Well, you referenced generally the process

10  that the Tribune --

11          MR. SEGAL:  I cite the PSR, but I think it's important

12  to understand the specific --

13          THE COURT:  And this goes to the issue of whether or

14  not the defense is understating?

15          MR. SEGAL:  Yes.

16          THE COURT:  I think I'm clear on that.  We haven't

17  talked about the Fox 40 customers.

18          MR. SEGAL:  No.  This is --

19          THE COURT:  I understand that argument.  We're going to

20  take a 30-minute break.  So ten of 1:00 we'll come back and go

21  through that agenda I just mentioned.

22          MR. SEGAL:  All right.  Thank you, Your Honor.

23          THE COURT:  All right.

24      (Lunch recess taken.)

25                          ---o0o---

SACRAMENTO, CALIFORNIA

WEDNESDAY, APRIL 13, 2016, 1:00 P.M.

---o0o---

1

2

3

4          THE CLERK:  Come to order.  Court is back in session.

5          THE COURT:  All right.  You may be seated.  We're back

6    on the record.

7          I forgot to ask earlier, is forfeiture an issue in this

8    case?

9          MR. SEGAL:  We had a forfeiture count, but we did not

10   ask -- we basically abandoned it.  The defendant actually was

11   given back the original of his computer.  We retained the

12   image.  So no.

13         THE COURT:  All right.  Agreed, Mr. Leiderman?

14         MR. LEIDERMAN:  Yeah, we have the -- we have the

15   materials.

16         THE COURT:  All right.  Normally I would include a

17   final order of forfeiture in the judgment and commitment if

18   that were an issue, but I will not here.

19         MR. LEIDERMAN:  Okay.  Thank you.

20         MR. SEGAL:  That's fine.

21         THE COURT:  All right.  So when do you want to read the

22   victim statements or have me hear from -- read Mr. Mercer's

23   statement and hear from Mr. Gaines?  Do you want do that after

24   you provide wrap-up argument or before?

25         MR. SEGAL:  I can do it now if that's what --

1          THE COURT:  I think that makes the most sense.  Then

2     we'll go through wrap-up argument, see if Mr. Keys wants to say

3     anything.

4          MR. SEGAL:  Okay.

5          THE COURT:  All right.

6          MR. SEGAL:  So the Court would prefer I read the

7     written statement rather than play the recording of Mercer?

8     Okay.

9          So I'm reading this, but these are Mr. Mercer's words,

10     and these are authorized by Tribune Media.

11     (Begin reading.)

12          I appreciate the opportunity to put in writing and in

13     an audio recording my thoughts on sentencing.  I apologize that

14     I cannot be in court in person.  I had plans to be in

15     Sacramento for the sentencing in March.  When the court date

16     was postponed, I already had a trip to Russia planned, and my

17     meetings there could not be rescheduled.

18          I hope I can offer the Court, and I hope that I can

19     offer Matthew Keys, some perspective from the victims impacted

20     by the e-mails from Fox Mulder and Matthew Keys' other aliases,

21     from the viewpoint of the Fox 40 staff, the Fox 40 viewers, who

22     were unwittingly dragged into a former employee's vindictive

23     grudge, and the larger staffs at Tribune and the L.A. Times,

24     who had to investigate and repair the breach of our servers

25     that Matt Keys' intentionally carried out in a campaign of fear

1    and intimidation.

2         I've been torn about this case and the person who

3    started it all.  It's a sad thing to see a person with promise

4    and potential, who I recruited and gave his first full-time job

5    in news, turn out to be a criminal.  I don't bear any grudge

6    against you, Matthew.  I forgave you a long time ago.  I

7    believe in the good in everyone, and I know Matthew Keys is

8    capable of contributing to society.  I believe before that can

9    happen, Matthew, you need to realize that you made a mistake,

10   and you need to apologize.  You need to truly be sorry for the

11   hurt you caused.  Remorse, contrition and accountability are

12   the way to make right what you did that was wrong.

13        I don't know what the proper sentence is for the amount

14   of time he robbed from us all or the amount of fear he chose to

15   create.  I don't know how much time in prison can make up for

16   the emotional distress of the elderly viewers I had to reassure

17   while they sobbed on the phone.  Aside from those victims is

18   the question of what to do when a journalist breaks the sacred

19   trust of his employment.

20        Keys, as a journalist, which he was at the time he

21   worked for Fox 40, should be held to a higher standard.  Part

22   of broadcasting is a respect for the viewers who give us our

23   livelihood.  We work hard every day to inform them to the best

24   of our ability and to earn their trust.  We know they depend on

25   us.  To intentionally harm people in the audience is to break

1  the bond of trust that journalists enjoy in American society as

2  envisioned by the framers of the Constitution.

3      Matt, if I can address my remarks to you personally for

4  a few moments, what you did was not accidental, but intentional

5  and done with malice to cause harm.  I typed you a long e-mail

6  on my old iPhone which you later responded to.  Do you remember

7  it?  I said, if you did this, you can never undo it.  I begged

8  you not to continue.  I told you about the people you were

9  hurting, innocent people whose personal information you were

10  using illegally.  I warned you about the harm you caused and

11  would cause if you ignored the warning.  I warned you whatever

12  happened would be the result of what you chose, and you would

13  have to suffer whatever consequences ensued.

14      This matter is in court today because you used your

15  special privileged position of access at the TV station, and at

16  the time as a journalist, intentionally to hurt both our

17  viewers and the station by trying to damage the bond of trust

18  between the station and its audience.  Trust in viewing habits

19  build up over a long time, but they can be shattered in an

20  instant.  One person can sever the bond of trust for an entire

21  news organizations.

22      The personal vendetta waged against your former

23  employer through your proxies, the poor viewers whose personal

24  e-mail addresses you chose to take, caused more harm than this

25  courtroom knows.  The judge and the jury heard about the weeks

of tracking the security breach, investigating server logs, and
creating and executing a plan and strategy to help the hundreds
of viewers you chose to terrorize.  That's the fiscal damage,
losses the company had to pay for.  What the courtroom hasn't
heard yet is the story of those viewers and what you put them
through.

I promised each viewer that I would do everything I
could to investigate how this Fox Mulder got their e-mail
address and make it right.  This is what I want to share with
the Court, and this to me was the worst part of this whole
ordeal.

It began when our web producer Sam Cohen called out to
me and said, Brandon, you're going to want to take this.  It
was a call from a woman scared to death about the e-mail she
was getting from a stranger.  I picked up and heard an elderly
woman in tears.  Her husband was suffering for kidney failure,
and now she was getting all of these terrifying e-mails in her
in-box.  She was already at the breaking point, and then she
got the threatening e-mails.

She asked me what should she do?  Was her identity at
risk?  She begged for help.  I recommended she change all of
her passwords, tried to reassure her and gave her some solace
so she could focus on life and loved ones, not the actions of a
rogue web producer.

You meant to cause harm, emotional distress, panic and

anxiety, and the e-mails you sent did all of that and more.
Life is about choices. We all choose our actions and our
reactions. And crime is about making the wrong choice knowing
its full -- knowing full well it is wrong.

Journalism works in the public interest and strives to
minimize harm. Ethics are the backbone of the profession,
without which it would lose all public confidence. Journalism
is never used for selfish, private ends or to hurt innocent
people. Your Honor, anyone who intentionally causes harm to
innocent people like this is not a journalist, he's a
terrorist.

I trust the Court will impose a sentence that metes out
justice for the act of intentionally misusing one's gifts of
intellect and technological prowess to hurt people. I trust
the sentence will serve as an example to others who might
imitate the same malicious acts. I believe the Court should
deal as harshly with those who choose to inflict injury on
innocent people from the safety of their homes, using their
minds and keyboards as weapons, as it does to those who use
guns and violence on the streets.

Thank you, Your Honor, for letting me describe the full
effects of what was done. I hope that whatever sentence is
given, that it ends with Matthew Keys realizing he had a chance
to avoid this, and he did not make the right choice. But there
is one more right choice to make. That is to apologize for not

1    acting in the public interest like a journalist, but in the

2    interest of himself.  That's the step to redemption and getting

3    on with life, and I hope, Matthew, you can make that decision

4    now and move on to a new phase in life.

5         Thanks to Matt Segal, John Cauthen, the FBI, the

6    Department of Justice and the U.S. Attorney's office for your

7    work on behalf of the public.  And, Your Honor, I trust your

8    wisdom and discernment in the most appropriate sentence.

9         Thank you, Brandon Mercer, former news director of KTXL

10   Fox 40.

11     (End reading.)

12         And, Your Honor, the current news director is also

13   present in the courtroom on behalf of Fox 40.

14         THE COURT:  All right.

15         MR. SEGAL:  All right.  And --

16         THE COURT:  And Mr. Gaines wishes to address the Court?

17         MR. SEGAL:  He does, Your Honor.

18         THE COURT:  You can come to the podium.  This is not

19   testimony as you provided earlier.  It's your statement.

20         MR. GAINES:  Okay.  I'm here representing the Los

21   Angeles Times.

22         I guess our overriding point today is that hacking a

23   news site and changing news content is a very, very serious

24   matter.  The Los Angeles Times has been existence for 114

25   years.  It has matured as one of the leading news organizations

1    in the country.  And like other organizations today, it faces a

2    challenge to respond to new ways of delivering news and changes

3    in our financial support.

4         But the underlying mission and business model remains

5    to report on what is happening in the region and throughout the

6    world and explain what it means and earn the trust of its

7    readers.  And providing useful and accurate information is a

8    crucial requirement, the core of our business, and to do this

9    readers must trust what they see.

10        Advertisers advertise because there's a high quality of

11   information, and the site is produced by a trustworthy

12   organization that attracts readers.

13        Credibility is the life blood of business.  Defacing a

14   website is not like defacing a building or a billboard.  It's

15   not the outside of the business or an entryway into the

16   business.  Yeah, it's the journalism business itself.

17        The top priority of an organization is to maintain

18   credibility, and rapidly fixing errors and incomplete articles

19   is built into the process of journalism.  Monitoring and

20   enforcing those standards has been a key job of mine and other

21   top editors at the Los Angeles Times, and when questions arise

22   we drop everything.  We leave meetings, we return to work on

23   weekends, we stop future work to ensure accuracy and the

24   integrity of the website.

25        So in the situation that became this case, I can still

remember the heightened level of stress and worry, both in myself and among my colleagues. I was expected to figure things out and to make sure our tech staff understood the gravity and urgency.

You know, we are accustomed to horrible news events in this industry, and we can work efficiently under high pressure. But losing control of the site is a much more basic matter, and it cuts to the foundation of our ability to work. Especially today when technology has been rapidly disrupting the delivery of news, it's important for society in general to preserve the beneficial effects of the free press, an active fourth estate, and robust ways of providing and exchanging information among the population.

For example, in an emergency or a natural disaster or a terrorist attack, the information provided by news organizations is a crucial part of community response, and lives can be at stake if people don't know who to believe or what to look at.

So the home page is the most important page that reflects a news organization's image, and it remains the primary public face of news institutions, even though things are changing. If readers wonder if they can tell what is accurate on the site due to hacking or changes in the website, it is not good for them, it's not good for the institution, it's not good for society. If this happens to multiple pages

1    and multiple organizations at once, it has the potential for

2    chaos.  That's why we're saying it's a serious matter.

3         So it's particularly important today because barriers

4    to entrance in news have been lowered.  Not everybody can buy a

5    printing press, but almost anybody can create a news site.  And

6    so there's already a problem in ascertaining what is reliable,

7    what is reliable news, and there are many news sites without

8    track records that produce news and/or news like information.

9    There are advertisers who want to make their advertising look

10   like news.

11        So when our site looks broken, it's a basic threat.  So

12   the organization has to protect their credibility, in fact,

13   from -- from any kind of threat or risk.  So we are among the

14   few places of stability on the web.

15        And hacking a print product is impractical, but online

16   our security is key.  The risk is real.  And for our industry,

17   it's crucial that we be a beacon in a confusing world.  It's

18   important to be able to trust some sites and for readers and

19   society to have something to guide them through what is a

20   difficult thing to sort out.

21        So we have a strong interest in sources and accuracy,

22   of course, and essentially we hope this case helps the nation

23   and the world understand that these are fundamental needs that

24   are important to society in general.

25        So thank you.

1          THE COURT:  All right.  Those are all the persons who

2     wish to address the Court, Mr. Segal?

3          MR. SEGAL:  Yes, Your Honor.

4          THE COURT:  All right.  I would hear wrap-up argument

5     at this point.

6          MR. SEGAL:  Okay.

7          THE COURT:  And Mr. Segal can go first.  I don't know

8     if you want to stand there the entire time, if you want to take

9     turns or just have one of you there.  It's entirely up to you.

10          MR. LEIDERMAN:  I don't mind standing.  Whatever

11     counsel and the Court prefer.

12          MR. SEGAL:  You can stand there and make faces.

13          MR. LEIDERMAN:  I can make faces if you want, sure.

14          MR. SEGAL:  All right.

15          THE COURT:  Let me just ask.  We've covered a lot of

16     ground --

17          MR. SEGAL:  Yeah.

18          THE COURT:  -- so I don't need to put a strict time

19     limit on you, but I'm assuming you can be fairly focused.

20          MR. SEGAL:  I'm going to try, Your Honor.

21          THE COURT:  All right.

22          MR. SEGAL:  Before I get started, I want to cover two

23     matters that had sort of -- I just want to cover two things

24     before I get started.

25          Under Treadwell, I don't think you should do -- be your

1   own kind of mini guidelines commission and compare 1030 cases.

2   It's impossible to individualize each case, and, you know,

3   3553(a)(6) is just one factor anyway.  You have to fashion a

4   sentence that is appropriate on the facts of this case, which

5   we do know.

6          That said, Greg King got two years in this very room.

7   Ryan Harris in the district of Massachusetts got 36 months.

8   Nikhil Shah in the Eastern District of North Carolina got 30

9   months.  Michael Musacchio, who was the defendant in a case

10  that we cited during the trial, got 60 months.  So people get

11  substantial sentences for this.

12         And the difference that I have noticed prosecuting this

13  case and other frauds is that there is this -- with this

14  defendant, there is this argument that essentially unless I

15  committed the crime of the century, I shouldn't go to prison,

16  and that is the voice of entitlement.  That's a person who is

17  educated and articulate and has some technical skill.  And even

18  though -- despite what the evidence shows beyond a reasonable

19  doubt he did, he is unwilling to think that he's like those

20  people, those other criminals from whom he disassociates

21  himself.

22         And you do have to treat like cases alike, and you have

23  to promote respect for law.  And part of promoting respect for

24  law is this defendant may be privileged in the eyes of society

25  outside this courtroom, but those things do not apply in here.

1    The Court indicated a reluctance to rely on the -- on

2    Keys' tweets and various interviews with the news media after

3    for evidentiary reasons.  And actually you don't have to worry

4    about that because paragraph 20 of the PSR is uncontested.  It

5    was not -- there was no informal objection, and there was no

6    formal objection to those facts.  He did those things.

7         And, you know, we all came to this profession and this

8    particular part of the profession because we esteem the trial

9    process.  When we try a case in front of a jury, we are part

10   of, you know, a continuum of judges and lawyers who came before

11   us for centuries developing that system, which is the the best

12   system we have for ascertaining truth, and we owe it to our

13   predecessors and to the people who come after us to defend that

14   system from attack.

15        And what the defendant did after this verdict was

16   disgraceful.  You were here, and the jury was here, and the

17   evidence proved beyond a reasonable doubt what he did.  And

18   unless the Court speaks clearly both with words and with a

19   number, what are the jurors who were here going to think?  What

20   are people going to think of the jury system?

21        THE COURT:  The Court has no plan to disrespect the

22   jury's decision, so that is clear.

23        MR. SEGAL:  So -- and how does a person who does

24   that --

25        THE COURT:  Mr. Keys does appear to respect the

1  appellate court.

2      MR. SEGAL:  He's saying factually he didn't do it,

3  Judge.  He said there's no question -- on October 12th, 2015,

4  there's no question I was targeted and falsely charged because

5  of my work as a journalist.  That's a lie.

6      THE COURT:  Well, so the record does not contain any

7  indication that Mr. Keys was targeted because of his

8  unwillingness to cooperate with federal agents.

9      MR. SEGAL:  In fact --

10     THE COURT:  You can take that issue --

11     MR. SEGAL:  In fact, it's the --

12     THE COURT:  That's not disputed.

13     MR. SEGAL:  When John Cauthen was in his apartment, he

14  offered to cooperate actually, and it's Government Exhibit 229.

15  What he said was his big concern was that the public not know

16  what he had done because it was an attack against a media

17  organization.

18     This is just a person who, for his own aggrandizement,

19  is willing to attack any institution that threatens him.

20  Right?  The press, broadcast media, print media, law

21  enforcement, the jury system.  It's such -- you talk about

22  mischief, but this wasn't mischief.  This was a narcissist -- a

23  rage driven by profound narcissism.  And it was -- so now I'm

24  going to get to -- in one article -- so let me talk about how

25  this was not just a prank.

1          We might be talking about a prank if this were

2     Sharpie's sentencing.  Right?  I think prank captures what

3     Sharpie did.  And you'd be looking at me asking what were you

4     guys doing?  Who cares enough to haul somebody into court

5     possibly from overseas, you know, for a 40-minute defacement

6     even if the victim -- to the victim it was the crime of the

7     century?  This wasn't that.

8          Sharpie's sentencing would be this guy got a password,

9     and he had all this power on the CMS, and all he did was he

10    changed a headline.  He wasn't an insider.  He didn't do it for

11    any sort of profoundly vindictive purpose.  He didn't act for a

12    week to crank up the loss and panic at his victim as much as

13    possible.  You know, there wasn't this sort of week long of

14    taunting e-mails saying we're in your system, and you can't do

15    anything about it.  IT can do -- IT security is helpless when a

16    determined insider decides to go rogue.  That was an actual

17    e-mail he sent to Mercer.

18         So that's why -- it's not just that it was a prank

19    because Sharpie was going to put up a whole set of front page

20    layouts.  It wasn't a prank because of that man's malicious

21    purpose to cause as much harm to as many people as possible and

22    to tolerate any level of collateral damage while doing it.

23    What did that old woman do to him?  He didn't care because he

24    was consumed by his own rage, and it was the only thing that

25    mattered in the world.

1    He said to John Cauthen in another excerpt that the

2    Court has seen, I was angry and hurt, and I wanted for there to

3    be consequences.  That's all he saw.  It was no -- this was not

4    a prank, it was a campaign of vengeance, and that's borne out

5    by the chronology.

6    So what the public has seen in this article -- on the

7    public side of the website, all they saw was 40 minutes of

8    defacement on the desktop site, and then it took a day for the

9    mobile site to update.  But what the Court knows and what Keys

10   knows, and tried to maximize, was that that actually was much

11   more.  It was much more damage because what he had done was not

12   just the edit, it was propagate these super user credentials

13   and instruct Anonymous on the user guide for the CMS, on how to

14   create other super user credentials that they could do whatever

15   they wanted with.  With this purpose, there is no -- there was

16   no limit to his purpose.  Right?

17   Remember the recording with John Cauthen when Keys said

18   these were the people who were doing the most damage.  That's

19   what he said.  He didn't say it was an environment of mischief.

20   Right?  This is after Keys had already engaged in the Cancer

21   Man e-mail campaign, saying we're in your network, here are

22   e-mails from your CMS, check and see if they're legit, you can

23   do nothing when a rogue insider is attacking you.

24   Then he goes to Anonymous to accomplish more.  That's

25   what the chronology establishes.  The only thing that limited

1  this crime was that Sharpie didn't want to hurt the L.A. Times

2  as much as Matthew Keys did.

3        So what happened after that?

4        You know, I was going over before what the IT response

5  was, and I'm not going to talk -- I'm not going to restate the

6  things that I said up until Dylan Kulesza.

7        So Armando Caro comes on to -- not Armando Caro.

8        Tim Rodriguez comes on, and he testified he started at

9  Tribune on January 3rd of 2011.  That was about three weeks

10  after the web defacement.  And the first instructions he gets

11  from Armando Caro is assess where the break-in happened, if the

12  break-in was continuing and if the perpetrator was still inside

13  Tribune's systems.  That's in the reporter's transcript at 413.

14        So in 2011, Tribune didn't know whether there were

15  other back doors, whether the CMS server logs themselves had

16  been altered.  So they couldn't even rely on the logs because

17  these credentials could have been used to delete log entries.

18  And they didn't know if the LDAP system, the authentication

19  system itself had been compromised.  That's in the transcript

20  at 414 to 418.

21        So the IT people had to review whether the attack had

22  changed archived news stories.  I mean, it's ironic --

23      (Interruption in proceedings.)

24        THE COURT:  That --

25        UNIDENTIFIED SPEAKER:  Sorry.  It was on silent.

1          THE COURT:  It doesn't matter whose phone goes off.

2          UNIDENTIFIED SPEAKER:  My apologies.

3          MR. SEGAL:  I'm working here.

4          UNIDENTIFIED SPEAKER:  Sorry.

5          MR. SEGAL:  So one of the other remarkable things that

6     I heard during the trial was that they didn't know if old news

7     stories had been changed.  Right?  So literally with these

8     credentials, Keys could have gone back to -- you know, it would

9     have been sort of Orwell's ministry of truth, you know, Oceania

10    has always been at war with Eastasia.  That could have

11    happened.

12         It's ironic that in the defendant's brief he's relying

13    on all these website citations to newspaper stories about the

14    cases that they want you to compare to.  But that's exactly the

15    principle that Keys undermined was the reliability of archived

16    web stories.  They didn't know.

17         And it's a testament to Tribune IT's belief and what

18    Mr. Gaines said that they engaged in this huge project to --

19    they didn't know if the archived news stories had changed, if

20    he had changed the information in the circulation system,

21    accessed payment systems or altered the systems or the plates

22    that printed to the actual newspapers.  So Rodriguez said that

23    he, and a number of other people who didn't testify, reviewed

24    what he said were literally hundreds of servers with thousands

25    of pages and archives and things of that nature.

1       So if the defendant thinks that this was a prank, if

2  that's the defense, then you need to impose a strong deterrent

3  sentence in order to promote respect for law and to show what

4  effect it actually had on the victim, because it wasn't a

5  prank.

6       Now --

7       THE COURT:  How much more time do you think you need?

8       MR. SEGAL:  Not too much.

9       In all of the cases that the defense -- the other thing

10  I think distinguishes this from I think every case that the

11  defense is asking you to compare this one to, an invitation

12  that you should decline because we don't have those PSRs --

13  this is the only one by somebody who was a site administrator

14  on the very network that he attacked.  That two-point

15  adjustment for abuse of position of private trust, that really

16  means something.

17       Now it's two levels on the guidelines, but it is a very

18  real distinction that shows -- that is there because people who

19  do that are more culpable.  And it's only two levels.  You

20  know, he could have been a -- you know, one of the cases that I

21  cited to was a ticket agent at an airline qualified for that

22  adjustment because of his network access.  But he was an

23  insider at a newspaper -- well, at a news station, and you

24  cannot overlook that, that he was -- that he was trusted by

25  that institution, steeped in its values.  And because of his

1    rage, he was willing to undermine all of those values to strike

2    back because he was hurt.  And you could say, oh, he was young,

3    he was a juvenile.  He was an adult, and he's accountable for

4    his adult decisions.

5         So also of those, he was the only one who we know

6    wanted to maximize the harm.  He wanted to maximize the harm,

7    the cost to Tribune to respond to what he did, and he had --

8    and because of his administrative responsibilities, he

9    absolutely knew what the response was going to be.

10        So those are the reasons, Your Honor, that I just --

11   this is not a case for a downward variance.  I appreciate that

12   the heart of Booker means that there should be -- that there's

13   a range of reasonable sentences.

14        Probation's recommendation --

15        THE COURT:  I think -- what's your recommendation given

16   the guideline range that the Court has calculated?

17        MR. SEGAL:  I asked for five in the papers.  I asked

18   for 60 months in the papers.  I think now with the Court's

19   range where it is, my recommendation is -- 37 to 46 is where we

20   are?

21        THE COURT:  Correct.

22        MR. SEGAL:  The middle of the range is 42.  It's -- 42

23   is my recommendation.

24        And I think that's --

25        THE COURT:  One thing you have not addressed, for

1    someone like Mr. Keys with no prior criminal history, assuming

2    some time -- I'm not making the final decision -- but why is 42

3    months sufficient but not greater than necessary?

4              MR. SEGAL:  Right.

5              THE COURT:  And, again, assume for sake of argument I'm

6    accepting your entitlement argument.  Why is not the low end of

7    the guidelines or even 24 months not sufficient to send the

8    message to Mr. Keys given his lack of any prior criminal

9    history and apparently no unlawful behavior while on pre-trial

10   release since April 23rd of 2013?

11             MR. SEGAL:  Okay.

12             THE COURT:  And he was summoned in.

13             MR. SEGAL:  He was.

14             THE COURT:  And he responded to the summons.

15             MR. SEGAL:  That was my decision to summons him, and

16   he's OR.  I mean, we have not gone overboard in this case, and

17   I think a mid-range recommendation doesn't do that now either.

18             I mean, the guideline range already accounts for

19   absence of criminal history.  Right?  Like, a criminal history

20   category I means that he has zero or one criminal history

21   point.

22             THE COURT:  And he has zero.  We --

23             MR. SEGAL:  He has zero.  With a misdemeanor, he would

24   have a I.  You know, so that range is kind of accommodated by

25   the criminal history category.

1      And, you know, I'm not going to tell you that 36 months

2      isn't unreasonable.  I concede that 36 months is a reasonable

3      sentence.  So -- and that's, you know, a bit below guidelines.

4      But I think that you should impose a number that I think that

5      would be -- somebody could view that as a reasonable sentence

6      and not one that is too forgiving or too kind of acknowledging

7      of his privilege.

8          But given the skill set that he had -- I mean, almost

9      everybody that I ask courts to sentence has no criminal history

10     because they're generally fraudsters and tax evaders.  And if

11     every time we said, well, he's never been in trouble before,

12     he's been on TSR, well, he's not living a life that would get

13     him in trouble.  You know, when the most important thing in his

14     life happened, when he was tested, what he decided to do was

15     kind of this criminal campaign of revenge, and that's his

16     character.

17         So then the final point on that is that, if you're

18     going to get deep into it, I think that although the Court is

19     not considering the cost of rebuilding the Green Links database

20     for $200,000 in its guidelines analysis, if you're not going to

21     think about it in the guidelines analysis, then you should

22     still fashion a sentence that acknowledges the e-mail campaign

23     and its kind of psychic cost to people and its monetary cost,

24     which he knew all about because he was involved in Fox 40

25     rewards.

1      So --

2          THE COURT:  All right.  I understand that argument.

3          MR. SEGAL:  That's the reason.  Thank you.

4          THE COURT:  All right.  Mr. Leiderman?

5          MR. LEIDERMAN:  Thank you, Your Honor.

6          THE COURT:  Can you address -- paragraph 20 was not

7      objected to.

8          MR. LEIDERMAN:  I don't have the report with me.

9          THE COURT:  That's the recounting of a tweet from the

10     courthouse, if not the courtroom, and comments to news

11     organizations following the verdict.

12         MR. LEIDERMAN:  I see.

13         THE COURT:  So is Mr. Segal right that I can rely on

14     that information?

15         MR. LEIDERMAN:  No, I don't think you can because it

16     lacks --

17         THE CLERK:  Sorry to interrupt.

18         MR. LEIDERMAN:  I don't think you can because it lacks

19     foundation with respect to the tweet.  There's no linkage of

20     that.

21         Second of all, there's no determination of what the

22     context was, and that's actually something I had intended to

23     address.  In fact, I'll address it right now.

24         THE COURT:  That's one question.  The other is on

25     Mr. Keys' relative youthfulness.

1          MR. LEIDERMAN:  Yes.

2          THE COURT:  I think at the time of the events, he was

3     about 23.

4          MR. LEIDERMAN:  22.

5          THE COURT:  22.  I think neuroscience would tell us the

6     brain isn't developed until sometime after that.  But if I can

7     consider the information set forth in paragraph 20, same kind

8     of juvenile response --

9          MR. LEIDERMAN:  Well --

10         THE COURT:  -- or sophomoric response to the verdict.

11         MR. LEIDERMAN:  Okay.  I'll start out there and then go

12    back.  I had this in the middle of my argument but let me begin

13    there, because it's all -- I think it all ties into one

14    particular issue.

15         So essentially, you know, I would agree to some extent

16    the government is correct when they state that Matthew has been

17    critical of the prosecution and the Department of Justice as a

18    whole, both in his case and again as a whole over the last

19    three years and particularly the last five months with respect

20    to his case.

21         He is also correct when he later says the public

22    confidence in the justice system is waning, but prosecutions

23    like this one cause a loss of public confidence.  It's not

24    about what Matthew may or may not have said on Twitter.

25         In the years since the case was brought, the Department

1    of Justice has been routinely criticized for its targeting of

2    journalists and its damage to the goodwill of journalistic

3    institutions.  It has, among other things, obtained phone

4    records of Associated Press journalists, pretended to be an

5    Associated Press returner, created fictitious Associated Press

6    slurries, threatened to jail a New York Times reporter as well

7    as a Fox News reporter, all in criminal investigations almost

8    all of which the government asserted were necessary in the

9    interest of national security.

10         The government's targeting of journalists --

11         THE COURT:  Just so it's clear, as you well know, but

12   just so everyone in the room understands, the Court itself has

13   nothing to do with charging decisions.

14         MR. LEIDERMAN:  I understand that.

15         THE COURT:  There are no preliminary examinations,

16   hardly ever.  And so what the Court does is, once the case is

17   filed, then ensures that there is a fair trial.

18         MR. LEIDERMAN:  I --

19         THE COURT:  Again, the charges --

20         MR. LEIDERMAN:  I understand that.  I have one more

21   statement to make, and then I'll wrap up the point, which is

22   that the government gives Matthew way too much credit for the

23   amount of influence he has in public discourse and dialogue

24   with respect to this issue.

25         The fact of the matter is this.  There are plenty of

1  critics out there.  Almost all of the critics have also been

2  highly critical of the government with respect to this

3  prosecution.  All of them say that the government overreached

4  and brought a case founded on bad law, which essentially

5  translates to this is B.S. in that context.

6          It is not an attack on a jury verdict.  It is not an

7  attack on anything.  It is a continuation of attacks on

8  journalists, and that is the point that is most salient here,

9  and that's the point that he expanded upon --

10          THE COURT:  So the fact of his being a journalist is

11  not disputed.

12          MR. LEIDERMAN:  No.

13          THE COURT:  But what allows me to conclude, based on

14  this record, that he was in some way targeted for that in a way

15  that affects the sentencing decision?

16          MR. LEIDERMAN:  Well, it's his -- well, you had asked

17  about the statement, the statement in paragraph 20.  And with

18  respect to paragraph 20 --

19          THE COURT:  There are multiple statements.

20          MR. LEIDERMAN:  Right.  And all of them have to do with

21  him being targeted because he's a journalist.  That was what

22  the statements were about, and that is his -- that is his

23  belief.

24          And it's not a -- it, you know, attributes it to

25  failing to turn over his notes to Agent Cauthen and being

raided a year and a couple months later.  You know, whether

he's right or wrong, that is his opinion.  And that statement

was the first statement he had ever made on the case.  And, you

know, maybe it's a well taken statement, maybe it's a

statement -- and I think it is a well taken statement in the --

in the public's fear.

And to say that there is only one interpretation of

that statement, and that is, you know, it's him acting out as

someone who is entitled, does not reflect the accuracy of the

statement.  There is a wide disparity in his behavior from when

he was 22 and when he is 29 now.  He just turned 29.

And, you know, his belief that this was a targeting of

journalists is something he's entitled to his opinion of, and

that doesn't attack the jury's verdict.  That doesn't -- you

know, that doesn't attack anything except the decision to bring

this prosecution.

THE COURT:  All right.  I understand that

characterization.

MR. LEIDERMAN:  Okay.

THE COURT:  I understand how that fits with what's

before the Court.  Whether or not I really -- cases are not

tried in the press in this courtroom, they are tried in this

courtroom.

MR. LEIDERMAN:  I --

THE COURT:  That's why I'm resisting taking a detour

1    into those reports and whatever the government might have said

2    in response.  So why don't you move on.

3         MR. LEIDERMAN:  Okay.  Well, if I can just say, you

4    know, the statement was made outside to the press and not with

5    respect to what the proceedings were in this courtroom.  And

6    with that, I'll move on.

7         So let me start here.

8         On September 20th, 2015, on the Primetime Emmys, the

9    host Andy Samberg, who is a comedian, you know, part of his

10   shtick there was to give away an active HBO Plus password that

11   people can use for their on-demand service.  It was essentially

12   so everyone could watch five seasons worth of Game of Thrones.

13   That's clearly trafficking in passwords, aiding and abetting

14   within the meaning of the CFAA.

15        Instead of, you know, running toward prosecution and

16   talking about what a serious breach this was of their system,

17   HBO turned it around and re-tweeted the password and used it as

18   a -- used it as good publicity for them.  And, you know, that's

19   something that could have been done here.  There were -- you

20   know, there were two ways to go about it and, you know, both

21   are equally insider works but, you know, it's a difference in

22   reaction.  And I think that leads us to what the CFAA is in

23   general.

24        Congress is regressive, not progressive.  And, in fact,

25   they're completely inactive these days, and it takes forever to

get anything done.  Though there have been proposals for

remediation of the CFAA, no action has been taken.  The CFAA is

a horse and buggy law in a jet plane society.  It does not

account for HTTP protocol.  It was written at a time when one

had to directly dial up with a modem and go straight to a

particular website.  It doesn't -- it doesn't account for the

modern Internet.

And, with that, the punishments do not fit the crime,

and this case is a prime example of it.  It's why, you know,

there's been an outcry to change the CFAA.  However unlikely,

Matthew can walk out of here with a 25-year sentence.

THE COURT:  But there are no mandatory minimums.

MR. LEIDERMAN:  There are no mandatory minimums, no, I

understand that.  But, you know --

THE COURT:  The floor is zero allowing you to --

MR. LEIDERMAN:  Well --

THE COURT:  -- argue for probation.

MR. LEIDERMAN:  And I'm getting there.  And that is, as

the Court is aware, what I will be arguing for.  But it's -- a

25-year top is staggering.

You know, the other thing is that the defendant needs

to go through trial to appeal what he feels is an unjust law,

what we feel is an unjust law.  You know, and the prosecution,

the government treats some things that we said in the

sentencing brief as things Matthew has said.  And I get that

1  he's the defendant but, of course, we wrote the brief, he

2  didn't write the brief and, you know, that bears some saying.

3      An apology is impossible at this point because it's

4  clear that we're going to appeal, and it's clear that we're

5  relying on the appeals court to either remand this with

6  instructions or to change the law.  At some point these cases

7  are going to start going to the Supreme Court and, quite

8  frankly, why not us?  So to argue that an apology is needed at

9  this time is not well taken because it can't be given.

10      THE COURT:  I understand that.

11      MR. LEIDERMAN:  Okay.  I want to talk to --

12      THE COURT:  The issue on the Computer Fraud and Abuse

13  Act is well preserved through --

14      MR. LEIDERMAN:  Yes.

15      THE COURT:  -- motion practice --

16      MR. LEIDERMAN:  Yes, Your Honor.

17      THE COURT:  -- and objections at trial.

18      MR. LEIDERMAN:  Yes.  Thank you.  But, I mean, it also

19  is important to know he cannot apologize knowing that --

20      THE COURT:  I understand.

21      MR. LEIDERMAN:  -- we're going to appeal so

22  significantly.

23      THE COURT:  I understand that.

24      MR. LEIDERMAN:  Okay.  In terms of restitution, we're

25  going to have that hearing, but I think it bears saying that,

1    you know, if it's a significant number, based upon what the PSR

2    said about Matthew's income, the fact that he was working for

3    Reuters, the biggest media company in the world, I believe, he

4    is never going to get a job like that again.  And they pay

5    lousy, they pay very lousy as you heard during trial.  He's

6    going to have this debt for the rest of his life.  And although

7    restitution isn't punitive, it's something that really should

8    be thought about in fashioning an appropriate sentence.

9         There was a claim at trial, and that wasn't in the

10   papers, that Matthew turned over credit card numbers, and it's

11   not supported by any evidence, and I do have evidence to the

12   contrary here.  If the Court is considering that, I'd like to

13   address the evidence.  If the Court isn't considering that,

14   that credit card numbers were accessed, I'd be happy to move

15   on.

16        THE COURT:  I'm not considering that.

17        MR. LEIDERMAN:  Thank you.

18        It also -- and we have proof of this, it's been stated

19   by the government repeatedly including today, that Matthew was

20   a network administrator, and such is not the case.  I have, you

21   know, the description of his job and all of that.  He was a

22   content provider, he was not a network administrator and, you

23   know, that bears saying.

24        THE COURT:  He was hired as a social media --

25        MR. LEIDERMAN:  Content provider, yes.

1          THE COURT:  -- wunderkind, and he had access to the

2    CMS.

3          MR. LEIDERMAN:  He had access to the CMS on that.

4          THE COURT:  A high level access to the CMS.

5          MR. LEIDERMAN:  Well, we dispute that.  I understand

6    what evidence came in at trial.  It wasn't -- I mean, I think

7    they're asserting that he upped his credentials to high level

8    access.  But, no, he, you know, asserts that that's incorrect,

9    and with that we'll move on.  Or we assert that that's

10   incorrect.

11         The line that they attribute, that the government

12   attributes to Matthew about an employee going rogue is from

13   WikiLeaks.  And at the time of WikiLeaks -- you remember most

14   of this happened while WikiLeaks and that press was going on.

15   An easy Google of that statement shows that it came straight

16   from WikiLeaks.

17         You know, some of the things that, you know, it bears

18   saying is that, for example, on his own, Matthew was able to

19   get the first ever interview with the Syrian Electronic Army

20   and got a lot of intel on them that was helpful to the United

21   States in terms of their positions, you know, identifications

22   and stuff like that.  It was also helpful to the world of

23   journalism.

24         You know, he's interviewed different people with, you

25   know, respect to high level -- high level activities.  He's

1    cited in Glenn Greenwald's book about Edward Snowden.  He's

2    been involved in a large news story about stingrays.

3            The Court is familiar with what stingrays are?

4            THE COURT:  Uh-huh.

5            MR. LEIDERMAN:  Okay.  Thank you.

6            So I think we've touched on this, but let me go back

7    over it.  Matthew was 22 years old in December 2010.  And the

8    Court correctly -- I was going to say it, but the Court

9    correctly noted the brain isn't fully developed.  Worse yet,

10   Matthew dropped out of college to pursue this, his first job.

11   The Court should look to his social history as noted in the

12   PSR.  He had a rough go of things.

13           You know, I don't know how much -- I know you read it.

14   I don't know how much want me to go into it.

15           THE COURT:  I read every word of it.

16           MR. LEIDERMAN:  Well, I really don't want to open up

17   his life, so I appreciate that.  But I think the Court

18   understands where I'm going with this in terms of, you know,

19   family relations and a rough childhood, and I'll leave it at

20   that.

21           So, you know, it's no surprise that what is clearly to

22   me untreated depression -- and I understand the Court asked for

23   more information about that recently.  I'm no psychiatrist, but

24   it seems -- you know, I've been doing criminal defense a long

25   time, and you can kind of see these things.

1          THE COURT:  Just to clarify, I did ask if the probation

2     officer had been able to reach the grandmother.

3          MR. LEIDERMAN:  And --

4          THE COURT:  And she said she had.

5          MR. LEIDERMAN:  Yes.

6          THE COURT:  And so that -- I did -- the probation

7     officer relayed --

8          MR. LEIDERMAN:  Okay.

9          THE COURT:  -- the gist of that discussion.

10          MR. LEIDERMAN:  Yeah.

11          THE COURT:  And composed terms of supervised release to

12     include a mental health treatment condition.

13          MR. LEIDERMAN:  I recognize that.  That's also a factor

14     that militates against a custodial sentence in terms of 3553 in

15     that, you know, he can be treated just, you know, with regular

16     medications in a regular setting.  People, you know, all the

17     time take anti-depressants, you know, whether they're in

18     custody or out, and that has no bearing.  And I don't disagree

19     with Ms. Modica that that, you know, is a solid idea.

20          But he was an immature 22, and that comes through in

21     just about everything that we see from five and a half years

22     ago.  But in it being his first job and it kind of, you know,

23     ending in the way it did with him quitting and then, you

24     know -- and then, you know, being out of work and kind of

25     without his college education, it's different now.  And, you

1  know, he's on his own as a journalist.  Grassfire folded.  He's

2  only able to be hired by startups.

3      The punishment for the transgressions of the past, they

4  were determined to be true by a jury, but they're no longer the

5  behaviors of the present.  And I think I explained that with

6  respect to the statements.  But it's not just three years on

7  pre-trial release without conditions that he's been perfect.

8  It's, you know, three and a half with respect to the search

9  warrant, and it's four plus with respect to the contact with

10 Agent Cauthen, and then it's five and a half with respect to

11 going back to -- just about five and a half going back to

12 December 2010.  And he's done nothing in that time.  And, you

13 know, we can presume that his -- in fact, that's something that

14 the Court can consider as part of mitigation that he has had no

15 incidents in that time.

16      So not only is his record clean, but in the interceding

17 five and a half years where he has grown up to a 29-year-old,

18 he's not done anything.  You know, he's not caused any

19 problems.  He's not -- you know, he's not bothered anyone.

20 He's not -- you know, the transgressions of a 22-year-old are

21 wildly different from the, you know, growing maturity of a

22 29-year-old.

23      Moreover, he's had a cloud hanging over his head -- oh,

24 one more thing I wanted to say.

25      Additionally he tested for a police records job

1    tomorrow -- I'm sorry -- yesterday.  So he might, you know, be

2    able to work at a police station should he be granted probation

3    in the records department.  And they're aware of this, this

4    case.

5           Moreover, his grandmother was a prison guard for many,

6    many years quite frankly militating toward -- perhaps if the

7    Court wants to impose some custodial sanction, that would

8    militate toward house arrest as opposed to prison.  What a

9    better situation than, you know, having Grandma there as an ex

10   prison guard.

11          You know, as I was about to say, moreover he's had a

12   cloud hanging over him for four years in his twenties.  One's

13   twenties are supposed to be one of the best times of their

14   lives clearly.  It was mine.  You know, I talked about it with

15   co-counsel, it was theirs.  And he feels as though he has lost

16   that.  You know, rightfully or wrongfully he has.  Or

17   deservedly or not deservedly he has.  And he now stands to

18   lose, you know, the rest of such an important decade plus, you

19   know, perhaps a chunk of his thirties.

20          You know, with regards to the e-mails he sent, as long

21   as we're talking about age, he would have no way of knowing

22   that he was sending an e-mail -- you know, presuming the facts

23   found by a jury which, you know, by the way, we're not -- we're

24   respecting but not conceding for purposes of appeal, you know,

25   he had no way of knowing who was on the other end of those if

1   he had sent those.

2           And, you know --

3           THE COURT:  But once he was told someone was elderly,

4   there were mocking statements.

5           MR. LEIDERMAN:  I don't recall that.

6           THE COURT:  About the Fox 40 --

7           MR. LEIDERMAN:  I'll accept the Court's representation.

8           There were a couple other -- you know, Mr. Segal

9   discussed some cases, and I wanted to do the same.

10          There is a case out of Pittsburgh --

11          THE COURT:  Are these in addition to what you've

12  already drawn --

13          MR. LEIDERMAN:  They are.  This is a fairly recent case

14  from the Western District of Pennsylvania in Pittsburgh.  It

15  was in front of Judge Cercone, and I have had a case in the

16  Western District, and I have appeared in front of Judge

17  Cercone.  And I will say, before reading this, he is a very

18  good judge, but he is no softy on sentencing at all.

19          THE COURT:  What do you plan to read?

20          MR. LEIDERMAN:  Yes.  This is the DOJ press release,

21  and it says:

22          According to information presented to the court on

23  November 28th, 2011 -- by the way, this is an Anonymous case --

24  Alyson Cunningham had been fired from a Pittsburgh law firm

25  referred to as VG.  In retaliation for the firing, Matthew

1  West, acting at Alyson and Jonathan Cunningham's encouragement,

2  logged onto VG's servers using an internal company password

3  provided to him by Alyson Cunningham over Facebook.  West

4  utilized a VPN proxy server located in Germany to use the

5  password to access VG's servers so as to shield his identity.

6  Once West accessed the server, he installed software on the

7  server that could be used to capture passwords of anyone on the

8  firm's network.

9      West got two years of probation.  The other two

10  received, the other two employees of the firm received three

11  years of straight probation.

12      Okay.  We had determined that credit cards weren't an

13  issue.

14      THE COURT:  Do you think you could wrap up in the next

15  few minutes?

16      MR. LEIDERMAN:  I have very little left, yes.

17      Just -- we have some e-mails from Jason Jedlinski where

18  he is agreeing with Mr. Segal that this is less than the crime

19  of the century, that this was, you know, not a great intrusion

20  in their -- their being the response team's view.

21      And I don't know whether those made it into evidence,

22  and I'm just summarizing them.  But if the Court wants to see

23  them, I do have them, and he states in three different e-mails

24  that this is --

25      THE COURT:  I don't think I need that.  I think the

1  parties agree it's not the crime of the century.

2          MR. LEIDERMAN:  Yes.

3          THE COURT:  It's a question of how serious it is and

4  what's the appropriate --

5          MR. LEIDERMAN:  Yes.  Moving on.

6          So there is the case from Pittsburgh.

7          This is a newer case out of San Francisco.  One of the

8  Chinese hackers who was taking military secrets and returning

9  them to -- not a hacker, but someone who was passing

10  information for a series of years related to Northrop Grumman,

11  I think the company is, and Boeing -- was taking military

12  secrets and passing them to China.  He received -- he just pled

13  guilty, and he received a conspiracy charge.  His top is 60

14  months.

15          So if we're going to give a Chinese hacker 60 months

16  over years of conduct with respect to a foreign government that

17  we're having, you know, sort of a cold cyber war with, a

18  sentence of 36 months is nowhere warranted.  You know, forget,

19  you know, insider trading or fraud cases or anything like that.

20  It's just this is more posit, and this is -- you know, would be

21  an outrageous disparity.

22          Then there was the celebrity hacker in Pennsylvania who

23  fished --

24          THE COURT:  Maybe this could be the last --

25          MR. LEIDERMAN:  It's the last.  It's the last.

1          THE COURT:  All right.

2          MR. LEIDERMAN:  He fished for years and got hundreds of

3    victims to give naked pictures, and he received a sentence of

4    18 months.

5          Based upon the cases I mentioned here today and the

6    comparative analysis done in both our papers and the attachment

7    thereto regarding all the other Anonymous prosecutions, there's

8    no need at this point to send any message.  That behavior has

9    ceased.  Future actions would be deterred by the series of

10   sentences that were handed out.

11         You know, other than Jerry Hammond, who received 10

12   years, no one else has received more than three.  The

13   three-year sentence was based upon conduct related to multiple

14   hackings of police database -- I think I said this before --

15   multiple hackings, like five different -- okay.

16         Of note, Fox 40, L.A. Times and Chicago Tribune still

17   use Matthew's work.  They cite his work in their articles

18   presently.  When he breaks a story, they use him and cite him.

19   You know, it militates against these statements in mitigation

20   to know that, if it's such a journalistic horror show, why use

21   the person behind it?  He is still a cited and trusted source

22   by these -- by these places.

23         One thing to consider is Steve Wozniak and Steve Jobs

24   from Apple, the creators, were caught by police with a blue

25   box, which is something that phone pranksters used to kind of

take a pay phone and make long distance calls for free.

Imagine how different the world would be if they were arrested,

prosecuted and given time for these, because that would happen

in today's day and age with the CFAA.  You know, I love my

iPhone, and I may not have it.

By the way, I use a VPN on my iPhone and my computer,

and everyone I know that wants to be secure in their data as a

lawyer does the same.  Journalists also using a VPN is common

because it's more secure with their sources.  It's ubiquitous.

The Syrian Electronic Army interview was conducted that way.

All Matthew has in this world is his ability to work.

He is a workaholic.  He barely sleeps.  He chases the news 24

hours a day to promote his site to make just that $1,700 a

month or whatever it is that he makes.  To imprison his body is

one thing, but to take away his journalism is to imprison his

soul, and I don't think the conduct here warrants that.

When everything is put together, this is a probation

case.  We've argued thoroughly in our papers, there's no

penological need, specific deterrence, general deterrence, any

of that, any of the factors to warrant more than a probation

sentence.  This isn't the case of the century.  Five years is

outrageous.  36 months is outrageous.  It is greater than

necessary to promote respect for the law, to achieve a balance

of the factors in 3553.

A sentence of probation like Matthew West or his

1    co-conspirators got is in line with this behavior.  That case

2    is almost a hundred percent on point, not like the cases

3    Mr. Segal mentioned.  And, quite frankly, probation will do

4    more than enough to ensure that this behavior won't occur

5    again.  And we know that because it hasn't occurred again

6    within five and a half years.

7              With respect, it's submitted, Your Honor.

8              THE COURT:  All right.  Just checking two things with

9    Mr. Segal.

10             You don't dispute the Syrian Electronic Army story and

11   the assistance that that might have provided?  That was in the

12   papers.

13             MR. SEGAL:  There is a lot of stuff that the defendant

14   submitted in his papers through the averments of counsel or

15   citations to websites that I've never heard of, and I have no

16   idea -- this is no insult to counsel, I just have no idea if

17   any of it was true.  It was not submitted to the probation

18   officer, and I don't think you should rely on it.

19             THE COURT:  And with respect to restitution, that's a

20   sentencing factor, the ability to pay restitution.  And so if

21   there is employment, a defendant can, to the extent not

22   incarcerated, make greater contributions toward restitution.

23             MR. SEGAL:  No, no, no.  You're not going to cut his

24   prison time so he can -- on the empty promise that he's going

25   to pay his victims back.  They don't care about the money.

1    They care about the security of their network.

2         I'll faint if this guy ever pays a dime in restitution.

3    He'll get a payment schedule, he'll pay $25 a month, it will be

4    meaningless.  What this case is about is punishment.

5         THE COURT:  I understand this case.  In terms of

6    applying that factor, the case law does develop that aspect.

7    But I understand your position.

8         Does Mr. Keys wish to address the Court?

9         MR. EKELAND:  No, Your Honor.

10        THE COURT:  All right.  I have everything I need to

11   exercise my sentencing authority, correct, Mr. Segal?

12        MR. SEGAL:  Yes, Your Honor.

13        THE COURT:  Mr. Ekeland?

14        MR. LEIDERMAN:  Yes, Your Honor, if I may --

15        THE COURT:  All right.

16        MR. EKELAND:  Yes, Your Honor.

17        THE COURT:  All right.

18        Well, I am prepared to exercise my sentencing

19   authority.  As we've discussed, the guideline range is 37 to 46

20   months.  That is the first step in the process.  In deciding

21   the appropriate sentence, the Court considers the sentencing

22   factors adopted by Congress.  Let me just run through those

23   summarizing aggravating and mitigating factors as they are

24   focused by those aspects of Section 3553.

25        So the first factor is the nature of the offense and

1    the defendant's characteristics.  The nature of the offense is

2    a serious -- is a serious one.  The jury convicted Mr. Keys on

3    three separate counts, conspiracy to transmit a program code,

4    command or information to a computer intending to cause damage;

5    transmitting a program, code, command or information to a

6    computer intending to cause damage; and attempting to transmit.

7    Three separate counts tied to the charges in the indictment.

8         And the damage actually caused was significant, the

9    intended damage was also significant, and I'll discuss that in

10   more detail as I pronounce sentence.

11        Mr. Keys' characteristics, as we've discussed over and

12   over again, zero criminal history.  He has been a contributing

13   member of society from a very young age.  Based on the

14   conviction, accepting the facts underlying the conviction, he

15   committed a gross error in judgment, and the Court does accept

16   at least in part the government's characterization as that

17   being driven by anger and pique.

18        In terms of respect for the law, except for the

19   activities underlying the conviction, it appears Mr. Keys has

20   been a fully compliant, law-abiding member of society.  No

21   prior criminal history and no subsequent criminal activity.  He

22   has responded to all of the summons, the summons issued by the

23   prosecutor.  He's appeared for all court appearances.  He's

24   been fully compliant with pre-trial release conditions.

25        Although the defense argued something along the lines

1    of post-offense rehab, I don't know if that's quite the right

2    way to frame what's presented to the Court.  There is no

3    indication except for the acts underlying the conviction that

4    Mr. Keys has committed any violation of law.

5            In terms of adequate deterrence, another sentencing

6    factor, having heard the arguments of the parties and

7    considered how they fit with the facts of this case, I do

8    believe, separate and apart from the serious disagreements the

9    defense has with the Computer Fraud and Abuse Act, that there

10   has been an understatement of Mr. Keys' responsibility for the

11   criminal activity both that he conducted and that he instigated

12   in others.

13           Has he learned his lesson?  That's a question the Court

14   is considering.  There's no indication that he is likely to

15   reoffend.  His current employer or immediate past employer did

16   send a letter saying he completely trusts him and trusts him

17   with all of the electronic access that he needs to have done

18   that job.  I do think that any time behind bars for Mr. Keys

19   would be significant.

20           We've touched on factors that the Court needs to think

21   about in terms of medical care or medical treatment.  I can

22   address those issues.  First, BOP is in a position to address

23   any issues such as depression during the time of any period of

24   incarceration, and the Court can address that issue also, and

25   also any anger management issues which may have flared up in

1   this case through terms of supervised release.

2          In terms of avoiding unwarranted disparities, I've

3   considered all of the cases the parties have thrown at the

4   Court, including those being brought to the Court's attention

5   today.  I think it is very hard to find a case on all fours,

6   but I'm aware of the range, anywhere from deferred prosecution

7   up to -- I mean, I think the maximum would be something in the

8   range of 60 months for this type of case.

9          Restitution is a critical factor.  Mr. Keys will be

10  ordered to pay restitution.  That amount will be determined at

11  the restitution hearing currently set for June.

12         So in applying those factors, the Court articulates the

13  reasons for the sentence in this way.

14         The First Amendment is a restraint on government

15  fundamentally, but it does signal the importance of a free

16  press, that fourth estate that Mr. Gaines mentioned more

17  generally.  And it's because of that press, which is free, that

18  allows an order free of censorship and properly deployed to

19  ensure an informed public, which is critical to our democracy.

20  I have no doubt that Mr. Keys understands this fully given his

21  dedication to journalism, which this court does not doubt.  He

22  himself has played a very important role in demonstrating the

23  constructive role that the press can play.

24         But also given his profession and given his

25  understanding of the way things should work in a properly

1    functioning democracy, Mr. Keys should and no doubt does

2    understand the power of words and the fundamental notion that

3    we take our debates public.  We fight words with words.  We

4    play fair.  And for the system to work, those words need to be

5    spoken directly, publicly, with the ability to be examined and

6    debated publicly.

7         They don't necessarily have to be properly attributed.

8    From the beginning of this country, pamphleteers were

9    publishing anonymous pamphlets taking extreme positions to the

10   street and from an unadulterated source, a single source.

11        So here when this court tries to make sense of what

12   Mr. Keys did, for what appears to be a limited period of time,

13   it was out of pique.  It was out of anger at his former

14   employer.  And I'll accept that he left by choice.  He

15   arrogated to himself on some level the decision to affect the

16   content of a journalistic publication.

17        In practical effect, at least with respect to looking

18   at the L.A. Times web page, the effect was relatively modest

19   and did not do much to actually damage the reputation of that

20   publication.  But the intent was to wreak further damage, which

21   could have had further consequences.

22        The same kind of access that Mr. Keys used in venting

23   his anger led him to use contact information for customers of

24   his former employer, hiding behind a screen.  And that use did

25   affect not only his former supervisor, former co-workers,

1    successor, but viewers, at least a not insignificant subset of

2    viewers. And the mask that Mr. Keys put on appeared to allow a

3    heartless character to utter lines that are really unbecoming

4    of a professional journalist, the kind of professional

5    journalist he holds himself out to be and that he is in most

6    respects in fact.

7         Ultimately, Mr. Keys' downfall appears to have come

8    from his trying to play his former employer and Anonymous off

9    of each other while holding out his public face as that

10   journalist. And for a while, he was getting away with it. But

11   the irony appears to be that, because of his journalism at

12   least in part, those superior hackers, the members of Anonymous

13   who he instigated, were displeased with his efforts to report.

14   At least that appears imbedded in some of the investigative

15   reports provided with the government's brief.

16        At bottom, in terms of what the convictions mean here,

17   Mr. Keys has been found -- and the Court accepts the jury's

18   verdict -- after a fair trial based on the law as it stands,

19   Mr. Keys did use CMS content to inflict harm and attempt

20   greater harm, harm in terms of temporary damage to the L.A.

21   Times front page on the web, planned damage to entire front

22   pages, harm to Fox 40's customers and to Fox 40 and the Tribune

23   Company in trying to fix the damage.

24        And there is no -- regardless of what Mr. Keys

25   believes, the Court has read carefully not just the PSR, but

1   all the briefing and the attachments to the briefing.  There is

2   nothing to suggest that a government agent was motivated by the

3   same kind of pique Mr. Keys felt towards his former employer to

4   punish him for failing to cooperate.

5       It is the case that Mr. Keys was younger at the time

6   that he engaged in these activities.  He's been fully compliant

7   with pre-trial services.  I do think really any meaningful

8   period of incarceration would send a very strong message to

9   Mr. Keys.

10      I have seriously considered whether the 37 months at

11  the bottom of the guidelines is a sufficient but not greater

12  than necessary sentence.  All things considered, I am prepared

13  to vary downward slightly, and that would be to a 24-month

14  sentence, but that is a period of incarceration to be followed

15  by a period of supervised release with supervision by his

16  grandmother.

17      Therefore, Matthew Keys, you are hereby committed to

18  the custody of the Bureau of Prisons to be imprisoned for a

19  term of 24 months as to Count One, 24 months as to each of

20  Counts Two and Three to run concurrently to each other and

21  Count One for a total term of 24 months.  You shall pay a

22  special assessment of $300.  That payment is due immediately.

23  We're deferring determination of restitution.

24      Would Mr. Keys waive his appearance at any restitution

25  hearing or does he wish to be present for restitution?  It's

1    entirely his call.

2        (Defense counsel conferring.)

3            MR. LEIDERMAN:  I'd prefer he was present.

4            THE COURT:  All right.  We'll note that he will be

5    present for that hearing.

6            Upon release from imprisonment, Mr. Keys, you shall be

7    placed on supervised release for a term of 24 months as to each

8    of Counts One, Two and Three, all to run concurrently to each

9    other for a total term of 24 months.  Within 72 hours of

10   release from the Bureau of Prisons' custody, you shall report

11   in person to the probation office in the district to which you

12   are released.  It's up to you to know that district.

13           While on supervised release, you shall not commit

14   another federal, state or local crime; shall not possess a

15   firearm, ammunition, destructive device or any other dangerous

16   weapon; and you shall not illegally possess controlled

17   substances.  You shall cooperate, as is required by law, in the

18   collection of DNA as directed by the probation officer.  And

19   you shall comply with the standard conditions recommended by

20   the U.S. Sentencing Commission.  I am adopting those.  Those

21   are conditions 1 through 13 attached to the report.

22           I understand that you did have a chance to read those.

23   That is correct, Mr. Leiderman, Mr. Keys did review the entire

24   PSR?

25           MR. LEIDERMAN:  Yes.

1          THE COURT:  I am suspending mandatory drug testing.

2     There's no indication that you pose any risk of future

3     substance abuse based on what I know.

4          I am imposing all of the special conditions recommended

5     by probation, conditions 1 through 8.  They're imposed as

6     written, again, with the understanding that you have reviewed

7     those.

8          Is there a request for a particular institution?

9          MR. LEIDERMAN:  Lompoc.

10         THE COURT:  I have the ability to recommend.  I

11    recommend that Mr. Keys be incarcerated at the federal

12    institution in Lompoc, California insofar as that

13    recommendation accords with security classification and space

14    availability.

15         I am prepared to grant voluntary surrender.  Any

16    objection to that for the record, Mr. Segal?

17         MR. SEGAL:  No, Your Honor.

18         THE COURT:  What would the date for voluntary surrender

19    be as of today, Ms. Schultz?

20         THE CLERK:  June 15, 2016.

21         THE COURT:  So, Mr. Keys, having been sentenced, you

22    shall surrender to the institution designated by the Bureau of

23    Prisons or, if no institution has been designated, to the U.S.

24    Marshal's facility in Sacramento before 2:00 p.m. -- you said

25    the 16th, Ms. Schultz?

1          THE CLERK:  One five, Your Honor.

2          THE COURT:  June 15th, 2016.

3          You are advised it is a criminal offense punishable by

4    a consecutive term to fail to surrender for service as just

5    ordered.  All of your conditions of pre-trial release remain in

6    effect pending surrender.  So that's clear, you should continue

7    to comply with all of those conditions.

8          If you do wish to appeal the sentence just imposed -- I

9    understand you do -- you must file a notice of appeal within 14

10   days of today's date.  If you require counsel on appeal and

11   cannot afford counsel, the Court will appoint counsel for you.

12         Is there anything else today?

13         MR. SEGAL:  No, Your Honor.  Thank you.

14         THE COURT:  Mr. Leiderman, Mr. Ekeland?

15         MR. LEIDERMAN:  May I just clarify?

16         I believe the Court imposed 24 months supervised

17   release, but I don't think -- okay.

18         THE COURT:  Yes.

19         MR. LEIDERMAN:  Thank you.

20         THE COURT:  I did.  With the conditions set forth in

21   the presentence report.  So it's 24 months incarceration

22   followed by 24 months supervised release.

23         MR. EKELAND:  Your Honor, just a procedural, technical

24   question on the notice of appeal.  We are having that

25   restitution hearing in the future.  Should we wait until after

1  that for us to file our notice of appeal?

2          THE COURT:  I'm not here to give legal advice, but I

3  don't think so.

4          MR. SEGAL:  My understanding is the judgment -- I mean,

5  I'll give you a little bit.  My understanding is the

6  judgment -- the Court is going to issue a judgment.  They have

7  to file a notice of appeal --

8          THE COURT:  And then the way restitution is affected --

9  that order is affected through an amended judgment and

10  commitment form.  So I issue the judgment and commitment form.

11  You'll see that within the next several days.

12          All right.  Thank you very much.

13          MR. SEGAL:  Thank you, Your Honor.

14          MR. EKELAND:  Thank you.

15          THE CLERK:  Court is in recess.

16              (Proceedings were concluded at 2:24 p.m.)

17                      ---o0o---

18

19

20

21

22

23

24

25

1     I certify that the foregoing is a correct transcript from

2   the record of proceedings in the above-entitled matter.

3

4
                                  /s/ Kathy L. Swinhart
5                                 KATHY L. SWINHART, CSR #10150

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25