McGREGOR W. SCOTT
United States Attorney
PAUL HEMESATH
GRANT B. RABENN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:13-CR-00082-KJM |
|---|---|
| Plaintiff, | GOVERNMENT'S REVOCATION HEARING BRIEF |
| v. | |
| MATTHEW KEYS, | DATE: October 29, 2020<br>TIME: 10:00 a.m.<br>COURT: Hon. Kimberly J. Mueller |
| Defendant. | |

## I.  INTRODUCTION

On April 27, 2020, the United States Probation Office filed a Petition For Warrant or Summons For Offender Under Supervision ("Petition") alleging that Matthew Keys violated his terms of supervised release by committing new law violations. Dkt. 185. At an admit/deny hearing, Keys denied the two charges, and he requested an evidentiary hearing. Dkt. 198. The Court set the hearing for October 29, 2020.

## II.  LEGAL STANDARDS

### A.  The Legal Standard Applicable to Revocation of Supervised Release

The court may revoke a term of supervised release if it finds "by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C.A. § 3583(e)(3). The Federal Rules of Evidence do not apply at a supervised release revocation proceeding. *United States v.*

*Walker*, 117 F.3d 417, 421 (9th Cir. 1997). While the offender has a due process right to confront witnesses, as codified in Rule 32.1(b)(2), that right does "'not rise to the level of similar rights at a criminal trial.'" *United States v. Martin*, 984 F.2d 308, 311 (9th Cir. 1993). The Ninth Circuit construes the due process confrontation right "as requiring that a supervised releasee receive a fair and meaningful opportunity to refute or impeach the evidence against him in order 'to assure that the finding of a [supervised release] violation will be based on verified facts.'" *Id.* at 310 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972)).

### B. Reliable hearsay is admissible at a supervised release revocation hearing

The Federal Rules of Evidence do not apply at a supervised release revocation proceeding. Fed. R. Evid. 1101(d). Revocation of supervised release is not a criminal prosecution for Sixth Amendment purposes because the violation "simply triggers the execution of the conditions of the original sentence." *United States v. Gavilanes-Ocaranza*, 2014 WL 6657029 (9th Cir. Nov. 25, 2014) (citing *United States v. Paskow*, 11 F.3d 873, 881 (9th Cir. 1993). The offender thus has no Sixth Amendment right to confront witnesses. While the offender has a due process right to confront witnesses, as codified in Rule 32.1(b)(2), that right does "'not rise to the level of similar rights at a criminal trial.'" *United States v. Martin*, 984 F.2d 308, 311 (9th Cir. 1993).

The Ninth Circuit construes the due process confrontation right "as requiring that a supervised releasee receive a fair and meaningful opportunity to refute or impeach the evidence against him in order 'to assure that the finding of a [supervised release] violation will be based on verified facts.'" *Martin*, 984 F.2d. at 310 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972)). Due process in the revocation context is flexible in its scope; "'it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure.'" *Martin*, 984 F.2d at 310 (quoting *Morrissey*, 408 U.S. at 481). The court balances the offender's right to confrontation against the government's "'good cause for denying it.'" *Id.* (quoting *United States v. Simmons*, 812 F.2d 561, 564 (9th Cir.1987)). "The balancing test is a workable means 'to assure that the finding of a [supervised release] violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the [releasee's] behavior.'" *Id.* at 314 (quoting *Morrissey*, 408 U.S. at 484).

In analyzing whether an offender's due process rights have been violated, the court looks to (1)

"the importance of the evidence to the court's ultimate finding," (2) the opportunity given the offender to refute the evidence, and (3) "the consequences of the court's finding." *Martin*, 984 F.2d at 311 (noting that this list is not exhaustive). The first factor "follows from the Supreme Court's emphasis on assuring that findings be based on 'verified facts.'" *Id.* at 311 (quoting *Morrissey*, 408 U.S. at 484). "The more significant particular evidence is to a finding, the more important it is that the releasee be given an opportunity to demonstrate that the proffered evidence does not reflect '"verified fact."' *Id*. The second factor – opportunity to refute evidence – includes not just confrontation and cross examination, but the ability to present contrary evidence. *Id*. at 312 (noting that the district court prohibited the offender from retesting the drug sample). The third factor – the consequences of the court's finding – include the finding's impact on the decision to revoke supervised release and the sentence imposed. *Id*. (noting that the court's finding triggered the application of a mandatory minimum).

In evaluating good cause for presenting hearsay evidence, the court looks to "'the difficulty and expense in procuring the witnesses'" and the "'traditional indicia of reliability borne by the evidence.'" *Martin*, 984 F.2d at 312 (quoting *Gagnon v. Scarpelli*, 411 U.S. 778, 783 n. 5 (1973) and *Simmons*, 812 F.2d at 564). Affidavits and other documentary evidence may constitute "'conventional substitutes,'" to live testimony. *Id.* at 313 (quoting *Gagnon*, 411 U.S. at 783 n. 5).

### III. STATEMENT OF THE CASE

The Petition alleges two violations of supervised release.

#### A. Charge 1 – New Law Violation

The Petition alleges in Charge One that Keys violated 18 U.S.C. §§ 1030(a)(5)(A), 1030(c)(4)(C) (knowingly causing the transmission of a program information code, or command, as a result of such conduct, causing damage without authorization to a protected computer). A violation of this statute would constitute a new violation of law—a felony—which is a violation of Key's Terms of Supervised Release. The elements of a violation of the statute are:

- First, the person knowingly caused the transmission of at least one program, code, command, or information to a computer;
- Second, as a result of the transmission, the person intentionally damaged a computer; and

- Third, the computer was used in or affected interstate or foreign commerce or communication.

Section § 1030(c)(4)(C) specifies that, after a conviction under the same section, the maximum penalty is 20 years of imprisonment, even without a meeting the $5,000 damage threshold otherwise applicable under the statute. The defendant was convicted of various counts under Section 1030 in this Court. Dkt. No. 155.

### B. Charge 2 – New Law Violation

The Petition alleges in Charge Two that Keys violated California Penal Code 502(c)(4) (unauthorized computer access). A violation of this statute would constitute a new violation of law—a felony.

The elements of the violation are:

- First, the person knowingly accessed a computer, and
- Second, the person, without permission added, altered, damaged, deleted, or destroyed any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

### C. Witnesses to testify in support of the Petition

The government intends to call between three and five witnesses (depending on the state of mutual stipulations) with knowledge of evidence showing Keys's violations: U.S. Probation Officer Miriam Olea, FBI Special Agent Heriberto Cadena, Comstock's Magazine employees Tom Couzens and Guinnevere King, and U.S. Probation forensic examiner Terry Ginsberg. Each witness will be subjected to cross examination. The remainder of the government's evidence includes the following:

1. Computer forensics reports;
2. Evidence from Keys's prior conviction for substantially similar conduct;
3. Phone weblogs showing the deletion of YouTube assets;
4. Keys's statement to United States Probation;
5. Summary charts.

The government's evidence in support of each charge is set out in further detail below.

### D. Summary of evidence in support of the Petition

At the hearing, the government expects that the evidence will show the following, in relation to

REVOCATION HEARING BRIEF

4

Charges One and Two.[1]

On or about February 13, 2020, an employee at Comstock's Magazine ("Comstock's") discovered that a password to Gmail account associated with the magazine's YouTube account—comstocksmag@gmail.com—no longer functioned. Shortly thereafter, the employee found that links associated with videos on the YouTube account were broken. Comstock's employees found that the videos had been deleted from the YouTube channel. The deleted content consisted of approximately 47 videos and the statistics associated with the channel (views, subscribers, etc.), although the exact number and titles are not known in their entirety. The channel was originally created in May of 2011 and had accumulated approximately 692 subscribers before it was deleted. Based on the timing of the last known access to the intact videos and the date that they were discovered deleted, the videos were erased sometime between February 7 and February 13, 2020.

In response, Comstock's supervisor Tom Couzens collected information about the Gmail account and the missing video clips. Based on data obtained from the digital accounts associated from the incident, Mr. Couzens suspected that Matthew Keys—whose employment at Comstock's had terminated on January 23, 2020—may have been responsible for the deleted videos. On February 9, 2020, a user had caused a new password to be created based on a two-step verification code that was sent to the email address: mkeys@comstocksmag.com.

Mr. Couzens also suspected that Keys was responsible for the deletion of the videos because on January 23, 2020, Keys separated from Comstock's under contentious circumstances. Furthermore, Couzens learned that Keys had been previously convicted of conspiracy to destroy data—which belonged to his then-employer—four years before.

As a result, Mr. Couzens contacted law enforcement, who opened an investigation concerning the deleted data.

Based on the Couzens's complaint and the screenshots from Key's computer, Probation Officer Miriam Olea and other law enforcement officials searched Keys's residence on March 11, 2020. Forensic Examiner Terry Ginsberg conducted a review of the devices seized from Keys. The data

---

[1] The federal and the state charges are sufficiently similar to one another that a single recitation will adequately summarize the government's case.

showed evidence consistent with Keys's access to and deletion of the YouTube channel at issue, including:

- Text messages from late January 2020 showing that Keys was angry with Comstock's;
- Web history from February 10, 2020, showing that:
    - Keys searched Google for the term "how to delete youtube channel"
    - Keys accessed YouTube content management pages and generated commands resulting in URLs containing the messages: "youtubeoptions/deletesuccess" and "myaccount.google.com/u/0/delete services.
- Other account access, cookie, and web history data corroborating the preceding.

Probation Officer Olea interviewed Keys about the videos. With this attorney in attendance, Keys denied the allegations. Through his attorney, Keys later submitted a written statement to United States Probation in which he:

- Accused Comstock's employees (including Mr. Couzens) of various misdeeds and disrespect;
- Accused Mr. Couzens of being responsible for the deletion of the YouTube channel;
- Denied having access or accessing the YouTube channel, or any other "Comstock's-related accounts";
- Denied deleting the YouTube channel;
- Accused Mr. Couzens of lying to the police;
- Offered a series of explanations and analysis as to why the person responsible could not be him.

Probation Officer Olea reviewed screenshots generated from monitoring software that was installed on Keys's computer as part of his Terms of Supervised Release. The report contained screenshots showing that—from his monitored computer—Keys accessed an iCloud account associated with Comstock's using the email address mkeys@comstocksmag.com through the use of a recovery QR code[2] around 2:34 a.m. on February 9, 2020. The screenshots also showed that Keys used the recovery

---

[2] A recovery QR code is often generated at the time that an email account is created, and it allows access to the account even if the password is lost.

code to access a Comstock's "news publisher" site (on iCloud) at about 2:38 a.m. that same morning.

The government will also introduce evidence from Matthew Keys's prior conviction—namely his familiarity with methods to circumvent computer security. This evidence will be offered to show that Keys had the knowledge to use artifacts that remained in his expired credentials (e.g., his password recovery codes) to re-enter prohibited accounts. The evidence will also show that Keys was motivated in both instances by the desire to exact revenge upon employers whom he perceived to be unfair. In both cases, Keys executed a plan to harm his former employers by accessing accounts to which he no longer had authorization to access. *See* Fed. R. Evid. 404(b) ("This evidence may be admissible [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

The government expects the evidence to show that Matthew Keys took deliberate and calculated steps to regain access to the Comstock's data and then deleted it. He then lied to the Probation Officer about his actions, which shows that he was conscious of his violations.

## IV. CONCLUSION

The evidence supports a finding that Keys violated the terms of supervised release as charged in Counts One and Two in the Petition.

Dated: October 26, 2020

McGREGOR W. SCOTT
United States Attorney

/s/ PAUL HEMESATH
PAUL HEMESATH
Assistant United States Attorney